# Exhibit 1

US008027326B2

(12) **United States Patent**
Shearer, III et al.

(10) **Patent No.:** **US 8,027,326 B2**
(45) **Date of Patent:** **Sep. 27, 2011**

(54) **METHOD AND SYSTEM FOR HIGH DATA RATE MULTI-CHANNEL WLAN ARCHITECTURE**

(75) Inventors: **Daniel D. Shearer, III**, Scottsdale, AZ (US); **Mark A. Webster**, Indian Harbour, FL (US)

(73) Assignee: **Xocyst Transfer AG L.L.C.**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1077 days.

(21) Appl. No.: **11/033,524**

(22) Filed: **Jan. 12, 2005**

(65) **Prior Publication Data**

US 2005/0180314 A1     Aug. 18, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/535,540, filed on Jan. 12, 2004.

(51) **Int. Cl.**
*H04J 1/00* (2006.01)

(52) **U.S. Cl.** .......................... **370/343**; 370/210; 370/480

(58) **Field of Classification Search** .................. 370/208, 370/343, 480

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,438,115 B1 * | 8/2002 | Mazur et al. .................. | 370/330 |
| 6,526,264 B2 | 2/2003 | Sugar et al. | |
| 6,728,517 B2 | 4/2004 | Sugar et al. | |
| 6,853,894 B1 | 2/2005 | Kolls | |
| 6,895,310 B1 | 5/2005 | Kolls | |
| 6,934,319 B2 | 8/2005 | Subramanian | |
| 6,973,309 B1 | 12/2005 | Rygula et al. | |
| 2001/0050926 A1 * | 12/2001 | Kumar ........................... | 370/529 |
| 2002/0034214 A1 * | 3/2002 | Okada et al. ................... | 375/147 |
| 2002/0080063 A1 * | 6/2002 | Bloebaum et al. ........ | 342/357.1 |
| 2002/0118702 A1 * | 8/2002 | Turner et al. ................... | 370/466 |
| 2004/0116075 A1 * | 6/2004 | Shoemake et al. ........... | 455/41.2 |
| 2004/0228269 A1 * | 11/2004 | Balakrishnan et al. ........ | 370/208 |
| 2005/0039208 A1 * | 2/2005 | Veeck et al. ................... | 725/76 |
| 2005/0073946 A1 * | 4/2005 | Dey et al. ...................... | 370/208 |
| 2005/0094592 A1 * | 5/2005 | Schmidt ........................ | 370/328 |
| 2005/0157682 A1 * | 7/2005 | Sandhu ......................... | 370/334 |
| 2005/0180314 A1 * | 8/2005 | Webster et al. .............. | 370/208 |
| 2006/0128302 A1 * | 6/2006 | van Rooyen et al. ....... | 455/3.06 |

OTHER PUBLICATIONS

Newton, "Newton's Telecom Dictionary", Nineteenth Edition, Mar. 2003, p. 367, CMP Books, San Francisco, CA.
IEEE Standard for Information Technology. ANSI/IEEE Std 802.11, 1999 Edition, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, 528 pages. Adopted by the ISO/IEC and redesignated as ISO/IEC 8802-11:1999(E).

* cited by examiner

*Primary Examiner* — Jianye Wu

(57) **ABSTRACT**

A method and system provides a way to achieve very high data rate expanded bandwidth (wide band) WLAN operations reusing existing single channel radio designs. The system provides a dual-channel form of operation for greater flexibility and performance across multiple platforms. Further, the system provides adaptive anti-aliasing techniques for eliminating aliasing due to adjacent channel waveform effects. These techniques mesh with existing systems cleanly.

**18 Claims, 53 Drawing Sheets**





DSRC
China
Japan
USA
Europe
Freq Band of Interest
Standard that Already has 10 MHz channels
5.825
5.925
5.725
5.850
4.900
5.000
5.150
5.250
5.030
5.091
5.150
5.350
5.725
5.85
Indoor 200 mW / Outdoor 1 W EIRP
Outdoor 4 W EIRP
Max peak Tx power
5.150
DFS & TPC
5.350
5.470
DFS & TPC
5.725
Indoor 200 mW EIRP
Outdoor 1W EIRP
Max mean Tx power
4.900 5.000 5.100 5.200 5.300 5.400 5.500 5.600 5.700 5.800 5.900 6.000
Freq./GHz
DFS: Dynamic Frequency Selection
TPC: Transmit Power Control

FIGURE 1

U.S. Patent

Sep. 27, 2011

Sheet 2 of 53

US 8,027,326 B2



FIGURE 2

U.S. Patent    Sep. 27, 2011    Sheet 3 of 53    US 8,027,326 B2



FIGURE 3

U.S. Patent

Sep. 27, 2011

Sheet 4 of 53

US 8,027,326 B2



FIGURE 4

U.S. Patent

Sep. 27, 2011

Sheet 5 of 53

US 8,027,326 B2

- **3 Spectrums**



FIGURE 5

U.S. Patent     Sep. 27, 2011     Sheet 6 of 53     US 8,027,326 B2



FIGURE 6

U.S. Patent          Sep. 27, 2011          Sheet 7 of 53          US 8,027,326 B2



FIGURE 7



FIGURE 8

U.S. Patent

Sep. 27, 2011

Sheet 8 of 53

US 8,027,326 B2

**Dual Chain Transmitter Spectrum With 6 dB PA Back-off**

**Spectral Mask**



FIGURE 9

**Single Chain Transmitter Spectrum With 6 dB PA Back-off**

**Spectral Mask Violated**



FIGURE 10

U.S. Patent

Sep. 27, 2011

Sheet 9 of 53

US 8,027,326 B2



FIGURE 11



FIGURE 12

U.S. Patent

Sep. 27, 2011

Sheet 10 of 53

US 8,027,326 B2

**Single Channel Mode**

freq

CH
2

↑

**Center Freq**

| **Std LPF's** | **Std ADC's** | **Std FFT** | **Sig1** |

CH 2

**Mode Switch**

**Dual Channel Mode**

freq

CH
2

CH
3

↑

**Center Freq**

| **Wide LPF's** | **Wide ADC's** | **Wide FFT** | **De-mux** | **Sig1** **Sig2** |

(CH 2 + CH 3)/2

FIGURE 13

U.S. Patent

Sep. 27, 2011

Sheet 11 of 53

US 8,027,326 B2

**2x Expanded BW Signal**



CH
1

CH
2

CH
3

freq



Sig1

Sig2

**Two Spatial
Mux'd Signals**



CH
1

CH
2

CH
3

freq



Sig1

Sig2

FIGURE 14

U.S. Patent

Sep. 27, 2011

Sheet 12 of 53

US 8,027,326 B2



**2x Expanded BW Signal**



Sig1

Sig2

**Existing design**

**Dual Channel
Protocol
Management**

FIGURE 15

U.S. Patent

Sep. 27, 2011

Sheet 13 of 53

US 8,027,326 B2



**Synth 1**

No synthesizer pop when
Switching between normal
And wide packets

CH 3

13 MHz    >=40 MHz

LPF's    DAC's    64pt IFFT    Tx FEQ    Sig1

+

LPF's    DAC's    64pt IFFT    Tx FEQ    Sig2

CH 2

**Synth 2**

13 MHz    >=40 MHz

FIGURE 16

FIGURE 17

U.S. Patent

Sep. 27, 2011

Sheet 14 of 53

US 8,027,326 B2

U.S. Patent

Sep. 27, 2011

Sheet 15 of 53

US 8,027,326 B2



FIGURE 18

U.S. Patent

Sep. 27, 2011

Sheet 16 of 53

US 8,027,326 B2



FIGURE 19

U.S. Patent

Sep. 27, 2011

Sheet 17 of 53

US 8,027,326 B2



FIGURE 20

U.S. Patent

Sep. 27, 2011

Sheet 18 of 53

US 8,027,326 B2



FIGURE 21



FIGURE 22



FIGURE 23

U.S. Patent

Sep. 27, 2011

Sheet 20 of 53

US 8,027,326 B2





**Distortion Created By PA Nonlinearities**

**802.11a Spectral Mask**

FIGURE 24



**802.11a Spectral Mask**

FIGURE 25

U.S. Patent

Sep. 27, 2011

Sheet 22 of 53

US 8,027,326 B2

**EVM =**
**Constellation Point Fuzziness**



Figure 121—Constellation error



FIGURE 26

U.S. Patent

Sep. 27, 2011

Sheet 23 of 53

US 8,027,326 B2



FIGURE 27



FIGURE 28



FIGURE 29

U.S. Patent

Sep. 27, 2011

Sheet 26 of 53

US 8,027,326 B2



FIGURE 30

U.S. Patent

Sep. 27, 2011

Sheet 27 of 53

US 8,027,326 B2



FIGURE 31



FIGURE 32

U.S. Patent

Sep. 27, 2011

Sheet 28 of 53

US 8,027,326 B2

U.S. Patent

Sep. 27, 2011

Sheet 29 of 53

US 8,027,326 B2



**Analysis Context**

**Tx Signal Generator**

**Rx Signal Generator**

FIGURE 33

U.S. Patent

Sep. 27, 2011

Sheet 30 of 53

US 8,027,326 B2



FIGURE 34

U.S. Patent

Sep. 27, 2011

Sheet 31 of 53

US 8,027,326 B2



FIGURE 35

9.2 MHz
20 MHz
CH3
CH2
Pwr Divide
6 order LPF's
ADC's
6 order LPF's
ADC's
For higher-rate ADC's (e.g., 40 MHz or 80 MHz) the aliasing weakens considerably (gets better)
Without alias canceling, Bit loading could be used based upon effective SNR.
Lower Signal & Distortion
Desired
Alias
$H_L(k)$
Aliased-component from upper signal
Sub-carrier Window roll-off From upper signal
dB
freq MHz
Upper Signal & Distortion
Desired
Alias
$H_U(k)$
Sub-carrier Window roll-off From upper signal
Aliased-component from upper signal
dB
freq MHz

FIGURE 36

U.S. Patent    Sep. 27, 2011    Sheet 33 of 53    US 8,027,326 B2



FIGURE 37

U.S. Patent

Sep. 27, 2011

Sheet 34 of 53

US 8,027,326 B2

# No frequency offset into 20 MHz ADC's



**Pre-ADC**          **Alias**          **Post-ADC**

**Upper signal
Subcarriers**

FIGURE 38

U.S. Patent

Sep. 27, 2011

Sheet 35 of 53

US 8,027,326 B2



FIGURE 39



FIGURE 40



FIGURE 41

U.S. Patent

Sep. 27, 2011

Sheet 38 of 53

US 8,027,326 B2



**Receive Side**

CH 3 + Freq Correct    9.2 MHz    20 MHz

Pwr Divide

6 order LPF's    ADC's

6 order LPF's    ADC's

CH 2 + Freq Correct    9.2 MHz    20 MHz

FIGURE 42

**Transmit Side**

Pre-Correct Freq    >=40 MHz    13 MHz    CH3

64pt IFFT    DAC's    LPF's    +

64pt IFFT    DAC's    LPF's    CH2

Pre-Correct Freq    >=40 MHz    13 MHz

FIGURE 43

U.S. Patent

Sep. 27, 2011

Sheet 39 of 53

US 8,027,326 B2



FIGURE 44

U.S. Patent

Sep. 27, 2011

Sheet 40 of 53

US 8,027,326 B2



FIGURE 45

U.S. Patent

Sep. 27, 2011

Sheet 41 of 53

US 8,027,326 B2



FIGURE 46

U.S. Patent

Sep. 27, 2011

Sheet 42 of 53

US 8,027,326 B2



**Tx Signal Generator**          **Rx Signal Generator**

FIGURE 47



FIGURE 48

U.S. Patent

Sep. 27, 2011

Sheet 43 of 53

US 8,027,326 B2

U.S. Patent

Sep. 27, 2011

Sheet 44 of 53

US 8,027,326 B2



FIGURE 49

U.S. Patent

Sep. 27, 2011

Sheet 45 of 53

US 8,027,326 B2



FIGURE 50

U.S. Patent    Sep. 27, 2011    Sheet 46 of 53    US 8,027,326 B2



FIGURE 51

U.S. Patent

Sep. 27, 2011

Sheet 47 of 53

US 8,027,326 B2



FIGURE 52

U.S. Patent    Sep. 27, 2011    Sheet 48 of 53    US 8,027,326 B2



**Desired Subcarrier Components**

**Undesired Alias Subcarrier Components**

FIGURE 53

U.S. Patent

Sep. 27, 2011

Sheet 49 of 53

US 8,027,326 B2



FIGURE 54

U.S. Patent

Sep. 27, 2011

Sheet 50 of 53

US 8,027,326 B2



FIGURE 55

U.S. Patent

Sep. 27, 2011

Sheet 51 of 53

US 8,027,326 B2



FIGURE 56



Lower Signal & Distortion
Desired
Alias
dB
freq MHz
Cleaned Lower Signal & Distortion
Desired
Alias
dB
freq MHz
+
+
-
*
Upper Signal & Distortion
Desired
Alias
dB
freq MHz
Freq Resp to Clean Lower using Upper
dB
freq

FIGURE 57

Upper Signal & Distortion
Desired
Alias
dB
freq MHz
+
+
-
*
Cleaned Upper Signal & Distortion
Desired
Alias
dB
freq MHz
Lower Signal & Distortion
Desired
Alias
dB
freq MHz
Freq Resp to Clean Upper using Lower
13 FIR Taps
dB
freq

FIGURE 58

US 8,027,326 B2

1

## METHOD AND SYSTEM FOR HIGH DATA RATE MULTI-CHANNEL WLAN ARCHITECTURE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to Provisional Application No. 60/535,540 filed on Jan. 12, 2004, and entitled "HIGH-DATA-RATE MULTI-CHANNEL ARCHITECTURE," which is incorporated herein by reference in its entirety.

### FIELD OF THE INVENTION

The present invention relates to wireless communications, and more particularly to a method and system for high data rate multi-channel wireless communications.

### BACKGROUND OF THE INVENTION

The invention and its various independent aspects, uses and objects are particularly useful and beneficial in the field of wireless communications, including in Wireless Local Area Networks (WLANs). Wireless devices often are deployed in environments that are electrically noisy and not optimal for wireless communications. For example, most homes and work places include many electronic devices resulting in an electronically noisy environment that may interfere with communications, such as microwave ovens, garage door openers, radios, television sets, computer systems, etc. The communication medium between wireless devices may change constantly. Most environments include multiple reflective surfaces and corners, creating multi-path noise. Also, movement of items or devices or the like, such as hands, bodies, jewelry, mouse pointers, etc. or activation of electronic devices, such as cooling fans or the like, affects the overall wireless communication path and potentially degrades wireless communication performance. Organizations, such as IEEE, have drafted and implemented standards to facilitate deployment of and enhance the efficacy of wireless communications systems and components.

The Institute of Electrical and Electronics Engineers, Inc. (IEEE) 802.11 specification falls under the IEEE 802 family of specifications for Local Area Network (LAN) technologies and is in essence a link layer that uses IEEE 802.2 Logical Link Control (LLC) encapsulation. The IEEE 802.11 specification includes a Media Access Control (MAC) sublayer on top of IEEE 802.11a/b/g physical layers (PHY) and represents a family of standards for wireless local area networks (WLAN) in the unlicensed ISM bands of 2.4 and 5 Gigahertz (GHz) bands. The IEEE 802.11b standard specifies a high rate direct sequence spread spectrum (HR/DSSS) with a chip rate of 11 Megahertz (MHz) and defines various data rates in the 2.4 GHz band, including data rates of 1, 2, 5.5 and 11 Megabits per second (Mbps). The IEEE 802.11a standard defines different and higher data rates of 6, 12, 18, 24, 36 and 54 Mbps in the 5 GHz band. It is noted that systems implemented according to the 802.11a and 802.11b standards are incompatible and will not work together. The IEEE 802.11g standard is, in essence, an extension to 802.11b that broadens data rates to 54 Mbps within the 2.4 GHz band using OFDM. Because of backward compatibility, an 802.11b radio card interfaces directly with an 802.11g access point (AP) (and vice versa) at 11 Mbps or lower depending on range.

A radio implemented in accordance with IEEE 802.11a or 802.11g standards employs Orthogonal Frequency Division Multiplexing (OFDM) modulation in which a stream of data

2

is transmitted over multiple small frequency sub-channels. In the OFDM configuration, multiple sub-carrier signals are incorporated within each OFDM symbol. Data is incorporated on each data tone using a selected modulation scheme, such as Binary Phase Shift Keying (BPSK), Quadrature PSK (QPSK), 16 Quadrature Amplitude Modulation (QAM), and/or 64 QAM. Each of the modulation schemes employs a corresponding constellation map with variable constellation points corresponding to a corresponding variable number of bits for achieving the various data rates. For example, BPSK is used for 6 or 9 Mbps, QPSK is used for 12 or 18 Mbps, 16 QAM is used for 24 or 36 Mbps, and 64 QAM is used for 48 or 54 Mbps. The encoding process employs a quadrature generation technique and provides in-phase (I) and quadrature (Q) signals on respective I and Q channels.

The IEEE 802.11a standard employs OFDM using 20 megahertz (MHz) wide channels in the 5 gigahertz (GHz) radio frequency (RF) band. Also, by way of example, wireless standards based on using OFDM with 10 MHz channels include the IEEE 802.11j standard for use in Japan and the DSRC standardization (Dedicated Short Range Communications). DSRC is a communications approach to allowing short range communications between vehicles and the roadside for a variety of purposes, such as electronic toll collection, intersection collision avoidance, transit or emergency vehicle signal priority, electronic parking payments, and commercial vehicle clearance and safety inspections. IEEE 802.11j (or, "11j") and DSRC have both described achieving OFDM with 10 MHz channels by using a clock at one-half the rate the 802.11a OFDM clock, or 10 MHz kernel sampling.

IEEE 802.11n standard has been proposed to provide higher throughput and calls for rates of at least 100 Mbits/second. This performance would be measured at the interface between the 802.11 MAC and higher layers, rather than at the PHY layer, to evaluate the net data rate experienced by the user. The net data rate in WLANs is significantly affected by sources of overhead within the 802.11 protocol, e.g., packet preambles, acknowledgements, contention windows and interframe-spacing. As a result, for example, although the 802.11b standard specifies a peak physical-layer rate of 11 Mbits/s, the typical net peak delivered is 5 to 6 Mbits/s. Also, although the 802.11a and 802.11g standards specify a peak PHY data rate of 54 Mbits/s, the typical net peak delivered is 20 to 24 Mbits/s. Accordingly, the 802.11n high throughput standard represents a four- to five-fold increase in actual throughput over that achievable with 802.11a/g. 802.11n specifies backward compatibility with legacy 802.11a/g deployments.

IEEE 802.11 networks typically consist of four physical components, including a distribution system, access points (APs), wireless media, and mobile stations comprising a basic service set (BSS). The mobile stations of a BSS are computing stations, such as notebook computers, PDAs, mobile telephones and other network devices, e.g., printers, facsimile machines, scanners, copiers, hubs, routers, switches, etc, that communicate with each other across one or more APs, which in turn communicate with each other over a distribution system. The communication between the BSS stations and the APs may form a basic service area (BSA) and occurs over a wireless medium. The communication between the APs and each other and the distribution system may be over a plurality of communications media, including wireless and wired media. The APs essentially perform a bridging function. Further, the distribution system may comprise or be in communication with a plurality of communications systems over a plurality of media. Also, within the realm of 802.11 is an independent BSS wherein mobile stations com-

US 8,027,326 B2

**3**

municate directly with one another. Accordingly, the smallest 802.11 network may consist of two mobile stations communicating with one another. Also, multiple BSSs may be linked together to form extended service sets (ESSs).

In operation, a short training period is typically included at the start of each transmission, including Short Syncs and two Long Syncs (LS) appended at the front end of each transmitted frame. The Long Syncs provide a reference amplitude and phase for each of the active subchannels. The Long Syncs may be averaged together to reduce the noise in the received reference values. After the Long Syncs have been received, each sub-channel received symbol is multiplied by the inverse of the reference amplitude and the conjugate of the reference phase (when expressed as a complex unit vector) for that sub-channel. This removes most of the amplitude and phase distortion that has occurred between the transmitter and the receiver.

Optimum soft-decisions should be Signal-to-Noise Ratio (SNR) weighted. The Long Syncs have been used to generate LLR (log likelihood ratio) weights to correctly weight soft-decisions going into an error-correcting decoder, such as a Viterbi decoder or the like. Given a flat noise floor, the use of LLR weights translates into a signal-power weighting. These LLR weights have been the signal power determined in each sub-channel of the Long Syncs. Using the LLR weights improves soft-decisions and reduces transmission errors.

A first problem is that the received reference values are usually degraded by noise, which is an unavoidable consequence of radio transmission. The reference information provided during the training phase (e.g., in the Long Syncs) is known by the receiver, so that a significant amount of this noise can be determined. A second problem, however, is that the signal amplitude and phase distortion may change over time, from the start of transmission of each frame to the end of the frame, making the initial channel estimate information obsolete and inaccurate towards the end of each frame. Both of these problems increase the probability of error when receiving a frame, due to both signal equalization errors and soft-decision weighting errors.

Legacy radios were designed with several assumptions. The channel was assumed to be relatively stable. The frames were bursty in nature and relatively short, so that it was assumed that the wireless channel did not significantly change over the duration of each frame. The initial channel estimate information determined at the start of each frame was assumed to be sufficiently accurate for that frame. Presently, however, there is a greater emphasis on mobility and/or accuracy. Mobility results in a changing environment that could result in significant changes in the channel during each frame. Even in a stable environment, improved accuracy can improve transmission speed and enable a higher transmission rate with a lower packet error rate (PER). It is desired to improve channel estimation to enable mobile application and/or higher transmission rates.

SUMMARY OF THE INVENTION

The present invention provides a way to achieve very high data rate expanded bandwidth (wide band) WLAN operations reusing existing single channel radio designs. The invention provides a dual-channel form of operation for greater flexibility and performance across multiple platforms. Further, the invention provides adaptive anti-aliasing techniques for eliminating aliasing due to adjacent channel waveform effects. The techniques of the invention mesh with existing systems cleanly.

**4**

The invention provides the following benefits, among others. One aspect of the invention minimizes required radio redesign by allowing greater use of legacy devices in 802.11 systems. Another aspect of the invention minimizes radio requirements associated with such systems, for example, for two parallel channels only 6th order filters are required as opposed to 10th order. Another aspect of the invention provides maximum radio flexibility, for example, Transmit (Tx)/Receive (Rx) in one or more channels to one or more radios. Another aspect of the invention defines a high data rate mode of operation to mesh cleanly with existing and future IEEE 802.11 systems, for example, to allow operation at both 2.4 GHz with 25 MHz channels and 5.8 GHz with 20 MHz channels.

An embodiment of the present invention is directed to concatenation of two (or more) channels using parallel transceivers at the transmit and/or receive end. Another embodiment of the present invention is directed to transmitting and/or receiving two channels to two different radios, or to a single radio thereby increasing data rate to the single radio. Another embodiment of the present invention is directed to being extensible to multiple channels. Another embodiment of the present invention is directed to an adaptive anti-aliasing function in the receiver. An embodiment of the present invention is directed to creating very high WLAN data rates that may not be supported by IEEE 802.11a/g. For example, the highest data rate for 802.11a/g is 54 Mbps. An exemplary technique may include channel concatenation, where multiple 802.11a/g channels are combined thereby expanding bandwidth and data rate. In general for conventional systems, a new radio must be designed that up-converts or down-converts the wide signal as a unit. An embodiment of the present invention decomposes the signal into separate pieces, up-converting and down-converting the pieces, whereby reuse of existing 802.11a/g radio designs by parallelizing the signals in frequency may be possible without implementing a new transceiver. An embodiment of the present invention provides for extensible channel concatenation, (e.g., one, two, three, . . . channels concatenated) and enables concurrent transmissions to two or more devices, such as radios. Further, an embodiment of the present invention meshes cleanly (friendly) with existing networks, such as 802.11a/g networks.

An exemplary embodiment provides a method and system for achieving very high data rate WLAN operations reusing existing single channel radio designs. A novel technique eliminates aliasing due to adjacent channel waveform. Legacy signals (e.g., one-channel) and wide signals (e.g., multiple-channels) may be arbitrarily interleaved in time (dynamic bandwidth switching) during packet transmission. For an exemplary technique of an embodiment of the present invention, no synthesizer frequency-popping exists when bandwidth switching between packets. Synthesizers may stay tuned to legacy channel centers for most or at all times. Further, synthesizer switches that can take 100 microseconds (μs) to settle may be avoided. Also, adaptive techniques are provided to mitigate the undesired impact of analog-to-digital converter (ADC) sample-rate aliasing. ADC sample-rate aliasing may occur when a wide signal is received by multiple, parallel receive chains designed to receive a single narrow signal. As described hereinbelow, for example, operations at 5 GHz are considered (e.g., 20 MHz legacy channel centers). In another example, operations at 2.4 GHz are considered (e.g., 25 MHz legacy channel centers).

The IEEE 802.11a/b/g WLAN standards currently exist. The new IEEE 802.11n standard (or variations thereof) is being discussed, developed and introduced. One goal of the

5

802.11n standard is to increase data rates and data throughput while being "friendly" to or meshing cleanly with existing 802.11 networks. An embodiment of the present invention increases the data rate using channel bonding with OFDM using two or more channels at once. Another aspect of the invention provides a technique for "filling the gap" between two signals with extra OFDM subcarriers, which is extensible to multiple channels. Yet another aspect of the invention provides a non-802.11n friendly alternative mode that provides higher data rates, but is not friendly to 802.11 because the spectral mask would be violated. As described hereinbelow, for example, 20 MHz channels centers with OFDM is described for 802.11a t 5.8 GHz and 25 MHz channels centers is described for 802.11g at 2.4 GHz.

BRIEF DESCRIPTION OF THE DRAWINGS

The benefits, features, and advantages of the present invention will become better understood with regard to the following description, and accompanying drawings in which:

FIG. **1** is a chart illustrating World-Wide 5 GHz frequency allocations;

FIG. **2** is a schematic diagram of existing IEEE 802.a/g WLAN with single channel stations;

FIG. **3** is a schematic diagram representing a possible IEEE 802.11n WLAN scenario with legacy 802.11a/g stations;

FIG. **4** is a chart illustrating three cases of frequency spectrums;

FIG. **5** is a chart illustrating three cases of frequency spectrums involving no synthesizer frequency popping;

FIG. **6** is a chart illustrating three cases of frequency spectrums involving an alternative mode of operation not defined in 802.11n;

FIG. **7** is a block diagram illustrating one physical implementation of a dual-chain wideband radio;

FIG. **8** is a block diagram illustrating an alternative single chain wideband radio implementation;

FIG. **9** is a graph representing a dual chain transmitter satisfying a spectral mask;

FIG. **10** is a graph representing a single chain transmitter violating a spectral mask;

FIG. **11** is a diagram illustrating a 6th order low pass filter on the receiver side in a dual chain wideband radio with a normal Q factor;

FIG. **12** is a diagram illustrating a 12th order low pass filter on the receiver side in a single chain wideband radio with a double Q factor;

FIG. **13** is a diagram illustrating a switching technique for single and dual chain modes in a bimodal wideband radio receiver;

FIG. **14** is a diagram illustrating spatial multiplexing in embodiment using MIMO technique;

FIG. **15** is a diagram illustrating a dual chain wideband radio receiver with reference to dual channel protocol management;

FIG. **16** is a schematic diagram of a dual-chain wideband transmitter;

FIG. **17** is a schematic diagram illustrating alternative pre-power amplifier summation and post-power amplifier summation in a dual-chain wideband transmitter;

FIG. **18** is a schematic diagram illustrating a post-antenna summation in a dual-chain wideband transmitter;

FIG. **19** is a graphical representation of signal components and processing involving two 802.11a signals with a two-channel transmitter;

6

FIG. **20** is a graphical representation of the signal components and processing of FIG. **19** with filled-gap OFDM technique;

FIG. **21** is a graphical representation of signal components and alternative processing with filled-gap OFDM with extra subcarriers;

FIG. **22** is a graphical representation of 802.11a subcarrier function associated with FIG. **19**;

FIG. **23** is a graphical illustration, respectively, of shaped subcarrier spectrum response and OFDM spectrum response in 802.11a example of FIG. **22**;

FIG. **24** illustrates power amplifier PSD distortion associated with operation of 802.11a single channel transmitters;

FIG. **25** is a series of graphs representing power amplifier input and output associated with one side of a wideband radio implementation;

FIG. **26** is a chart illustrating the error vector magnitude (EVM) associated with an exemplary 16 QAM 802.11a/g signal;

FIG. **27** illustrates both a post-power amplifier summation dual-chain wideband radio implementation and a post-antenna summation dual-chain wideband radio implementation;

FIG. **28** is a series of graphs representing power amplifier input and output associated with both sides of the post-power amplifier summation dual-chain wideband radio implementation of FIG. **27**;

FIG. **29** is a series of graphs representing power amplifier input and output associated with both sides of the post-power amplifier summation dual-chain wideband radio implementation of FIG. **27** characterized with filled-gap OFDM;

FIG. **30** is a pre-power amplifier summation dual-chain wideband radio implementation;

FIG. **31** is a series of graphs representing power amplifier input and output associated with sides of the pre-power amplifier summation dual-chain wideband radio implementation of FIG. **27**;

FIG. **32** is a series of graphs representing power amplifier input and output associated with both sides of the pre-power amplifier summation dual-chain wideband radio implementation of FIG. **27** characterized with filled-gap OFDM;

FIG. **33** is a schematic diagram of a dual-chain wideband transmitter and a dual-chain wideband receiver with signal separator;

FIG. **34** illustrates operation and response of a 6th order Butterworth low pass filter on half of the wideband receiver;

FIG. **35** illustrates operation and response of a 6th order Butterworth low pass filter on both the upper and lower halves of the wideband receiver;

FIG. **36** illustrates upper and lower signal outputs of the dual-chain wideband receiver of FIG. **35** without alias canceling;

FIG. **37** illustrates the EVM and effects of aliasing associated with the upper and lower signals of the wideband receiver of FIG. **35**;

FIG. **38** illustrates the effects of subcarriers in upper signal aliasing into the lower signal in a wideband receiver;

FIG. **39** illustrates the desired and undesired subcarrier components in a post-ADC lower signal and distortion in a wideband receiver resulting from aliasing with no frequency offset;

FIG. **40** is a series of graphs representing relationship between upper signal aliases to lower signal on 16 QAM subcarrier;

FIG. **41** illustrates coherent anti-aliasing technique applied to the upper and lower signal components of a dual-chain wideband receiver;

US 8,027,326 B2

7

FIG. **42** is a schematic diagram of a dual-chain wideband receiver with frequency correction;

FIG. **43** is a schematic diagram of a dual-chain wideband transmitter with frequency pre-correction;

FIG. **44** is a illustrates a feedback error, anti-aliasing technique applied to the upper and lower signal components of a dual-chain wideband receiver;

FIG. **45** is a illustrates a feedback technique for anti-aliasing in a dual-chain wideband receiver;

FIG. **46** illustrates a special training technique utilizing interleaved subcarriers and acquisition with long sync;

FIG. **47** illustrates fading issues associated with multiple antennae in receivers and transmitters in multi-channel communications;

FIG. **48** is a graphical representation of three cases of a dual channel communication;

FIG. **49** is a schematic diagram of an embodiment of a dual-chain wideband transmitter;

FIG. **50** is a graphical representation of signal components and processing involving two 802.11a signals with a two-channel transmitter given 25 MHz spacings;

FIG. **51** is a graphical representation of the signal components and processing of FIG. **50** with filled-gap OFDM technique characterized by 25 MHz spacing;

FIG. **52** illustrates coherent anti-aliasing technique applied to the upper and lower signal components of a dual-chain wideband receiver characterized by 25 MHz spacing;

FIG. **53** is a graphical representation of the relationship between desired and undesired subcarrier components associated with anti-aliasing;

FIG. **54** is a schematic diagram illustrating an implementation using frequency domain adaptive non-coherent anti-alias restore technique;

FIG. **55** is a schematic diagram illustrating an implementation using time domain adaptive anti-alias restore technique;

FIG. **56** is a schematic diagram illustrating an implementation using feedback for time domain anti-alias technique;

FIG. **57** is a graphical representation of upper and lower signal and distortion and a process for providing a clean lower signal in a 13 tap adaptive filter; and

FIG. **58** is a graphical representation of upper and lower signal and distortion and a process for providing a clean upper signal in a 13 tap adaptive filter.

DETAILED DESCRIPTION THE INVENTION

The following description is presented to enable one of ordinary skill in the art to make and use the present invention as provided within the context of a particular application and its requirements. Various modifications to the preferred embodiment will, however, be apparent to one of ordinary skill in the art, and the general principles defined herein may be applied to other embodiments. Therefore, the present invention is not intended to be limited to the particular embodiments shown and described herein, but is to be accorded the widest scope consistent with the principles and novel features herein disclosed.

The present invention provides a way to achieve very high data rate expanded bandwidth (wide band) WLAN operations reusing existing single channel radio designs. The invention provides a dual-channel form of operation for greater flexibility and performance across multiple platforms. Further, the invention provides adaptive anti-aliasing techniques for eliminating aliasing due to adjacent channel waveform effects. The techniques of the invention mesh with existing systems cleanly.

8

One embodiment of the invention simplifies WLAN radio redesign and opens network access to new systems by allowing greater use of legacy devices in 802.11 systems. The invention also minimizes radio requirements associated with such systems, for example, for two parallel channels only 6th order filters are required as opposed to 10th order or higher. The invention also provides for enhances radio flexibility, for example, enables Transmit (Tx)/Receive (Rx) in one or more channels to one or more radios/stations. Another aspect of the invention provides a high data rate mode of operation to mesh cleanly with existing and future IEEE 802.11 systems, for example, to allow operation at both 2.4 GHz with 25 MHz channels and 5.8 GHz with 20 MHz channels.

IEEE 802.11 specification includes 802.11a/b/g physical layer specifications/standards that operate on ISM bands of 2.4 and 5 Gigahertz (GHz) bands. IEEE 802.11a operates in the 5 GHz band using 20 megahertz (MHz) wide channels, and the 802.11g standard operates in the 2.4 GHz band using 25 megahertz (MHz) wide channels. FIG. **1** is a chart illustrating World-Wide 5 GHz frequency allocations, including those for 802.11a as discussed herein. The invention is not limited to these standards, which are referred to herein as examples of applications for the invention and to facilitate describing the inventive aspects. Other wireless standards, for example, based on OFDM include 802.11j standard for use in Japan and the DSRC standardization (Dedicated Short Range Communications), both of which use 10 MHz channels.

A radio configured in accordance with 802.11a or 802.11g standards employs Orthogonal Frequency Division Multiplexing (OFDM) modulation in which a stream of data is transmitted over multiple small frequency sub-channels. In the OFDM configuration, multiple sub-carrier signals are incorporated within each OFDM symbol. Data is incorporated on each data tone using a selected modulation scheme, such as Binary Phase Shift Keying (BPSK), Quadrature PSK (QPSK), 16 Quadrature Amplitude Modulation (QAM), and/or 64 QAM. Each of the modulation schemes employs a corresponding constellation map with variable constellation points corresponding to a corresponding variable number of bits for achieving the various data rates. For example, BPSK is used for 6 or 9 Mbps, QPSK is used for 12 or 18 Mbps, 16 QAM is used for 24 or 36 Mbps, and 64 QAM is used for 48 or 54 Mbps. The encoding process employs a quadrature generation technique and provides in-phase (I) and quadrature (Q) signals on respective I and Q channels.

IEEE 802.11n or any other standard calling for high data rates of 100 Mbits/second or more require more of a system than do the present standards. The net data rate in WLANs is significantly adversely affected by sources of overhead within the 802.11 protocol, e.g., packet preambles, acknowledgements, contention windows and interframe spacing. The 802.11n high throughput standard represents a four- to five-fold increase in actual throughput over that required by 802.11a/g and requires backward compatibility with legacy 802.11a/g deployments.

IEEE 802.11 networks typically consist of four physical components, including a distribution system, access points (APs), wireless media, and mobile stations comprising a basic service set (BSS). The mobile stations of a BSS are computing stations, such as notebook computers, PDAs, mobile telephones and other network devices, e.g., printers, facsimile machines, scanners, copiers, hubs, routers, switches, etc, that communicate with each other across one or more APs, which in turn communicate with each other over a distribution system. The communication between the BSS stations and the APs may form a basic service area (BSA) and occurs over a wireless medium. The communication between

US 8,027,326 B2

9

the APs and each other and the distribution system may be over a plurality of communications media, including wireless and wired media. The APs essentially perform a bridging function. Further, the distribution system may comprise or be in communication with a plurality of communications systems over a plurality of media. Also, within the realm of 802.11 is an independent BSS wherein mobile stations communicate directly with one another. Accordingly, the smallest 802.11 network may consist of two mobile stations communicating with one another. Also, multiple BSSs may be linked together to form extended service sets (ESSs).

FIG. **2** is a schematic diagram of an existing IEEE 802.a/g WLAN, referenced generally at **100**, having two BSSs, BSS**1** **102** and BSS**2** **104**, comprised of 802.11a/g type mobile stations or radios **106**. As shown in FIG. **1**, two separate channels, for instance one each for 802.11a and 802.11g, are involved in the communications system **100**. The stations of BSS**1** **102** communicate via AP **108** and the stations of BSS**2** **104** communicate via AP **110**.

The present invention has many independent aspects, uses and advantages. One embodiment of the invention provides a high data rate multi-channel architecture for WLAN systems. Given the widespread adoption of WLAN technology in home, office, shops, travel, hotel, leisure and so many other areas of life, there has been an increasing effort to meet the demand and squeeze as much efficiency out of the available bandwidth. To this end, organizations such as IEEE have developed and adopted a series of standards to facilitate the adoption and increase the beneficial use of WLAN technologies for the benefit of all. One aspect of this development is the adoption of several competing and complimentary standards, e.g., 802.11a, 802.11b, and 802.11g, with more on the way, e.g., 802.11n. These standards have advantages and disadvantages depending upon particular applications, uses, environments, traffic, etc. As a result, devices associated with the 802.11 family of standards are varied and it has become increasingly critical that newly adopted standards and the use of existing legacy equipment accommodate new and legacy equipment alike. To this end, one aspect of the present invention provides a method and system for achieving the required high data rate of newer standards, e.g., 802.11n, while preserving the utility and access of legacy systems, e.g., 802.11a/g equipment.

FIG. **3** is a schematic diagram representing one exemplary 802.11n WLAN system **300** having legacy 802.11a/g stations **302** operating at channel **2** and **304** operating at channel **3**. In addition, system **300** includes a networked device **306**, in this case a HDTV audio/video (AV) station (STA), such as a flat panel display for viewing television shows and the like, which includes a dual-chain wideband receiver comprising a first radio or receiver station **308** and a second radio or receiver station **310**, respectively operating on channels **2** and **3**. Multi-channel AV access point (AP) **312** is a dual-chain wideband transmitter comprising individual radios/transmitters **314** and **316**. The AP **312** manages communications with and between the stations **302**, **304** and **310** and may permit single channel or multi-channel communication or a combination thereof and may prioritize access to the WLAN depending upon need and set-up, instructions, etc. Processes for accomplishing this and the particular implementation of the components are described in more detail below.

One goal of the 802.11n standard is to increase data rates and data throughput while being "friendly" to or meshing cleanly with existing 802.11 networks. An embodiment of the present invention increases the data rate using channel bonding with OFDM using two or more channels at once. Another aspect of the invention provides a technique for "filling the

10

gap" between two signals with extra OFDM subcarriers, which is extensible to multiple channels. Yet another aspect of the invention provides a non-802.11n friendly alternative mode that provides higher data rates, but is not friendly to 802.11 because the spectral mask would be violated. As described hereinbelow, for example, 20 MHz channels centers with OFDM is described for 802.11a t 5.8 GHz and 25 MHz channels centers is described for 802.11g at 2.4 GHz.

FIG. **4** is a chart illustrating three exemplary cases of frequency spectrums for discussing the inventive approaches. Case **1** shows two 802.11a channels, CH **2** and CH **3**, the center frequencies of which are separated by 20 MHz. Case **2** illustrates the inventive filed-gap OFDM approach and shows the use of additional subcarriers to "fill the gap" between the two single channels **2** and **3** to permit greater information over the bandwidth. Case **3** is an alternative approach whereby additional subcarriers are implemented on the outer boundaries of the channels CH **2** and CH **3**.

FIG. **5** is a chart illustrating three cases, similar to those of FIG. **4**, of frequency spectrums involving no synthesizer frequency popping. In this case, the radio may dynamically switch to tune to center frequency in wideband operation or to the upper or lower side frequency in legacy systems. In this manner, the invention allows for dynamic switching between wide and narrow filters. On the transmit side, the device could transmit in wideband at the center frequency or tune the synthesizer to one of the narrower signals for legacy system transmission.

Dual-channel (or dual-chain) without gap fill transmits at a rate of 108 Mbps ((96 sc)/(48 sc)=2× data rate factor; 2 times 48 data subcarriers (sc)=96 data sc). In one example, using the OFDM filled-gap technique yields an increase in data rate to 121.5 Mbps ((108 sc)/(48 sc)=2.25× data rate yielding 121.5 Mbps, where 64(left channel)+64(right channel)−6(left guard)−5(right guard)−4(pilot tones)−5(lost to DC offsets)=108 data subcarriers). This is only one example, for instance the number of slots lost to DC offsets may range from 1 to 5 subcarriers.

The alternative mode is not presently defined in 802.11n, as the interference level will be a little higher than accepted. An advantage to this embodiment is that the alternative mode will still allow fast switching between normal 802.11a and the alternative mode packet using 802.11g-like mechanisms. The use of the additional subcarriers can increase the data rate to 135 Mbps, for example, dual channel with all gaps filled yields a data rate of 135 Mbps ((120 sc)/(48 sc)=2.5× times 54 Mbps=135 Mbps; 64+64−4−4=120 data subcarriers).

An embodiment of the present invention is directed to increasing the data rate even more without increase the analog and mixed signal requirements. This may be accomplished by using a full spectral synthesis capability of the Inverse Fast Fourier Transform/Fast Fourier Transform (IFFT/FFT). All the subcarriers (sc) across two channels for carrying data except four pilot tones and two DC notches at legacy locations may be utilized. This is like the alternative mode filled-gap OFDM presented in the preceding section, where the gaps on the outer edges are also filled. As a result, the guard band on each end is filled with data. This increases Adjacent Channel Interference (ACI) beyond 802.11a levels.

FIG. **6** is a chart illustrating three cases of frequency spectrums involving three channels and includes an alternative mode of operation not presently defined in 802.11n. In this example, channel CH **1** may be reserved for legacy radio stations with legacy AP, e.g., existing 802.11a/g equipment. Channels CH **2** and CH **3** may be reserved for new wideband radio equipment, such as for 802.11n and alternative modes. This arrangement would permit a bi-modal manner of opera-

US 8,027,326 B2

**11**

tion. In one manner, the AP could instruct the legacy equipment to go to "sleep mode" for some period, say 100 milliseconds, during which time operation would be reserved for wideband use, and vice-versa. As shown in the filled-gap OFDM of case **2**, the gap is filled between the two "normal" OFDM channels thereby "stacking" the channels to allow greater information in the bandwidth. An increase in the number of subcarriers will lead to an increase in computational/chip requirements. For each subcarrier there is an equalization that must occur (correction of distortion of amplitude and/or phase). Accordingly, extra FEQ (Frequency domain equalizer) taps may be needed, extra soft-decisions may need to be generated, and Viterbi (error correction) decoder may run faster. OFDM is comprised of discrete tones, one aspect of the present invention creates a super OFDM with approximately twice the number of tones. The exact number for 802.11n purposes is not set.

Another aspect of the invention involves the implementation of the invention, for example in either wide single channel (wideband) or two legacy (dual channel or chain) channels. This applies to both the transmit and the receive side. More particularly, the high data rate multi-channel arrangement of the invention may be achieved, for example, by 1) using two existing legacy circuits or radios in parallel (2-64 point FFTs that process two halves of the signal (1-upper and 1-lower)) or 2) by using a single circuit that processes the whole signal (1-128 point FFT).

An embodiment of the present invention is directed to concatenation of two (or more) channels using parallel transceivers at the transmit and/or receive end. Another embodiment of the present invention is directed to transmitting and/or receiving two channels to two different radios, or to a single radio thereby increasing data rate to the single radio. Another embodiment of the present invention is directed to being extensible to multiple channels. Another embodiment of the present invention is directed to an adaptive anti-aliasing function in the receiver. An embodiment of the present invention is directed to creating very high WLAN data rates that may not be supported by IEEE 802.11a/g. For example, the highest data rate for 802.11a/g is 54 Mbps. An exemplary technique may include channel concatenation, where multiple 802.11a/g channels are combined thereby expanding bandwidth and data rate. In general for conventional systems, a new radio must be designed that up-converts or down-converts the wide signal as a unit. An embodiment of the present invention decomposes the signal into separate pieces, up-converting and down-converting the pieces, whereby reuse of existing 802.11a/g radio designs by parallelizing the signals in frequency may be possible without implementing a new transceiver. An embodiment of the present invention provides for extensible channel concatenation, (e.g., one, two, three, . . . channels concatenated) and enables concurrent transmissions to two or more devices, such as radios. Further, an embodiment of the present invention meshes cleanly (friendly) with existing networks, such as 802.11a/g networks.

In design, the radio for a wide signal built from two narrower signals is a wide-channel transceiver (wideband radio) with faster Digital-to-Analog Converters (DAC's) and Analog-to-Digital Converters (ADC's) (e.g., 40 MHz wide instead of 20 MHz wide). However, there are problems associated with this implementation. There are cost and power increases for 40 MHz channels. Presently, only 20 MHz channel doubling is practical with current technology. More than two channels becomes very complex. 25 MHz channel doubling at 2.4 GHz is likewise complex, e.g., 50 MHz front-end is more difficult than 40 MHz. More Power Amplifier (PA)

**12**

back-off is required to meet the spectral mask, especially at 2.4 GHz. ADCs and DACs must run much faster. Receive filter requirements are very difficult. Filter must be wide and have very sharp skirts to reject adjacent channel interference. There may be synthesizer retuning issues. An embodiment of the present invention is directed to avoiding the 40 MHz transceiver (XCVR) by reusing existing legacy 20 MHz XCVRs.

FIG. **7** is a block diagram illustrating one physical implementation of a dual-chain wideband radio having low pass filters (LPFs), ADCs, and Fast Fourier Transforms (FFTs). This is a "multiple radios in a box" implementation. In this implementation multi-chain radios each with a single bandwidth and multiple FFTs, multiple converters, and multiple analog filters are used. This is a form of "channel bonding" and may use common synthesizer and automatic gain control (AGC) with receiving.

In the alternative, FIG. **8** is a block diagram illustrating an alternative single-chain wideband radio implementation. In this implementation a single radio is used to handle multichannel capability and involves a single chain with programmable bandwidth (BW) expansion, high speed converters, BW switched filters and large FFT (e.g., 128 point) are required. The example of FIG. **8** includes a wide LPF, a wide ADC, a wide FFT and a demultiplexer (De-mux).

FIG. **9** is a graph representing a dual chain transmitter satisfying a spectral mask and FIG. **10** is a graph representing a single chain transmitter violating a spectral mask.

FIGS. **11** and **12** illustrate Analog Transmit (Tx)/Receive (Rx) filters. FIG. **11** is a diagram illustrating a 6th order low pass filter on the receiver side in a dual-chain wideband radio with normal Q factor. FIG. **12** is a diagram illustrating a 12th order low pass filter, for example, on the receiver side in a single chain wideband radio with a double Q factor representing a relatively steep skirt ("brick wall"). Q factor must meet 802.11a/g spectral mask and adjacent channel interference (ACI) requirements. Single channel receiver doubles Tx/Rx filter Q requirements, where Q refers to how narrow a filter is (higher Q is more narrow with steeper skirts). Dual channel receiver uses single channel filters with normal Q factor.

FIG. **13** is a diagram illustrating a switching technique for single and dual chain modes in a bimodal wideband radio receiver. Synthesizer (and BW) switching issue, it may be desirable to have an 802.11g-like switching operation. Single channel receiver must jump synthesizer frequency when switching between wide and normal packets if tight receive filtering is needed (sensitivity and interference robustness). Dual channel implementation does not jump frequency but requires two synthesizer LO (Local Oscillator) frequencies, though. In this bi-modal implementation, the radio alternates between forms of operation and may assign durations of operation/inoperation allowed for the dual modes.

FIG. **14** is a diagram illustrating spatial multiplexing in embodiment using multiple input multiple output (MIMO) technique. Multi-channel radio architecture may be implemented for spatial multiplexing. Hence, implementing bandwidth expansion using the multi-channel radio architecture makes a system more 11n ready. With the penalty of added expense and power draw. In the top example shown, the bandwidth is doubled with two signals in parallel. In the second example, bottom, two signals are spatially multiplexed and sit on top of each other. This implementation would require the removal of interference between the two signals.

FIG. **15** is a diagram illustrating a dual chain wideband radio receiver with reference to dual channel protocol management. This relates to PEER related concerns, i.e., the

US 8,027,326 B2

13

amount of power draw a device requires to operate. This is especially critical in battery powered devices. Using the dual-chain implementation of two radios ganged together in parallel requires greater power that would a single chain custom circuit. In some applications power may not be a prime concern, e.g., where the devices are connected to AC power sources (flat panel displays). The implementation may use a dual channel protocol management function, e.g., cell phone towers that consume two channels in parallel must provide for increased protocol for multiple channels. For instance, a tower may instruct all legacy radios to go to channel **2** and stay off of channel **3** to prevent collision and increase efficiency.

FIG. **16** is a schematic diagram of a dual-chain wideband transmitter including LPFs, DACs, IFFTs, and Tx FEQs. In this implementation, an expanded Bandwidth (BW) signal may be decomposed into sub-components. The radio frequency-concatenates two Tx signal components at RF (Radio Frequency). A synthesizer may be used to realize the exact two LO offsets needed related to subcarrier spacing (both can have same part per million (PPM) error). Use expanded bandwidth station (XBW STA) (e.g., 40 MHz instead of 20 MHz) to phase-align two chains thru feedback packet, if desirable. This is not viewed as necessary. Use Tx DAC sample rate that allows clean digital synthesis of two Tx signal components with simple reconstruction low pass filter (LPF's).

FIGS. **17** through **32** are illustrative of various particular implementations of dual-chain configurations and there attendant design considerations and do not require detailed discussion herein. FIG. **17** is a schematic diagram illustrating alternative pre-power amplifier summation and post-power amplifier summation in a dual-chain wideband transmitter. FIG. **18** is a schematic diagram illustrating a post-antenna summation in a dual-chain wideband transmitter. FIG. **19** is a graphical representation of signal components and processing involving two 802.11a signals with a two-channel transmitter. FIG. **20** is a graphical representation of the signal components and processing of FIG. **19** with filled-gap OFDM technique. FIG. **21** is a graphical representation of signal components and alternative processing with filled-gap OFDM with extra subcarriers. FIG. **22** is a graphical representation of 802.11a subcarrier function associated with FIG. **19**. FIG. **23** is a graphical illustration, respectively, of shaped subcarrier spectrum response and OFDM spectrum response in 802.11a example of FIG. **22**. FIG. **24** illustrates power amplifier PSD distortion associated with operation of 802.11a single channel transmitters. FIG. **25** is a series of graphs representing power amplifier input and output associated with one side of a wideband radio implementation. FIG. **26** is a chart illustrating the error vector magnitude (EVM) associated with an exemplary 16 QAM 802.11a/g signal. FIG. **27** illustrates both a post-power amplifier summation dual-chain wideband radio implementation and a post-antenna summation dual-chain wideband radio implementation. FIG. **28** is a series of graphs representing power amplifier input and output associated with both sides of the post-power amplifier summation dual-chain wideband radio implementation of FIG. **27**. FIG. **29** is a series of graphs representing power amplifier input and output associated with both sides of the post-power amplifier summation dual-chain wideband radio implementation of FIG. **27** characterized with filled-gap OFDM. FIG. **30** is a pre-power amplifier summation dual-chain wideband radio implementation. FIG. **31** is a series of graphs representing power amplifier input and output associated with sides of the pre-power amplifier summation dual-chain wideband radio implementation of FIG. **27**. FIG. **32** is a series of graphs representing power amplifier

14

input and output associated with both sides of the pre-power amplifier summation dual-chain wideband radio implementation of FIG. **27** characterized with filled-gap OFDM.

The following discussion concerns the aspect of the invention concerning adaptive anti-aliasing techniques and implementations. One novel technique eliminates aliasing due to adjacent channel waveform. Legacy signals (e.g., one-channel) and wide signals (e.g., multiple-channels) may be arbitrarily interleaved in time (dynamic bandwidth switching) during packet transmission. For an exemplary technique of an embodiment of the present invention, no synthesizer frequency-popping exists when bandwidth switching between packets. Synthesizers may stay tuned to legacy channel centers for most or at all times. Further, synthesizer switches that can take 100 microseconds (μs) to settle may be avoided. Also, adaptive techniques are provided to mitigate the undesired impact of analog-to-digital converter (ADC) sample-rate aliasing. ADC sample-rate aliasing may occur when a wide signal is received by multiple, parallel receive chains designed to receive a single narrow signal. As described hereinbelow, for example, operations at 5 GHz are considered (e.g., 20 MHz legacy channel centers). In another example, operations at 2.4 GHz are considered (e.g., 25 MHz legacy channel centers).

This aspect of the invention concerns filter leakage associated with a radio processing one half of a signal while receiving both halves of the signal. The invention allows for the interfering half of the signal to be applied to subtract, or otherwise cross-compare, with the non-interfering half of the signal to remove the distortion associated with filter leakage. The magnitude of the interference is a function of the front end filter. For example, the subcarrier from the upper half of the signal may come through (leak) when processing the lower half of the signal by the FFT. This is a receiver side design issue associated with wideband radio using the dual-chain implementation, i.e., when two radios are used in parallel to separately process half of the wideband signal (lower and upper halves). This is especially an issue when using the filled-gap technique. If not using the filled-gap mode, then the aliasing is greatly reduced. The anti-aliasing techniques apply equally to the alternative mode operation.

FIG. **33** is a schematic diagram of a dual-chain wideband transmitter and a dual-chain wideband receiver with signal separator. FIG. **34** illustrates operation and response of a 6th order Butterworth low pass filter on half of the wideband receiver. FIG. **35** illustrates operation and response of a 6th order Butterworth low pass filter on both the upper and lower halves of the wideband receiver in filled-gap operation, where lower signal is represented as $H_L(k)$ and the upper signal is represented by $H_U(k)$ at the filter output. FIG. **36** illustrates upper and lower signal outputs at the ADCs of the dual-chain wideband receiver of FIG. **35**. FIG. **37** illustrates the EVM and effects of aliasing associated with the upper and lower signals at the outputs of the ADCs of the wideband receiver of FIG. **35**. FIG. **38** illustrates the effects of subcarriers in upper signal aliasing into the lower signal in a wideband receiver.

FIG. **39** illustrates the desired and undesired subcarrier components in a post-ADC lower signal and distortion in a wideband receiver resulting from aliasing with no frequency offset. FIG. **40** is a series of graphs representing the relationship between upper signal aliases to lower signal on 16 QAM subcarrier. With no offset the problem is elegant, use upper signal FFT to cancel aliasing on the lower signal.

FIG. **41** illustrates coherent anti-aliasing technique applied to the upper and lower signal components of a dual-chain wideband receiver and the responses associated therewith.

US 8,027,326 B2

15                                                    16

In one exemplary radio embodiment, the frequency offsets are eliminated at the ADCs to pre-correct frequency offsets prior to Rx ADC'S. There are a number of acceptable methods having advantages and disadvantages, for example, Frac-N (or other type of frequency synthesizer capable of high resolution frequency steps) may be used on transmit or receive (100 microseconds settling time (can't be switched often)). In another example, Tx digital pre-correction may be implemented in RTL (e.g., a language used to describe digital circuits). In another example, STA (or AP (e.g., access point in a WLAN cell)) may be implemented to do all the work on downlink from AP to STA (D/L) & uplink from STA to AP (U/L). For transmit pre-correction, PPM offset may be communicated for time tracking to a receiver. Frequency offset elimination management may be simplified if wide packets are sent using D/L. For example, if normal channel packets for ACK are used, then no U/L pre-correction is needed.

FIG. 42 is a schematic diagram of a dual-chain wideband receiver with frequency correction and FIG. 43 is a schematic diagram of a dual-chain wideband transmitter with frequency pre-correction.

FIG. 44 is a illustrates a feedback error, anti-aliasing technique applied to the upper and lower signal components of a dual-chain wideband receiver. Various adaptation techniques may be implemented. For example, the least-mean-squared (LMS) technique may be used.

FIG. 45 is a illustrates a feedback technique for anti-aliasing in a dual-chain wideband receiver. Any signal common to both Rx chains may be used to train/track anti-alias—desired packets, noise. If dominate noise is common to both chains, the noise can be used to adapt the taps. An embodiment of the present invention may involve defining a special signal that may be used to train (e.g., bootstrap) the anti-alias canceling circuit. This waveform could be used in various formats, including: in a preamble; a broadcast beacon from AP; embedded periodically in signal. A suggested waveform may involve using an interleaved subcarrier pattern relative to upper/lower signals. This may be extensible to more than two channels. The pattern is flexible. A key concept: do not transmit concurrently both the upper and lower subcarriers with the same index number. Special training process involving interleaved subcarriers may be as follows. Step 1: Lower signal transmits using odd numbered subcarriers; Upper signal transmits using even numbered subcarriers. Step 2: Lower signal transmits using even numbered subcarriers; Upper signal transmits using odd numbered subcarriers. Receiver may measure the alias this way. FIG. 46 illustrates a special training technique utilizing interleaved subcarriers and acquisition with long sync.

In design, there are issues with sending or receiving upper/lower signals with separate antennae and 20 MHz ADCs. Exemplary situation: the transmitter has one antenna. Signal components multipath fade in unison where upper and lower signals tend to have same (or similar) power level. More complex exemplary situation, the transmitter has two antennas and/or, the receiver has two antennas. Signal components multipath fade independent where upper and lower channels may differ in power level. Impact of harder exemplary situation: dynamic range requirements increase for receiver's anti-aliasing circuit and preamble training pattern is more essential.

FIG. 47 illustrates fading issues associated with multiple antennae in receivers and transmitters in multi-channel communications. In one exemplary radio set-up either Tx has separate antennas or Rx has separate antennas or both. Problem is that fading is "independent" between Tx-Rx pairs, power difference between upper and lower signal (ACI), and

spectrum difference between upper and lower signal. Tend to lose aliasing visibility with 20 MHz ADC's. Different for every AP-STA radio-pair. Exemplary solution is to use XBW only on D/L to STA.

Frequency offset may be avoided in this architecture. With no frequency offset, each upper signal subcarrier aliases exactly on a corresponding lower signal subcarrier. An interference subcarrier may leak onto exactly one desired subcarrier. Exploits the orthogonal nature of OFDM. With frequency offset, alias subcarriers fall "in-between" desired subcarriers. One interference subcarriers may leak onto many desired subcarriers. There are many interference subcarriers. All the previous comments/architectures apply to the alternative mode. More subcarriers may be used to increase the data rate. All the Tx and Rx techniques carry over directly. Also, works for 25 MHz channel spacing at 2.4 GHz and other specifics.

Now considering OFDM with 25 MHz channel centers (situation with 802.11g, 2.4 GHz). FIG. 48 is a graphical representation of three cases of a dual channel communication. Considering transmitters with 25 MHz channels, FIG. 49 is a schematic diagram of an embodiment of a dual-chain wideband transmitter. A difference is the synthesizer tunes to 25 MHz spacings. The synthesizer may tune to other spacings as well. No synthesizer pop when switching between normal and wide packets.

FIG. 50 is a graphical representation of signal components and processing involving two 802.11a signals with a two-channel transmitter given 25 MHz spacings. FIG. 51 is a graphical representation of the signal components and processing of FIG. 50 with filled-gap OFDM technique characterized by 25 MHz spacing;

Now considering filled-gap OFDM, 25 MHz channel spacing no frequency offset into receive ADCs output. Relatively little change, anti-aliasing circuits work on aliasing about 25 MHz centers, circuit applies and hardware is essentially the same for the 20 MHz case. FIG. 52 illustrates coherent anti-aliasing technique applied to the upper and lower signal components of a dual-chain wideband receiver characterized by 25 MHz spacing.

Other channel center frequencies and ADC rates are possible for this Frequency Domain Anti-Alias Technique to Work. For instance, the earlier sections have shown how to cancel aliasing distortion in the frequency domain (at FFT outputs) caused by using multiple narrow receivers on a wide OFDM signal. No frequency offset was assumed at ADC input, 20 MHz channel centers for 5.8 GHz was mentioned with 20 MHz ADC and 25 MHz channel centers for 2.4 GHz was mentioned with 20 MHz ADC. In these cases, the out-of-subband alias OFDM subcarriers fall directly on top of in-subband desired OFDM subcarriers. Other channel centers and ADC rates are possible with this technique, any channel-center/ADC pair works if: the out-of-subband alias OFDM subcarriers fall directly on top of in-subband desired OFDM subcarriers. For example, the 802.11 OFDM subcarriers are spaced by 20 MHz/64=312.5 KHz. Hence, any ADC rate which is an integer multiple of 312.5 KHz has this property. Any channel center that is an integer multiple of 312.5 KHz is possible. Note, 20 MHz and 25 MHz channel centers satisfy this requirement (as discussed in earlier sections).

FIG. 53 is a graphical representation of the relationship between desired and undesired subcarrier components associated with anti-aliasing.

Now with reference to non-coherent adaptive techniques. This explores other techniques for canceling aliasing. In particular, alias canceling is considered in the time domain (Pre-FFT, above post-FFT was considered) and with frequency

US 8,027,326 B2

**17**

offset present or not. FIG. **54** is a schematic diagram illustrating an implementation using frequency domain adaptive non-coherent anti-alias restore technique. FIG. **55** is a schematic diagram illustrating an implementation using time domain adaptive anti-alias restore technique. Ostensibly no analog receive changes compared to what is currently used and Rx FEQ combine overlap. Signal separator needed for alias components. FIG. **56** is a schematic diagram illustrating an implementation using feedback for time domain anti-alias technique. Any signal common to both Rx chains can be used to train/track anti-alias—desired packets, noise. FIG. **57** is a graphical representation of upper and lower signal and distortion and a process for providing a clean lower signal in a 13 tap adaptive filter. FIG. **58** is a graphical representation of upper and lower signal and distortion and a process for providing a clean upper signal in a 13 tap adaptive filter.

Although a system and method according to the present invention has been described in connection with various embodiments, it is not intended to be limited to the specific form set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the invention.

The invention claimed is:

**1**. A method for increasing data rates and data throughput in a network, the method comprising:

selecting at least a first channel and a second channel, wherein the first channel and the second channel are adjacent without any other channels therebetween, wherein the first channel and the second channel each have a plurality of data subcarriers, wherein the data subcarriers of the first channel and the data subcarriers of the second channel are separated by a frequency gap corresponding to one or more guard bands between the first and second channels;

partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform;

combining the first channel and the second channel using channel bonding with orthogonal frequency division multiplexing (OFDM); and

transmitting data subcarriers occupying the first channel, the second channel, and the frequency gap in parallel to a receiver.

**2**. The method of claim **1**, wherein combining the first channel and the second channel further comprises: interleaving one of a legacy signal and a wide signal during packet transmission.

**3**. The method of claim **2**, wherein the legacy signal comprises one channel and the wide signal comprises multiple channels.

**4**. The method of claim **1**, wherein transmitting the first channel and the second channel comprises transmitting to multiple radios.

**5**. The method of claim **1**, wherein transmitting the first channel and the second channel comprises transmitting to a single radio.

**6**. The method of claim **1**, wherein the method is extensible to additional channels.

**7**. The method of claim **1**, further comprising eliminating synthesizer frequency popping during bandwidth switching between packets.

**18**

**8**. The method of claim **1** further comprising:

tuning a first synthesizer to the first channel, wherein the first synthesizer remains tuned to the first channel during mode switching; and

tuning a second synthesizer to the second channel, wherein the second synthesizer remains tuned to the second channel during mode switching.

**9**. The method of claim **1**, wherein channel bonding comprises use of common synthesizers.

**10**. The method of claim **1**, wherein the plurality of data subcarriers are OFDM subcarriers.

**11**. The method of claim **10**, further comprising:

identifying additional points in a Fast Fourier Transform (FFT) across the first and second channels; and

adding subcarriers to the additional points.

**12**. The method of claim **11**, wherein the additional points exist on an outer edge of the first channel or the second channel.

**13**. The method of claim **12**, wherein a guard band on each edge is filled with data.

**14**. The method of claim **1**, further comprising utilizing an anti-aliasing technique at a receiver.

**15**. The method of claim **14**, wherein the anti-aliasing technique comprises passing upper signals and lower signals through a first filter and a second filter.

**16**. A system for increasing data rates and data throughput in a network, the system comprising:

means for selecting at least a first channel and a second channel, wherein the first channel is adjacent to the second channel without any other channels therebetween, wherein the first channel comprises a first plurality of subcarriers, and the second channel comprises a second plurality of subcarriers, wherein a frequency gap corresponding to at least one guard band between the first channel and the second channel separates the first plurality of subcarriers from the second plurality of subcarriers;

means for partially filling the frequency gap with at least one additional subcarrier such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform;

means for combining the first channel and the second channel using channel bonding with orthogonal frequency division multiplexing (OFDM); and

means for transmitting the first plurality of subcarriers, the second plurality of subcarriers, and the at least one additional subcarrier in parallel to a receiver.

**17**. The system of claim **16**, wherein the frequency gap is tilled with a portion of the first plurality of subcarriers and a portion of the second plurality of subcarriers.

**18**. A non-transitory computer-readable medium having instructions stored thereon, the instructions comprising:

instructions to select at least a first channel and a second channel, wherein the first channel and the second channel are adjacent without any other channels therebetween, wherein the first channel and the second channel each have a plurality of data subcarriers, wherein the data subcarriers of the first channel and the data subcarriers of the second channel are separated by a frequency gap corresponding to one or more guard bands between the first and second channels;

instructions to partially fill the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled

US 8,027,326 B2

**19**

with at least some of the one or more data subcarriers using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform;

instructions to combine the first channel and the second channel using channel bonding with orthogonal frequency division multiplexing (OFDM); and

**20**

instructions to transmit data subcarriers occupying the first channel, the second channel, and the frequency gap in parallel to a receiver.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,027,326 B2                                    Page 1 of 1
APPLICATION NO.     : 11/033524
DATED               : September 27, 2011
INVENTOR(S)         : Shearer, III et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

    Column 18, line 51, in Claim 17, delete "tilled" and insert -- filled --.

Signed and Sealed this
Fifteenth Day of May, 2012

David J. Kappos
*Director of the United States Patent and Trademark Office*

# **Exhibit 2**

US007324469B2

(12) **United States Patent**

Wilson

(10) Patent No.: **US 7,324,469 B2**

(45) Date of Patent: **Jan. 29, 2008**

(54) **SATELLITE DISTRIBUTED HIGH SPEED INTERNET ACCESS**

(75) Inventor: **W. David Wilson**, Cincinnati, OH (US)

(73) Assignee: **System Services, Inc.**, Batavia, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 563 days.

(21) Appl. No.: **10/950,860**

(22) Filed: **Sep. 27, 2004**

(65) **Prior Publication Data**

US 2005/0105484 A1    May 19, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/523,061, filed on Nov. 18, 2003, provisional application No. 60/517,044, filed on Nov. 4, 2003, provisional application No. 60/507,022, filed on Sep. 29, 2003.

(51) **Int. Cl.**
    *H04B 7/185*    (2006.01)

(52) **U.S. Cl.** ...................... **370/316**; 370/351; 370/352; 455/428

(58) **Field of Classification Search** ................ 370/316, 370/474, 475, 352, 321, 390, 432, 351, 355, 370/356; 455/13.3, 12.1, 428, 445; 714/752, 714/791, 794, 800
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,081,703 A | 1/1992 | Lee |
| 5,678,172 A | 10/1997 | Dinkins |
| 6,035,178 A | 3/2000 | Chennakeshu et al. |
| 6,072,768 A | 6/2000 | Wiedeman et al. |
| 6,212,550 B1 | 4/2001 | Segur |
| 6,243,450 B1 | 6/2001 | Jansen et al. |
| 6,414,635 B1 | 7/2002 | Stewart et al. |
| 6,522,865 B1 | 2/2003 | Otten |
| 6,556,828 B1 | 4/2003 | Carlin et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 1 024 610 A2 | 2/2000 |
|---|---|---|

OTHER PUBLICATIONS

Unknown, VP1200/VP1210 Vivato Indoor & Outdoor Wi-Fi Base Stations, copyright 2004, Vivato, Inc., San Francisco, CA U.S.A.

*Primary Examiner*—CongVan Tran
(74) *Attorney, Agent, or Firm*—Taft Stettinius & Hollister LLP

(57)    **ABSTRACT**

A satellite distributed high-speed Internet "Hotspot" enables wireless and hardwired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card or prepaid coupon. The Hotspots can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish. Upon connecting to the Hotspot, the user is directed to a remote server for log-on and validation of the user's account. During validation, the remote server verifies that prepaid access time remains in the user's account. Upon validation, the user may browse the web until the prepaid access time runs out. Alternatively, an account may be set up on a "continue until canceled" basis, wherein the user's credit card will be charged for the amount of time used during each session.

**32 Claims, 4 Drawing Sheets**



US 7,324,469 B2

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,584,083 B1 | 6/2003 | Toporek et al. |
| 6,591,084 B1 | 7/2003 | Chuprun et al. |
| 6,611,821 B2 | 8/2003 | Stahl et al. |
| 6,894,990 B1* | 5/2005 | Agarwal et al. ............ 370/321 |
| 7,216,283 B2* | 5/2007 | Shen et al. ................ 714/752 |
| 2001/0010047 A1 | 7/2001 | Shen et al. |
| 2001/0026537 A1 | 10/2001 | Massey |
| 2002/0006116 A1 | 1/2002 | Burkhart |
| 2003/0046242 A1 | 3/2003 | Himmel et al. |
| 2003/0149601 A1* | 8/2003 | Cabral ........................... 705/5 |
| 2003/0181162 A1* | 9/2003 | Matula ...................... 455/13.3 |
| 2004/0255221 A1* | 12/2004 | Shen et al. ................. 714/752 |
| 2005/0135422 A1* | 6/2005 | Yeh ............................. 370/474 |
| 2007/0115942 A1* | 5/2007 | Money et al. .............. 370/352 |

* cited by examiner



FIG.1



FIG.2



FIG. 3

U.S. Patent        Jan. 29, 2008        Sheet 4 of 4        US 7,324,469 B2



FIG. 4

US 7,324,469 B2

**1**

## SATELLITE DISTRIBUTED HIGH SPEED INTERNET ACCESS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority of provisional application Ser. No. 60/507,022, filed Sep. 29, 2003, provisional application Ser. No. 60/517,044, filed Nov. 4, 2003, and provisional application Ser. No. 60/523,061, filed Nov. 18, 2003.

### BACKGROUND

The continued development of high speed wireless Internet connections permitting the transceiving of real time information has greatly increased the volume and efficiency of work, both commercial and personal, that can be accomplished. This efficiency saves both time and money for its users and is quickly becoming a necessary part of our overall telecommunications infrastructure.

This efficiency however, is not easily accessible unless one has a wireless ready PC, and their own satellite dish and transceiver or is located in or near a city with providers who sell access subscriptions to their equipment. Anyone in transit, such as salesmen, executives, truckers and private individuals has virtually no access while traveling, especially in rural areas. Even in populated areas, one must find a hard-wired commercial access point to get to the Internet. This is time consuming, costly and severely limits the benefits of the Internet in most areas of the country.

### SUMMARY

The present invention provides rural "Hotspots" (such as Wi-Fi access, for example) to enable wireless and hard-wired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card. The "Hotspots" can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish. These "Hotspots" would best be located in areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges. A Hotspot may allow access to users with cabled devices, wireless devices, or both.

Accordingly, it is a first aspect of the present invention to provide a method for establishing and operating an Internet Hotspot that includes the steps of: providing a satellite dish communicating with the Internet via data link with a satellite; providing at least one router operatively coupled to the satellite dish; installing the satellite dish and router in a rural location, which experiences a relatively high volume of transient traffic; and allowing a user to access the Internet at the rural location by connecting a user's web-ready device to the Internet via the router and satellite dish. In a more detailed embodiment, the router includes at least one jack to which a web-ready device may be connected via a cable. In a further detailed embodiment the method further includes a step of providing a subscriber access unit operatively coupled between the satellite dish and the router, where a user opens a subscription account via a remote server before the user is enabled to access other websites. Alternately, a user purchases a quantity of subscription-based access time using a credit card via the remote server before the user is enabled to access other websites. The subscription-based access time may be purchased in a definite quantity, or the

**2**

subscription-based access time may be purchased on a "continued until canceled" basis. The credit card billing may performed by an existing merchant service and the existing merchant service may be reciprocal with other Internet subscription providers nationwide. Optionally, a user's account status is first authenticated by the remote server each time the user establishes a connection with the Hotspot before the user is enabled to access other websites. This authentication of the user's account is performed by a subscriber merchant service.

In an alternate detailed embodiment of the first aspect of the present invention, the connecting step includes a step of communicating the user's web-ready device to the router via a wireless connection. Further, a plurality of users can simultaneously access the Internet by communicating wireless web-ready devices with the router. Further, the method may include a step of operatively coupling a subscriber access between the satellite dish and the router, where a user opens a subscription account via a remote server before the user is enabled to access other websites. With this, a user may purchase a quantity of subscription-based access time using a credit card via the remote server before the user is enabled to access other websites. The subscription-based access time may be purchased in a definite quantity, or the subscription-based access time may be purchased on a "continued until canceled" basis. The credit card billing may performed by an existing merchant service and the existing merchant service may reciprocate with other Internet subscription providers nationwide. Optionally, a user's account status is first authenticated by the remote server each time the user establishes a connection with the Hotspot before the user is enabled to access other websites. With this the authentication of the user's account is performed by a subscriber merchant service. Alternatively, the method further includes the steps of operatively coupling at least one wireless transceiver extender unit between the satellite dish and the router to extend the range of Internet access at the rural location.

The method of the first aspect may further include the steps of operatively coupling at least one wireless transceiver extender unit between the satellite dish and the router to extend the range of Internet access at the rural location.

It is a second aspect of the present invention to provide a method for providing satellite-distributed high-speed Internet access that includes the steps of: providing a router to which a web-ready device may be connected via at least one of a cable and a wireless data link; assigning a dynamic IP address to the web-ready device that has been connected to the router; forwarding by the router of the user's connection to a subscriber access unit; retrieving from memory by the subscriber access unit of the static IP address of a remote server; forwarding the user's connection to a satellite dish; establishing communication by the satellite dish with a satellite, which is enabled to send and receive data over the Internet; establishing a connection over the Internet with the remote server, whose interface is viewed by the user as a webpage on the web-ready device; prompting by the remote server of the user for a username and password; accessing a database by the remote server to verify the username and password; prompting the user to create a new account, if the username and password are invalid or the user's account has zero time remaining; charging the user's credit card, if a new account is created; allowing the user to access other websites, until the user's account has zero time remaining or the user logs off the network; and updating the user's account in the database by the remote server to subtract the amount of time used during the just-completed session when the user

US 7,324,469 B2

**3**

logs off the network. In a detailed embodiment the method further includes the step of installing the router and the satellite dish in a rural location experiencing a relatively high volume of transient traffic.

It is a third object of the present invention to provide an Internet Hotspot that includes: a satellite dish installed in a remote location experiencing a relatively high volume of transient traffic, and the satellite dish communicating with the Internet via data link with a satellite; at least one router operatively coupled to the satellite dish and installed in the remote location, where a user may access the Internet at the remote location by establishing a data connection with the router via a user's web-ready device. In a more detailed embodiment, the data connection is a wireless data connection. In another detailed embodiment, a plurality of users may access the Internet simultaneously at the remote location by respectively establishing data connections with the router via their web-ready devices. The data connections may be wired and/or wireless connections. The Hotspot may also include a subscriber access unit operatively coupled between the satellite dish and the router and/or at least one wireless extender transceiver wirelessly, operatively coupled between the router and the satellite dish.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an exemplary embodiment of the invention with a cabled router providing access to the Hotspot for cabled users.

FIG. **2** shows an exemplary embodiment of the invention with an Ethernet wireless access point (wireless router) providing access to the Hotspot for wireless users.

FIG. **3** shows an exemplary embodiment of the invention with wireless transceiver extender units, allowing the access point (Ethernet wireless access point or router) to be located remotely from the remainder of the Hotspot apparatus.

FIG. **4** shows an exemplary embodiment of the invention with a Vivato outdoor switch used as the wireless access point, providing long range operation.

DETAILED DESCRIPTION

The present invention provides rural "Hotspots" (such as Wi-Fi access, for example) to enable wireless and hardwired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card or prepaid coupon. The "Hotspots" can be located anywhere there is 120 volt electricity available, either from an electric utility service or from an on-site power source such as a solar panel with a bridged access point, and enough space to house the transceiver and mount a satellite dish. These "Hotspots" would best be located in areas that experience high volume transient traffic, such as rest area, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges. Since the signal is always "live," all a potential wireless user would have to do is to move within the transceiver's field (an approximately radius of 0.2 to 0.4 miles when an amplifier used, in an exemplary embodiment) and turn on his/her wireless ready PC to know the service was available. Alternatively, for those with cabled web-ready devices, signage can announce the availability of access to internal network ports. Because these internal network ports, if available, would always be "live," all a potential user would have to do is to plug in a web-ready device and logon. Several transceivers/routers (providing cabled and/or wireless access) can be installed to provide coverage for large or multi-floor sites.

**4**

In the exemplary embodiment, when a client attempts to access the Internet, they are routed through the "Subscriber Access Unit." This unit, utilizing radius client, automatically forces the user to first logon via satellite through a third party commercial site that houses the radius server. Internet access is granted upon activation of a valid credit card, or existing valid account. Access time is sold by the hour, day, week, or month, or as a "continued until canceled" subscription, and the validation and billing are done by an existing merchant service. Time purchased is durable until used within the purchased time unit (or one day, if purchased by the hour or day—whichever is less) and credits and accounts are reciprocal with other subscription providers nation-wide. Invalid credit cards or expired accounts are not permitted beyond the logon screen. Detailed transaction records are provided by the existing telecommunications infrastructure.

An exemplary embodiment of the system providing access to cabled users is shown in FIG. **1**. The Hotspot **10** comprises all the equipment installed at the rural location that is necessary to provide Internet access via satellite **12**. The equipment installed at the rural location includes a satellite dish **14** for communicating with the satellite, a subscriber access unit **16** operatively coupled to the satellite dish **14** and a router **18** operatively coupled to the subscriber access unit **18**. As used herein, the term "operatively coupled" refers to any configuration in which two or more devices interact in any way, by wired or wireless connections. Some or all of the components of the Hotspot **10** may be powered by a solar panel **19**. User web-enabled devices, such as PC **20**, laptop computer **22** and PDA **24** are directly coupled to the router via wired connections (i.e., cables). The user can access the Hotspot using his own web-ready device to acquire a dynamic IP address from one of many wired jacks located all over the router **18** using DHCP (Dynamic Host Configuration Protocol). The router **18** then forwards the user access to the subscriber access unit **16**. Each router **18** can allow **254** concurrent users to gain access to the Internet.

At a central location **26**, a radius server **28** includes a database **30** and modem **32** operatively coupled thereto. The radius server **28** is operatively coupled to the Internet **34** through an Internet server **36** and is protected by a firewall **38**. The satellite **12** communicates to the radius server over the internet (via another satellite dish and associated computer—not shown).

The subscriber access unit **16** has the static IP address **36** of the Radius server **28** pre-programmed. It then uses Radius client software to send the user directly to the satellite dish **14**. The user's connection then passes to the satellite **12** then through the Internet **34** where, using the Radius server's IP address **36**, it finds the Radius server **28**. The Static IP address **36** routes the traffic through the firewall **38**.

Upon establishing a user connection to the Radius server **28**, the Radius server is viewed as a webpage in SSL (Secure Socket Layer) by the user. The user is prompted for a username and password. The Radius server **28** uses the database **30** to validate username and password and check that the number of minutes left in the user's account is greater than **0**. If the user cannot submit a valid username and password for an account that has more than zero minutes left, the user will be prompted to create a new account. Upon creating an account, the Radius server **28** will charge the credit card furnished by the user using the modem **32** or Internet **34**.

Upon validation by database **30**, the user can browse the Internet **34** until the minutes are used up or the user is logged

US 7,324,469 B2

5

off the network. When the user logs off, the database **30** will be updated, subtracting the minutes used during the just-completed session.

Another exemplary embodiment **10'** of the system providing access to wireless users is shown in FIG. **2**. The basic system architecture and operation are substantially the same as described above. The main difference in the wireless access Hotspot of FIG. **2** is that the cabled router **18** of FIG. **1** has been replaced by an Ethernet wireless access point or router **40**. The user can access the Hotspot using his own wireless web-ready device, such as a personal digital assistant (PDA) **24'**, web-enabled cell phone **23'**, or laptop computer with wireless network card **22'** to acquire a dynamic IP address from the Ethernet wireless access point **40** using DHCP (Dynamic Host Configuration Protocol). The Ethernet wireless access point **40** then forwards the user access to the subscriber access unit **16**. Each Ethernet wireless access point **40** can allow **254** concurrent users to gain access to the Internet **34**. The Ethernet wireless access point **40** can employ a security protocol of a type that is known to persons skilled in the art, such as the 802.11b security protocol, or any subsequent or future versions of the 802.11 standard. Such security protocols may be generally designated as 802.11x, where x can be any version or implementation of the 802.11 standard.

From the subscriber access unit **16**, a connection is established with the Radius server **28** in the substantially same manner as described above. The Radius server prompts the user to log in and verifies the user's password and account status, including the amount of time remaining, in substantially the same manner as described above.

In another exemplary embodiment **10''**, as illustrated in FIG. **3**, the Ethernet wireless access point **40** may be separated from, and communicate wirelessly with, the subscriber access unit **16**. The Ethernet wireless access point **40** is connected by wire to wireless transceiver extender unit "1" (**42**). Utilizing a different channel from the Ethernet wireless access point **40**, the wireless transceiver extender unit "1" (**42**) transmits and receives wirelessly to and from wireless transceiver extender unit "2" (**44**). Wireless transceiver extender unit "2" (**44**) will run directly by wire to the subscriber access unit **16**. This use of wireless transceiver extender units **42**, **44** allows the Ethernet wireless access point **40** to be placed further away, extending the effective range of the hotspot. The wireless transceiver extender units **42**, **44** can employ a security protocol of the 802.11x form, as explained above, where x can be any version or implementation of the 802.11 standard. From the subscriber access unit **16**, a connection is established with the Radius server **28** in substantially the same manner as described above. The Radius server **28** prompts the user to log in and verifies the user's password and account status, including the amount of time remaining, in substantially the same manner as described above.

This wireless extension embodiment may also be practiced with a cabled router connected to wireless transceiver extender unit "1" (**42**) in place of Ethernet wireless access point **40**, thus allowing cabled access with the router located remotely from the subscriber access unit **16**.

In the exemplary embodiments **10'** and **10''** of the system shown in FIGS. **2** and **3**, respectively, the Ethernet wireless access point can be operatively coupled to an amplifier **46** and antenna **48**. The antenna **48** can be an omni-directional antenna or a directional antenna such as a yagi antenna. The amplifier in conjunction with the antenna can increase the DBi gain to 28 to 35 based on the DBi gain for the antenna selected. The total output of the antenna will not exceed the

6

36 DBi limited by current Federal Communications Commission regulations. Additional wireless access points or antennas can be added to widen the coverage area as needed, provided that the wireless beams of overlapping signal coverage will need to use different channels to prevent interference.

Alternatively, as shown in FIG. **4**, the wireless Ethernet access point can be replaced with a Vivato® outdoor switch **50** (such as the VP1210 available from Vivato, Inc), which includes an amplifier and antenna. The Vivato® outdoor switch features an electronically controlled phased array antenna that can be used to create high gain beams of Wi-Fi on three channels simultaneously. In order to prevent interference, three nonadjacent channels (e.g., channels **1**, **6**, and **11**, as shown in FIG. **4**) can be selected from the eleven channels supported by the 802.11x communication protocol. This embodiment can provide Wi-Fi access for many kilometers along a line of sight from the antenna, providing three simultaneous beams of Wi-Fi throughout the coverage area with extended range.

Having described the invention with reference to exemplary embodiments, it is to be understood that the invention is defined by the claims and it not intended that any limitations or elements describing the exemplary embodiment set forth herein are to be incorporated into the meanings of the claims unless such limitations or elements are explicitly listed in the claims. Likewise, it is to be understood that it is not necessary to meet any or all of the identified advantages or objects of the invention disclosed herein in order to fall within the scope of any claims, since the invention is defined by the claims and since inherent and/or unforeseen advantages of the present invention may exist even though they may not have been explicitly discussed herein.

What is claimed is:

**1**. A method for establishing and operating an Internet Hotspot comprising the steps of:

providing a satellite dish communicating with the Internet via data link with a satellite;

providing at least one router operatively coupled to the satellite dish;

providing a subscriber access unit operatively coupled between the satellite dish and the router;

installing the satellite dish, router and subscriber access unit in a rural location, the rural location experiencing a relatively high volume of transient traffic;

connecting a web-ready device to the router;

creating by a user a subscription account, the subscription account being created on a remote server and enabling the user to access the Internet;

navigating a browser operating on the web-ready device to a subscriber access website, the subscriber access website being capable of verifying that the subscription account is valid;

verifying that the subscription account is valid via the subscriber access website to allow access to the Internet; and

allowing a user to access the Internet at the rural location.

**2**. The method of claim **1**, wherein the router includes at least one jack to which a web-ready device may be connected via a wired connection.

**3**. The method of claim **1**, wherein the step of creating a subscription account includes creating the subscription account using a prepaid coupon via the remote server.

US 7,324,469 B2

7

**4**. The method of claim **1**, wherein the step of creating a subscription account includes purchasing by the user a quantity of subscription-based access time using a credit card via the remote server.

**5**. The method of claim **4**, wherein the subscription-based access time may be purchased in a definite quantity.

**6**. The method of claim **4**, wherein the subscription-based access time may be purchased on a "continued until canceled" basis.

**7**. The method of claim **4**, wherein the credit card billing is performed by an existing merchant service.

**8**. The method of claim **7**, wherein the existing merchant service is reciprocal with other Internet subscription providers nationwide.

**9**. The method of claim **1**, wherein the verifying step is performed by a subscriber merchant service.

**10**. The method of claim **1**, wherein the connecting step includes connecting the web-ready device to the router via a wireless connection.

**11**. The method of claim **10**, wherein a plurality of users can simultaneously connect web-ready devices to the router.

**12**. The method of claim **10**, further comprising the steps of operatively coupling at least one wireless transceiver extender unit between the satellite dish and the router to extend the range of Internet access at the rural location.

**13**. The method of claim **1**, further comprising an amplifier and antenna operatively coupled to the router.

**14**. The method of claim **10**, wherein the wireless connection is one of an 802.11a wireless area network, an 802.11b wireless area network, an 802.11g wireless area network, and an 802.11n in wireless area network.

**15**. A method for providing satellite-distributed high-speed Internet access, comprising the steps of:

providing a router to which a web-ready device may be connected via at least one of a cable or a wireless data link;

assigning a dynamic IP address to the web-ready device that has been connected to the router;

forwarding by the router of the user's connection to a subscriber access unit;

retrieving from memory by the subscriber access unit of the static IP address of a remote server;

forwarding the user's connection to a satellite dish;

establishing communication by the satellite dish with a satellite, which is enabled to send and receive data over the Internet;

establishing a connection over the Internet with the remote server, whose interface is viewed by the user as a webpage on the web-ready device;

prompting by the remote server of the user for a username and password;

accessing a database by the remote server to verify the username and password;

prompting the user to create a new account, if the username and password are invalid or the user's account has zero time remaining;

allowing the user to access other websites, until the user's account has zero time remaining or the user logs off the network; and

updating the user's account in the database by the remote server to subtract the amount of time used during the just-completed session, when the user logs off the network.

**16**. The method of claim **15**, wherein the interface of the remote server is viewed by the user as a webpage on the web-ready device using Secure Socket Layer encryption.

8

**17**. The method of claim **15**, wherein the user may create an account using a prepaid coupon.

**18**. The method of claim **15**, further comprising, after the step of prompting the user to create a new account, if the username and password are invalid or the user's account has zero time remaining, the step of:

charging the user's credit card, if a new account is created.

**19**. The method of claim **18**, wherein the user may purchase access time in a definite quantity when creating an account.

**20**. The method of claim **18**, wherein the user may purchase access time on a "continue until canceled" basis when creating an account.

**21**. The method of claim **18**, wherein the charging of the user's credit card is performed by an existing merchant service.

**22**. The method of claim **21**, wherein the existing merchant service is reciprocal with other Internet subscription providers nationwide.

**23**. The method of claim **18**, further comprising the step of installing the router and the satellite dish in a rural location experiencing a relatively high volume of transient traffic.

**24**. An Internet Hotspot comprising:

a satellite dish communicating with the Internet via one or more data links with a satellite;

at least one router operatively coupled to the satellite dish;

a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and

a web-ready device operatively coupled to the at least one router, the web-read device having a browser application operating thereon for accessing the Internet;

wherein the satellite dish, at least one router and the subscriber access unit are located in a remote location experiencing a relatively high volume of transient traffic;

wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router.

**25**. The Internet Hotspot of claim **24**, wherein the data connection is one of a wired data connection and a wireless data connection.

**26**. The Internet Hotspot of claim **24**, wherein a plurality of users may access the Internet simultaneously at the remote location by respectively establishing data connections with the router via their web-ready devices.

**27**. The Internet Hotspot of claim **26**, wherein the data connections include wired data connections.

**28**. The Internet Hotspot of claim **26**, wherein the data connections include wireless data connections.

**29**. The Internet Hotspot of claim **28**, further comprising an amplifier and antenna operatively coupled to the router.

**30**. The Internet Hotspot of claim **29**, wherein the router is a Vivato outdoor switch.

**31**. The Internet Hotspot of claim **24**, further comprising at least one wireless extender transceiver operatively coupled between the subscriber access unit and the router.

**32**. The Internet Hotspot of claim **25**, wherein the wireless connection is one of an 802.11a wireless area network, an 802.11b wireless area network, an 802.11g wireless area network, and an 802.11n wireless area network.

\* \* \* \* \*

# Exhibit 3



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

23524        7590        05/16/2011

FOLEY & LARDNER LLP
150 EAST GILMAN STREET
P.O. BOX 1497
MADISON, WI 53701-1497

| EXAMINER |
| --- |
| WU, JIANYE |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2462 | |

DATE MAILED: 05/16/2011

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 11/033,524 | 01/12/2005 | Mark A. Webster | 088245-2602 | 7352 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR HIGH DATA RATE MULTI-CHANNEL WLAN ARCHITECTURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | NO | $1510 | $300 | $0 | $1810 | 08/16/2011 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE** MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. **THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or <u>Fax</u>    (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| | |
|---|---|
| 23524    7590    05/16/2011<br><br>FOLEY & LARDNER LLP<br>150 EAST GILMAN STREET<br>P.O. BOX 1497<br>MADISON, WI 53701-1497 | Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.<br><br>**Certificate of Mailing or Transmission**<br>I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below. |

|  |  |
|---|---|
| | _____ (Depositor's name) |
| | _____ (Signature) |
| | _____ (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/033,524 | 01/12/2005 | Mark A. Webster | 088245-2602 | 7352 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR HIGH DATA RATE MULTI-CHANNEL WLAN ARCHITECTURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1510 | $300 | $0 | $1810 | 08/16/2011 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| WU, JIANYE | 2462 | 370-203000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
  ☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
  ☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
  (1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
  (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered attorney or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                 (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :  ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:
  ☐ Issue Fee
  ☐ Publication Fee (No small entity discount permitted)
  ☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
  ☐ A check is enclosed.
  ☐ Payment by credit card. Form PTO-2038 is attached.
  ☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
  ☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.   ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____                 Date _____

Typed or printed name _____                 Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/033,524 | 01/12/2005 | Mark A. Webster | 088245-2602 | 7352 |

23524     7590     05/16/2011

FOLEY & LARDNER LLP
150 EAST GILMAN STREET
P.O. BOX 1497
MADISON, WI 53701-1497

| EXAMINER |
|---|
| WU, JIANYE |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2462 | |

DATE MAILED: 05/16/2011

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 766 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 766 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. | Applicant(s) | |
|---|---|---|---|
| | 11/033,524 | WEBSTER ET AL. | |
| | Examiner | Art Unit | |
| | JIANYE WU | 2462 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *3/28/11*.

2. ☒ The allowed claim(s) is/are *1-15 and 18-20, renumbered as 1-18*.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

       1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☒ Examiner's Amendment/Comment

8. ☐ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____.

/Jianye Wu/
Primary Examiner, Art Unit 2462

Application/Control Number: 11/033,524                                    Page 2

Art Unit: 2462

## EXAMINER'S AMENDMENT

1.     An examiner's amendment to the record appears below. Should the changes

and/or additions be unacceptable to applicant, an amendment may be filed as provided

by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be

submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview

with Nick Lagewall on 5/6/11 and on 5/9/11.

The application has been amended as follows:

For claims 1, 18 and 20,

replacing

"such that the one or more guard bands are at least partially filled with at least

some of the one or more data subcarriers"

with

--such that the one or more guard bands are at least partially filled with at least

some of the one or more data subcarriers *using full spectral synthesis capability of a*

*fast fourier transform or an inverse fast fourier transform*--.

Claim 20 is further amended as follows:

replacing

 "A tangible computer-readable medium"

with

--A non-transitory computer-readable medium--.

/Jianye  Wu/
Primary Examiner, Art Unit 2462

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND DIVISION

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) |
| *Plaintiffs*, | ) ) Civil Action No. 7:24-cv-00277 |
| v. | ) ) |
| | ) **JURY TRIAL DEMANDED** |
| SOUTHWEST AIRLINES CO., | ) ) |
| *Defendant*. | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "Intellectual Ventures," "IV," or "Plaintiffs"), in their Complaint for patent infringement against Defendant Southwest Airlines Co. ("Southwest" or "Defendant"), hereby allege as follows:

### NATURE OF THE ACTION

1.      This is a civil action for the infringement of United States Patent No. 8,332,844 ("the '844 Patent"), United States Patent No. 8,407,722 ("the '722 Patent"), United States Patent No. 7,949,785 ("the '785 Patent"), United States Patent No. 8,027,326 ("the '326 Patent), United States Patent No. 7,324,469 ("the '469 Patent"), and United States Patent No. 7,257,582 ("the '582 Patent") (collectively, the "Patents-in-Suit") under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

### THE PARTIES

#### Intellectual Ventures

2.      Plaintiff Intellectual Ventures I LLC ("Intellectual Ventures I") is a Delaware limited liability company having its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

3.      Plaintiff Intellectual Ventures II LLC ("Intellectual Ventures II") is a Delaware limited liability company having its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

4.      Intellectual Ventures I is the owner of all rights, title, and interest in and to the '722, '582, '326, and '785 Patents.

5.      Intellectual Ventures II is the owner of all rights, title, and interest in and to the '844 and '469 Patents.

## Southwest Airlines

6.      Upon information and belief, Defendant Southwest Airlines ("Southwest") is a Texas corporation with its principal place of business at 2702 Love Field Drive, Dallas, TX 75235. Southwest may be served with process through its registered agent, Corporation Service Company at 211 E. 7th Street Suite 620, Austin, TX 78701.  Southwest is registered to do business in the State of Texas and has been since at least 1967.  On information and belief, Southwest does business in the State of Texas and the Western District of Texas.

7.      Upon information and belief, Southwest makes, utilizes, services, tests, distributes, sells, offers, and/or offers for sale in the State of Texas and the Western District of Texas products, services, and technologies ("Accused Products and Services") that infringe the Patents-in-Suit, contributes to the infringement by others, and/or induces others to commit acts of patent infringement in the State of Texas and the Western District of Texas.

8.      On information and belief, Southwest has derived substantial revenue from infringing acts in the Western District of Texas, including from the sale and use of the Accused Products and Services as described in more detail below.

## JURISDICTION AND VENUE

9. This is an action for patent infringement arising under the patent laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10. This Court has personal jurisdiction over Southwest because Southwest conducts business in and has committed acts of patent infringement, contributed to infringement by others, and/or induced others to commit acts of patent infringement in this District, the State of Texas, and elsewhere in the United States, and has established minimum contacts with this forum state such that the exercise of jurisdiction over Southwest would not offend the traditional notions of fair play and substantial justice. Upon information and belief, Southwest transacts substantial business with entities and individuals in the State of Texas and the Western District of Texas, by, among other things, utilizing, servicing, testing, distributing, selling, offering, and/or offering for sale the Accused Products and Services that infringe the Patents-in-Suit, as well as by providing service and support to its customers in this District. Southwest also places certain of the Accused Products and Services into the stream of commerce with the knowledge and expectation that they will be sold in the State of Texas, including this District. For example, Southwest provides Wi-Fi service for its customers and/or employees on Southwest airplanes within this District.

11. Southwest is subject to this Court's general and specific jurisdiction pursuant to due process and/or the Texas Long Arm Statute due at least to Southwest's substantial business in the State of Texas and this District, including maintaining a principal place of business at 2702 Love Field Drive, Dallas, TX 75235, through its past infringing activities, because Southwest regularly does and solicits business herein, and/or because Southwest has engaged in persistent conduct and/or has derived substantial revenues from goods and services provided to customers in the State of Texas and this District.

12.     Upon information and belief, Southwest does business itself, or through its subsidiaries, affiliates, and agents, in the State of Texas and the Western District of Texas.

13.     Upon information and belief, Southwest flies to 10 destinations[1] within Texas.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Southwest has both established places of business in this judicial district and has committed acts of infringement in this judicial district.

15.     Upon information and belief, Southwest maintains regular and established places of business via terminals, airplanes, operations centers, and ticket counters, as well as other equipment and facilities, at airports located in this District.  Southwest has regular and established places of business at which it has committed acts of infringement and placed the Accused Products and Services into the stream of commerce, throughout the State of Texas and the Western District of Texas.  For example, Southwest operates flights at multiple airports throughout this District, including at least: (1) Midland International Air & Space Port (MAF) – located at 9506 La Force Blvd; (2) Austin-Bergstrom International Airport (AUS) – located at 3600 Presidential Blvd, Austin, TX 78719; (3) San-Antonio International Airport (SAT) – located at 9800 Airport Blvd, San Antonio TX 78216; (4) El Paso International Airport (ELP) – located at 6701 Convair Rd, El Paso, TX 79925 (collectively "Southwest Airport Locations").

16.     Upon information and belief, Southwest is one of only four airline carriers at the Midland International Air & Space Port[2].

---

[1] https://www.swabiz.com/route-map/?clk=RTMAPMAP (Last Accessed on 10/9/2024).
[2] https://www.flymaf.com/147/Airlines (Last Accessed on 10/9/24).

4

17.     Upon information and belief, Southwest has a 44%[3] share of all the seats at the Austin-Bergstrom International Airport.

18.     Upon information and belief, Southwest holds its Southwest Airport Locations to be regular and established places of business of Southwest in this District by operating flights, selling tickets, and servicing customers at these locations.

19.     Upon information and belief, the Southwest Airport Locations in this District are regular, continuous, and established physical places of business of Southwest, being established, ratified, and/or controlled by Southwest as authorized locations, which are places of business at which Southwest makes, utilizes, services, tests, distributes, offers and/or offers for sale the Accused Products and Services.

20.     Upon information and belief, Southwest ratifies and holds its Southwest Airport Locations out as regular and established places of business of Southwest in this District by listing them on Southwest's website, including, *e.g.,* as shown below:[4]

---

[3] https://thepointsguy.com/news/delta-air-lines-austin-expansion-texas/ (Last Accessed on October 9, 2024)

[4] https://www.southwest.com/route-map/?clk=GSUBNAV-AIR-ROUTEMAP (Last Accessed on October 9, 2024).



21.     Upon information and belief, Southwest has established, ratified, and holds these Southwest Airport Locations out as regular and established places of business of Southwest by directing and controlling these Southwest Airport Location's actions and services in the foregoing manner, and has consented to these Southwest Airport Locations acting on Southwest's behalf and being Southwest's places of business whereby the Accused Products  and Services are utilized, serviced, tested, distributed, offered and/or offered for sale and placed into the stream of commerce in this District, and these Southwest Airport Locations have consented to act on Southwest's behalf pursuant to the foregoing terms of control and direction in order to, among other things, be able to offer flight services that utilize the Accused Products  and Services.

## **FACTUAL BACKGROUND**

22.    Intellectual Ventures Management, LLC ("Intellectual Ventures Management")
was founded in 2000.  Since then, Intellectual Ventures Management has been involved in the
business of inventing.  Intellectual Ventures Management facilitates invention by inventors and
the filing of patent applications for those inventions, collaboration with others to develop and
patent inventions, and the acquisition and licensing of patents from individual inventors,
universities, corporations, and other institutions.  A significant aspect of Intellectual Ventures
Management's business is managing the Plaintiffs in this case, Intellectual Ventures I and
Intellectual Ventures II.

23.    One of the founders of Intellectual Ventures Management is Nathan Myhrvold, who
worked at Microsoft from 1986 until 2000 in a variety of executive positions, culminating in his
appointment as the company's first Chief Technology Officer ("CTO") in 1996.  While at
Microsoft, Dr. Myhrvold founded Microsoft Research in 1991 and was one of the world's foremost
software experts.  Between 1986 and 2000, Microsoft became the world's largest technology
company.

24.    Under Dr. Myhrvold's leadership, Intellectual Ventures acquired more than 70,000
patents covering many important inventions used in the airline and avionics industries.

25.    Southwest offers various types of airline and avionics related services and
technologies to its customers, partners, vendors, and/or third parties.  Southwest's products and
services utilize and/or support various technologies, including but not limited to Kubernetes,
Kafka, Docker, Spark, Hadoop, In-Flight Connectivity, and Internet Hotspots.  Certain of these
products and services, such as In-Flight Connectivity and Internet Hotspots, are offered to
Southwest's customers and use WiFi technologies, managed by Southwest, to enable Southwest

products and services that it further offers to its customers. Certain of these products and services, such as Kubernetes, Kafka, Docker, Spark, and Hadoop, are technologies used and managed by Southwest to enable the various products and services that Southwest offers to its customers. Southwest makes, utilizes, services, tests, distributes, offers, and/or offers for sale these products and services throughout the world, including in the United States and Texas.

**THE PATENTS-IN-SUIT**

*U.S. Patent No. 8,332,844*

26. On December 11, 2012, the PTO issued the '844 Patent, titled "Root Image Caching and Indexing for Block-Level Distributed Application Management." The '844 Patent is valid and enforceable. A copy of the '844 Patent is attached as Exhibit 1.

27. Intellectual Ventures II is the owner of all rights, title, and interest in and to the '844 Patent, and holds all substantial rights therein, including the right to grant licenses, to exclude others, and to enforce and recover past damages for infringement of the '844 Patent.

*U.S. Patent No. 8,407,722*

28. On March 26, 2013, the PTO issued the '722 Patent, titled "Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network." '722 Patent is valid and enforceable. A copy of the '722 Patent is attached as Exhibit 2.

29. Intellectual Ventures I is the owner of all rights, title, and interest in and to the '722 Patent, and holds all substantial rights therein, including the right to grant licenses, to exclude others, and to enforce and recover past damages for infringement of the '722 Patent.

**U.S. Patent No. 7,949,785**

30.     On May 24, 2011, the PTO issued the '785 Patent, titled "Secure Virtual Community Network System."  The '785 Patent is valid and enforceable.  A copy of the '785 Patent is attached as Exhibit 3.

31.     Intellectual Ventures I is the owner of all rights, title, and interest in and to the '785 Patent, and holds all substantial rights therein, including the right to grant licenses, to exclude others, and to enforce and recover past damages for infringement of the '785 Patent.

**U.S. Patent No. 8,027,326**

32.     On September 27, 2011, the PTO issued the '326 Patent, titled "Method and System for High Data Rate Multi-Channel WLAN Architecture."  The '326 Patent is valid and enforceable.  A copy of the '326 Patent is attached as Exhibit 4.

33.     Intellectual Ventures I is the owner of all rights, title, and interest in and to the '326 Patent, and holds all substantial rights therein, including the right to grant licenses, to exclude others, and to enforce and recover past damages for infringement of the '326 Patent.

**U.S. Patent No. 7,324,469**

34.     On January 29, 2008, the PTO issued the '469 Patent titled "Satellite Distributed High Speed Internet Access."  The '469 Patent is valid and enforceable.  A copy of the '469 Patent is attached as Exhibit 5.

35.     Intellectual Ventures II is the owner of all rights, title, and interest in and to the '469 Patent, and holds all substantial rights therein, including the right to grant licenses, to exclude others, and to enforce and recover past damages for infringement of the '469 Patent.

*U.S. Patent No. 7,257,582*

36.     On August 14, 2007, the PTO issued the '582 Patent titled "Load Balancing with Shared Data."  The '582 Patent is valid and enforceable.  A copy of the '582 Patent is attached as Exhibit 6.

37.     Intellectual Ventures I is the owner of all rights, title, and interest in and to the '582 Patent, and holds all substantial rights therein, including the right to grant licenses, to exclude others, and to enforce and recover past damages for infringement of the '582 Patent.

## COUNT I
(Southwest's Infringement of U.S. Patent No. 8,332,844)

38.     Paragraphs 1 through 37 are incorporated by reference as if fully set forth herein.

39.     **Direct Infringement.**  Southwest, without authorization or license from IV, has directly infringed, and continues to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, the '844 Patent, by making, utilizing, servicing, testing, distributing, selling offering, and/or offering for sale the Accused Products and Services that infringe the '844 Patent, including but not limited to at least the Accused Products and Services identified in the example chart incorporated, per paragraph 50 below, into this Count (collectively, "Example Southwest Count I Products and Services") that infringe at least the example claims of the '844 Patent identified in the chart incorporated into this Count (the "Example '844 Patent Claims") literally or by the doctrine of equivalents.

40.     On information and belief, Southwest has also infringed and continues to directly infringe literally or under the doctrine of equivalents, the Example '844 Patent Claims, by internal testing and use of the Example Southwest Count I Products and Services.

41.     Each claim of the '844 Patent is valid, enforceable, and patent eligible under Section 101 of the Patent Act.  For example, the '844 Patent is related to root image caching and

indexing for block-level distributed application management. The '844 Patent discloses and claim systems and methods that address technical problems that are inherent in and derive from prior art method and systems involving the problems of updating the boot image(s) for the cluster, among other issues. The '844 Patent addressed this technical problem and others with a technical solution. Additionally, the claims of the '844 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

42.     Each claim of the '844 Patent recites an independent invention. Neither the example claims described nor any other individual claim is representative of all claims in the '844 Patent.

43.     Southwest has known that its infringing products and services, such as the Example Count I Products and Services, cannot be used without infringing the technology claimed in the '844 Patent, and are not staple articles of commerce suitable for substantial non-infringing uses.

44.     **Willful Blindness.** Southwest knew of the '844 Patent, or should have known of the '844 Patent, but was willfully blind to its existence. Southwest has had actual knowledge of the '844 Patent not later than receipt of a letter, dated September 30, 2024, and received on the same date. By the time of trial, Southwest will have known (since receiving such notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '844 Patent. *See* Exhibit 7 (Notice Letter).

45.     **Induced Infringement.** Southwest has also contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '844 Patent by contributing to and/or inducing its partners, vendors, customers, and/or third parties to use or cause to use its products and services, such as Example Southwest Count I Products and Services, in an infringing manner as described above, including encouraging and instructing its partners, vendors, customers,

11

and/or third parties to infringe the '844 Patent. For example, on information and belief, Southwest offers products and services to its customers and third parties and/or employees that are associated with backend functionality provided by the Example Southwest Count I Products and Services. Southwest has contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '844 Patent by offering such products and services and contributing to and/or inducing its customers and third parties and/or employees to use such products and services that are associated with backend functionality provided by the Example Southwest Count I Products and Services.

46.     Southwest therefore actively, knowingly, and intentionally has committed, and continues to commit, affirmative acts that cause infringement, literally and/or by the doctrine of equivalents, of one or more claims of the '844 Patent with knowledge of the '844 Patent and knowledge that the induced acts constitute infringement of one or more claims of the '844 Patent. Southwest has actively induced others, including, but not limited to, partners, vendors, customers, and/or third parties who use the Example Southwest Count I Products and Services to infringe the '844 Patent, literally and/or by the doctrine of equivalents, throughout the United States, including within this District, by, among other things, advertising, promoting, and instructing the infringing use of the Example Southwest Count I Products and Services.

47.     **Contributory Infringement.**  Southwest actively, knowingly, and intentionally has committed, and continues to commit contributory infringement, literally and/or by the doctrine of equivalents, by, *inter alia,* knowingly providing software and technologies that when used, cause the direct infringement of one or more claims of the '844 Patent by its customers, partners, vendors, and/or third parties, and which have no substantial non-infringing uses, or include a separate and distinct technology that is especially made or especially adapted for use in

infringement of the '844 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

48.     Southwest therefore actively, knowingly, and intentionally has been and continues to materially contribute to their partners', vendors', and/or third parties' infringement of the '844 Patent, literally and/or by the doctrine of equivalents, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Example Southwest Count I Products and Services for use in a manner that infringes one or more claims of the '844 Patent.  Example Southwest Count I Products and Services are especially made or adapted for infringing the '844 Patent and have no substantial non-infringing use.

49.     Exhibit 8 (claim chart) includes the Example Southwest Count I Products and Services and Example '844 Patent Claims. As set forth in the chart, the Example Southwest Count I Products and Services practice the technology claimed by the '844 Patent.  Accordingly, the Example Southwest Count I Products and Services incorporated in the chart satisfies all elements of the Example '844 Patent Claims.

50.     Intellectual Ventures therefore incorporates by reference in its allegations herein the claim chart of Exhibit 8.

51.     Intellectual Ventures is entitled to recover damages adequate to compensate for Defendant's infringement of the '844 Patent and will continue to be damaged by such infringement.  Intellectual Ventures is entitled to recover damages from Defendant to compensate them for Defendant's infringement, as alleged above, in an amount measured by no less than a reasonable royalty under 35 U.S.C. § 284, as well as enhanced damages pursuant to 35 U.S.C. § 284.

52.     Further, Defendant's infringement of Intellectual Ventures' rights under the '844 Patent will continue to damage Intellectual Ventures' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court.

53.     As a result of Defendant's acts of infringement, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT II

(Southwest's Infringement of U.S. Patent No. 8,407,722)

54.     Paragraphs 1 through 53 are incorporated by reference as if fully set forth herein.

55.     **Direct Infringement.**  Southwest, without authorization or license from IV, has directly infringed, and continues to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, the '722 Patent, by making, utilizing, servicing, testing, distributing, and/or offering the Accused Products and Services that infringe the '722 Patent, including but not limited to at least the Accused Products and Services identified in the example chart incorporated, per paragraph 66 below, into this Count (collectively, "Example Southwest Count II Products and Services") that infringed at least the example claims of the '722 Patent identified in the chart incorporated into this Count (the "Example '722 Patent Claims") literally or by the doctrine of equivalents.

56.     On information and belief, Southwest has also infringed and continues to directly infringe, literally or under the doctrine of equivalents, the Example '722 Patent Claims, by internal testing and use of the Example Southwest Count II Products and Services.

57.     Each claim of the '722 Patent is valid, enforceable, and patent eligible under Section 101 of the Patent Act.  For example, the '722 Patent is related to a dynamic content routing network that routes update messages including updates to properties of live objects to clients.  The

'722 Patent discloses and claims systems and methods that address technical problems that are inherent in and derive from prior art method and systems involving the problems of dynamically updating content at a client device, among other issues. The '722 Patent addressed this technical problem and others with a technical solution that is described in the specification and captured by one or more claims. Additionally, the claims of the '722 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

58.     Each claim of the '722 Patent recites an independent invention. Neither the example claims described nor any other individual claim is representative of all claims in the '722 Patent.

59.     Southwest has known that its infringing products and services, such as the Example Southwest Count II Products and Services, cannot be used without infringing the technology claimed in the '722 Patent, and are not staple articles of commerce suitable for substantial non-infringing uses.

60.     **Willful Blindness.** Southwest knew of the '722 Patent, or should have known of the '722 Patent, but was willfully blind to its existence. Southwest has had actual knowledge of the '722 Patent not later than receipt of a letter, dated September 30, 2024, and received on the same date. By the time of trial, Southwest will have known and intended (since receiving such notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '722 Patent. *See* Exhibit 7 (Notice Letter).

61.     **Induced Infringement**. Southwest has also contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '722 Patent by contributing to and/or inducing its partners, vendors, customers, and/or third parties to use or cause to use its

products and services, such as Example Southwest Count II Products and Services, in an infringing manner as described above, including encouraging and instructing its partners, vendors, customers, and/or third parties to infringe the '722 Patent. For example, on information and belief, Southwest offers products and services to its customers and third parties and/or employees that are associated with backend functionality provided by the Example Southwest Count II Products and Services. Southwest has contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '722 Patent by offering such products and services and contributing to and/or inducing its customers and third parties and/or employees to use such products and services that are associated with backend functionality provided by the Example Southwest Count II Products and Services.

62. Southwest therefore actively, knowingly, and intentionally has committed, and continues to commit, affirmative acts that cause infringement, literally and/or by the doctrine of equivalents, of one or more claims of the '722 Patent with knowledge of the '722 Patent and knowledge that the induced acts constitute infringement of one or more claims of the '722 Patent. Southwest has actively induced others, including, but not limited to, partners, vendors, customers, and/or third parties who use the Example Southwest Count II Products and Services to infringe the '722 Patent, literally and/or by the doctrine of equivalents, throughout the United States, including within this District, by, among other things, advertising, promoting, and instructing the infringing use of the Example Southwest Count II Products and Services.

63. **Contributory Infringement.** Southwest actively, knowingly, and intentionally has committed, and continues to commit contributory infringement, literally and/or by the doctrine of equivalents, by, *inter alia,* knowingly providing software and technologies that when used, cause the direct infringement of one or more claims of the '722 Patent by its partners, vendors,

customers, and/or third parties, and which have no substantial non-infringing uses, or include a separate and distinct technology that is especially made or especially adapted for use in infringement of the '722 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

64.     Southwest therefore actively, knowingly, and intentionally has been and continues to materially contribute to their partners', vendors', and/or third-parties' infringement of the '722 Patent, literally and/or by the doctrine of equivalents, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Example Southwest Count II Products and Services for use in a manner that infringes one or more claims of the '722 Patent.  Example Southwest Count II Products and Services are especially made or adapted for infringing the '722 Patent and have no substantial non- infringing use.

65.     Exhibit 9 (claim chart) includes the Example Southwest Count II Products and Services and Example '722 Patent Claims.  As set forth in the chart, the Example Southwest Count II Products and Services practice the technology claimed by the '722 Patent.  Accordingly, the Example Southwest Count II Products and Services incorporated in the chart satisfies all elements of the Example '722 Patent Claims.

66.     Intellectual Ventures therefore incorporates by reference in its allegations herein the claim chart of Exhibit 9.

67.     Intellectual Ventures is entitled to recover damages adequate to compensate for Defendant's infringement of the '722 Patent and will continue to be damaged by such infringement.  Intellectual Ventures is entitled to recover damages from Defendant to compensate them for Defendant's infringement, as alleged above, in an amount measured by no less than a

reasonable royalty under 35 U.S.C. § 284, as well as enhanced damages pursuant to 35 U.S.C. § 284.

68.     Further, Southwest's infringement of Intellectual Ventures' rights under the '722 Patent will continue to damage Intellectual Ventures' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court.

69.     As a result of Southwest's acts of infringement, Intellectual Ventures has suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT III

(Southwest's Infringement of U.S. Patent No. 7,949,785)

70.     Paragraphs 1 through 69 are incorporated by reference as if fully set forth herein.

71.     **Direct Infringement**.  Southwest, without authorization or license from IV, has directly infringed, and continues to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, the '785 Patent, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Accused Products and Services that infringe the '785 Patent, including but not limited to at least the Accused Products and Services identified in the example chart incorporated, per paragraph 82 below, into this Count (collectively, "Example Southwest Count III Products and Services") that infringe at least the example claims of the '785 Patent identified in the chart incorporated into this Count (the "Example '785 Patent Claims") literally or by the doctrine of equivalents.

72.     On information and belief, Southwest has also infringed and continues to directly infringe, literally or under the doctrine of equivalents, the Example '785 Patent Claims, by internal testing and use of the Example Southwest Count III Products and Services.

73. Each claim of the '785 Patent is valid, enforceable, and patent eligible under Section 101 of the Patent Act. For example, the '785 Patent is related to private virtual dynamic networks and enabling communications between devices on public and private networks. The '785 Patent discloses and claims systems and methods that address technical problems that are inherent in and derive from prior art method and systems involving the problems of virtual network management, among other issues. The '785 Patent addressed this technical problem and others with a technical solution that is described in the specification and captured by one or more claims. Additionally, the claims of the '785 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

74. Each claim of the '785 Patent recites an independent invention. Neither the example claims described nor any other individual claim is representative of all claims in the '785 Patent.

75. Southwest has known that its infringing products and services, such as the Example Southwest Count III Products and Services, cannot be used without infringing the technology claimed in the '785 Patent, and are not staple articles of commerce suitable for substantial non-infringing uses.

76. **Willful Blindness.** Southwest knew of the '785 Patent, or should have known of the '785 Patent, but was willfully blind to its existence. Southwest has had actual knowledge of the '785 Patent not later than receipt of a letter, dated September 30, 2024, and received on the same date. By the time of trial, Southwest will have known and intended (since receiving such notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '785 Patent. *See* Exhibit 7 (Notice Letter).

77.  **Induced Infringement.**  Southwest has also contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '785 Patent by contributing to and/or inducing its partners, vendors, customers, and/or third parties to use or cause to use its products and services, such as Example Southwest Count III Products and Services, in an infringing manner as described above, including encouraging and instructing its partners, vendors, customers, and/or third parties to infringe the '785 Patent.  For example, on information and belief, Southwest offers products and services to its customers and third parties and/or employees that are associated with backend functionality provided by the Example Southwest Count III Products and Services. Southwest has contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '785 Patent by offering such products and services and contributing to and/or inducing its customers and third parties and/or employees to use such products and services that are associated with backend functionality provided by the Example Southwest Count III Products and Services.

78.  Southwest therefore actively, knowingly, and intentionally has committed, and continues to commit, affirmative acts that cause infringement, literally and/or by the doctrine of equivalents, of one or more claims of the '785 Patent with knowledge of the '785 Patent and knowledge that the induced acts constitute infringement of one or more claims of the '785 Patent. Southwest has actively induced others, including, but not limited to, partners, vendors, customers, and/or third parties who use the Example Southwest Count III Products and Services to infringe the '785 Patent, literally and/or by the doctrine of equivalents, throughout the United States, including within this District, by, among other things, advertising, promoting, and instructing the infringing use of the Example Southwest Count III Products and Services.

79.     **Contributory Infringement.**  Southwest actively, knowingly, and intentionally has committed, and continues to commit contributory infringement, literally and/or by the doctrine of equivalents, by, *inter alia*, knowingly providing software and technologies that when used, cause the direct infringement of one or more claims of the '785 Patent by its partners, vendors, customers, and/or third parties, and which have no substantial non-infringing uses, or include a separate and distinct technology that is especially made or especially adapted for use in infringement of the '785 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

80.     Southwest therefore actively, knowingly, and intentionally has been and continues to materially contribute to their partners', vendors', and/or third-parties' infringement of the '785 Patent, literally and/or by the doctrine of equivalents, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Example Southwest Count III Products and Services for use in a manner that infringes one or more claims of the '785 Patent.  Example Southwest Count III Products and Services are especially made or adapted for infringing the '785 Patent and have no substantial non-infringing use.

81.     Exhibit 10 (claim chart) includes the Example Southwest Count III Products and Services and Example '785 Patent Claims.  As set forth in the chart, the Example Southwest Count III Products and Services practice the technology claimed by the '785 Patent.  Accordingly, the Example Southwest Count III Products and Services incorporated in the chart satisfies all elements of the Example '785 Patent Claims.

82.     Intellectual Ventures therefore incorporates by reference in its allegations herein the claim chart of Exhibit 10.

83.     Intellectual Ventures is entitled to recover damages adequate to compensate for Defendant's infringement of the '785 Patent and will continue to be damaged by such infringement.  Intellectual Ventures is entitled to recover damages from Defendant to compensate them for Defendant's infringement, as alleged above, in an amount measured by no less than a reasonable royalty under 35 U.S.C. § 284, as well as enhanced damages pursuant to 35 U.S.C. § 284.

84.     Further, Southwest's infringement of Intellectual Ventures' rights under the '785 Patent will continue to damage Intellectual Ventures' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court.

85.     As a result of Defendant's acts of infringement, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## **COUNT IV**

(Southwest's Infringement of U.S. Patent No. 8,027,326)

86.     Paragraphs 1 through 85 are incorporated by reference as if fully set forth herein.

87.     **Direct Infringement**.  Southwest, without authorization or license from IV, has directly infringed, and continues to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, the '326 Patent, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Accused Products and Services that infringe the '326 Patent, including but not limited to at least the Accused Products and Services identified in the example chart incorporated, per paragraph 98 below, into this Count (collectively, "Example Southwest Count IV Products and Services") that infringe at least the example claims of the '326 Patent identified in the chart incorporated into this Count (the "Example '326 Patent Claims") literally or by the doctrine of equivalents.

88.     On information and belief, Southwest has also infringed and continues to directly infringe, literally or under the doctrine of equivalents, the Example '326 Patent Claims, by internal testing and use of the Example Southwest Count IV Products and Services.

89.     Each claim of the '326 Patent is valid, enforceable, and patent eligible under Section 101 of the Patent Act.  For example, the '326 Patent is related to increasing Wi-Fi bandwidth using a dual-channel for increased flexibility and performance.  The '326 Patent discloses and claims systems and methods that address technical problems that are inherent in and derive from prior art method and systems involving the problems of increasing Wi-Fi bandwidth, among other issues.  The '326 Patent addressed this technical problem and others with a technical solution that is described in the specification and captured by one or more claims.  Additionally, the claims of the '326 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

90.     Each claim of the '326 Patent recites an independent invention.  Neither the example claims described nor any other individual claim is representative of all claims in the '326 Patent.

91.     Southwest has known that its infringing products and services, such as the Example Southwest Count IV Products and Services, cannot be used without infringing the technology claimed in the '326 Patent, and are not staple articles of commerce suitable for substantial non-infringing uses.

92.     **Willful Blindness.**  Southwest knew of the '326 Patent, or should have known of the '326 Patent, but was willfully blind to its existence.  Southwest has had actual knowledge of the '326 Patent not later than receipt of a letter, dated September 30, 2024, and received on the same date.  By the time of trial, Southwest will have known and intended (since receiving such

notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '326 Patent.  *See* Exhibit 7 (Notice Letter).

93.  **Induced Infringement.**  Southwest has also contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '326 Patent by contributing to and/or inducing its partners, vendors, customers, and/or third parties to use or cause to use its products and services, such as Example Southwest Count IV Products and Services, in an infringing manner as described above, including encouraging and instructing its customers, partners, vendors, customers, and/or third parties to infringe the '326 Patent.  For example, on information and belief, Southwest offers Wi-Fi service through one or more providers such as Viasat and Anuvu,[5] and Southwest uses hardware and/or software from these providers that support Wi-Fi, including IEEE 802.11n and 802.11ac protocols.[6]

94.  Southwest therefore actively, knowingly, and intentionally has committed, and continues to commit, affirmative acts that cause infringement, literally and/or by the doctrine of equivalents, of one or more claims of the '326 Patent with knowledge of the '326 Patent and knowledge that the induced acts constitute infringement of one or more claims of the '326 Patent. Southwest has actively induced others, including, but not limited to, customers, partners, vendors, customers, and/or third parties who use the Example Southwest Count IV Products and Services to infringe the '326 Patent, literally and/or by the doctrine of equivalents, throughout the United States, including within this District, by, among other things, advertising, promoting, and instructing the infringing use of the Example Southwest Count IV Products and Services.

---

[5] https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I (Last Accessed on 10/11/2024).
[6] https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf.; https://fcc.report/FCC-ID/U6YRDAA8190/5344017.pdf. (Last Accessed on 10/9/2024).

95.     **Contributory Infringement.**  Southwest actively, knowingly, and intentionally has committed, and continues to commit contributory infringement, literally and/or by the doctrine of equivalents, by, *inter alia*, knowingly providing software and technologies that when used, cause the direct infringement of one or more claims of the '326 Patent by its partners, vendors, customers, and/or third parties, and which have no substantial non-infringing uses, or include a separate and distinct technology that is especially made or especially adapted for use in infringement of the '326 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

96.     Southwest therefore actively, knowingly, and intentionally has been and continues to materially contribute to their customers, partners', vendors', and/or third-parties' infringement of the '326 Patent, literally and/or by the doctrine of equivalents, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Example Southwest Count IV Products and Services for use in a manner that infringes one or more claims of the '326 Patent.  Example Southwest Count IV Products and Services are especially made or adapted for infringing the '326 Patent and have no substantial non-infringing use.

97.     Exhibit 11 (claim chart) includes the Example Southwest Count IV Products and Services and Example '326 Patent Claims.  As set forth in the chart, the Example Southwest Count IV Products and Services practice the technology claimed by the '326 Patent.  Accordingly, the Example Southwest Count IV Products and Services incorporated in the chart satisfies all elements of the Example '326 Patent Claims.

98.     Intellectual Ventures therefore incorporates by reference in its allegations herein the claim chart of Exhibit 11.

99.     Intellectual Ventures is entitled to recover damages adequate to compensate for Defendant's infringement of the '326 Patent and will continue to be damaged by such infringement.  Intellectual Ventures is entitled to recover damages from Defendant to compensate them for Defendant's infringement, as alleged above, in an amount measured by no less than a reasonable royalty under 35 U.S.C. § 284, as well as enhanced damages pursuant to 35 U.S.C. § 284.

100.     Further, Southwest's infringement of Intellectual Ventures' rights under the '326 Patent will continue to damage Intellectual Ventures' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court.

101.     As a result of Defendant's acts of infringement, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT V

(Southwest's Infringement of U.S. Patent No. 7,324,469)

102.     Paragraphs 1 through 101 are incorporated by reference as if fully set forth herein.

103.     **Direct Infringement**.  Southwest, without authorization or license from IV, has directly infringed, and continues to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, the '469 Patent, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Accused Products and Services that infringe the '469 Patent, including but not limited to at least the Accused Products and Services identified in the example chart incorporated, per paragraph 114 below, into this Count (collectively, "Example Southwest Count V Products and Services") that infringe at least the example claims of the '469 Patent identified in the chart incorporated into this Count (the "Example '469 Patent Claims") literally or by the doctrine of equivalents.

104.    On information and belief, Southwest has also infringed and continues to directly infringe, literally or under the doctrine of equivalents, the Example '469 Patent Claims, by internal testing and use of the Example Southwest Count V Products and Services.

105.    Each claim of the '469 Patent is valid, enforceable, and patent eligible under Section 101 of the Patent Act.  For example, the '469 Patent is related to an improved satellite distributed high-speed Internet Hotspot.  The '469 Patent discloses and claims systems and methods that address technical problems that are inherent in and derive from prior art method and systems involving the problems of distributed Internet Hotspots, among other issues.  The '469 Patent addressed this technical problem and others with a technical solution that is described in the specification and captured by one or more claims.  Additionally, the claims of the '469 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

106.    Each claim of the '469 Patent recites an independent invention.  Neither the example claims described nor any other individual claim is representative of all claims in the '469 Patent.

107.    Southwest has known that its infringing products and services, such as the Example Southwest Count V Products and Services, cannot be used without infringing the technology claimed in the '469 Patent, and are not staple articles of commerce suitable for substantial non-infringing uses.

108.    **Willful Blindness.**  Southwest knew of the '469 Patent, or should have known of the '469 Patent, but was willfully blind to its existence.  Southwest has had actual knowledge of the '469 Patent not later than receipt of a letter, dated September 30, 2024, and received on the same date.  By the time of trial, Southwest will have known and intended (since receiving such

notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '469 Patent.  *See* Exhibit 7 (Notice Letter).

109.    **Induced Infringement.**  Southwest has also contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '469 Patent by contributing to and/or inducing its partners, vendors, customers, and/or third parties to use or cause to use its products and services, such as Example Southwest Count V Products and Services, in an infringing manner as described above, including encouraging and instructing its customers, partners, vendors, customers, and/or third parties to infringe the '469 Patent.  For example, on information and belief, Southwest offers Wi-Fi service, including satellite-based Wi-Fi, through one or more providers such as Viasat and Anuvu,[7] and Southwest uses hardware and/or software from these providers that support Internet Hotspots using Wi-Fi.[8]

110.    Southwest therefore actively, knowingly, and intentionally has committed, and continues to commit, affirmative acts that cause infringement, literally and/or by the doctrine of equivalents, of one or more claims of the '469 Patent with knowledge of the '469 Patent and knowledge that the induced acts constitute infringement of one or more claims of the '469 Patent. Southwest has actively induced others, including, but not limited to, partners, vendors, customers, and/or third parties who use the Example Southwest Count V Products and Services to infringe the '469 Patent, literally and/or by the doctrine of equivalents, throughout the United States, including within this District, by, among other things, advertising, promoting, and instructing the infringing use of the Example Southwest Count V Products and Services.

---

[7] https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I (Last Accessed on 10/11/2024).
[8] https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf. (Last Accessed on 10/9/2024); https://fcc.report/FCC-ID/U6YRDAA8190/5344017.pdf. (Last Accessed on 10/9/2024).

111. **Contributory Infringement.** Southwest actively, knowingly, and intentionally has committed, and continues to commit contributory infringement, literally and/or by the doctrine of equivalents, by, *inter alia*, knowingly providing software and technologies that when used, cause the direct infringement of one or more claims of the '469 Patent by its partners, vendors, customers, and/or third parties, and which have no substantial non-infringing uses, or include a separate and distinct technology that is especially made or especially adapted for use in infringement of the '469 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

112. Southwest therefore actively, knowingly, and intentionally has been and continues to materially contribute to their customers, partners', vendors', and/or third-parties' infringement of the '469 Patent, literally and/or by the doctrine of equivalents, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Example Southwest Count V Products and Services for use in a manner that infringes one or more claims of the '469 Patent. Example Southwest Count V Products and Services are especially made or adapted for infringing the '469 Patent and have no substantial non-infringing use.

113. Exhibit 12 (claim chart) includes the Example Southwest Count V Products and Services and Example '469 Patent Claims. As set forth in the chart, the Example Southwest Count V Products and Services practice the technology claimed by the '469 Patent. Accordingly, the Example Southwest Count V Products and Services incorporated in the chart satisfies all elements of the Example '469 Patent Claims.

114. Intellectual Ventures therefore incorporates by reference in its allegations herein the claim chart of Exhibit 12.

115.    Intellectual Ventures is entitled to recover damages adequate to compensate for Defendant's infringement of the '469 Patent and will continue to be damaged by such infringement.  Intellectual Ventures is entitled to recover damages from Defendant to compensate them for Defendant's infringement, as alleged above, in an amount measured by no less than a reasonable royalty under 35 U.S.C. § 284, as well as enhanced damages pursuant to 35 U.S.C. § 284.

116.    Further, Southwest's infringement of Intellectual Ventures' rights under the '469 Patent will continue to damage Intellectual Ventures' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court.

117.    As a result of Defendant's acts of infringement, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT VI

(Southwest's Infringement of U.S. Patent No. 7,257,582)

118.    Paragraphs 1 through 117 are incorporated by reference as if fully set forth herein.

119.    **Direct Infringement**.  Southwest, without authorization or license from IV, has directly infringed, and continues to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, the '582 Patent, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Accused Products and Services that infringe the '582 Patent, including but not limited to at least the Accused Products and Services identified in the example charts incorporated, per paragraph 130 below, into this Count (collectively, "Example Southwest Count VI Products and Services") that infringe at least the example claims of the '582 Patent identified in the charts incorporated into this Count (the "Example '582 Patent Claims") literally or by the doctrine of equivalents.

120. On information and belief, Southwest has also infringed and continues to directly infringe, literally or under the doctrine of equivalents, the Example '582 Patent Claims, by internal testing and use of the Example Southwest Count VI Products and Services.

121. Each claim of the '582 Patent is valid, enforceable, and patent eligible under Section 101 of the Patent Act. The '582 Patent is related to improving load balancing by parallel processing of partitioned data. The '582 Patent discloses and claims systems and methods that address technical problems that are inherent in and derive from prior art method and systems involving the problems of enabling parallel processing involving linear processes, among other issues. The '582 Patent addressed this technical problem and others with a technical solution that is described in the specification and captured by one or more claims. Additionally, the claims of the '582 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

122. Each claim of the '582 Patent recites an independent invention. Neither the example claims described nor any other individual claim is representative of all claims in the '582 Patent.

123. Southwest has known that its infringing products and services, such as the Example Southwest Count VI Products and Services, cannot be used without infringing the technology claimed in the '582 Patent, and are not staple articles of commerce suitable for substantial non-infringing uses.

124. **Willful Blindness.** Southwest knew of the '582 Patent, or should have known of the '582 Patent, but was willfully blind to its existence. Southwest has had actual knowledge of the '582 Patent not later than receipt of a letter, dated September 30, 2024, and received on the same date. By the time of trial, Southwest will have known and intended (since receiving such

notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '582 Patent. *See* Exhibit 7 (Notice Letter).

125. **Induced Infringement.** Southwest has also contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '582 Patent by contributing to and/or inducing its partners, vendors, customers, and/or third parties to use or cause to use its products and services, such as Example Southwest Count VI Products and Services, in an infringing manner as described above, including encouraging and instructing its partners, vendors, customers, and/or third parties to infringe the '582 Patent. For example, on information and belief, Southwest offers products and services to its customers and third parties and/or employees that are associated with backend functionality provided by the Example Southwest Count VI Products and Services. Southwest has contributed to and/or induced, and continues to contribute to and/or induce the infringement of the '582 Patent by offering such products and services and contributing to and/or inducing its customers and third parties and/or employees to use such products and services that are associated with backend functionality provided by the Example Southwest Count VI Products and Services.

126. Southwest therefore actively, knowingly, and intentionally has committed, and continues to commit, affirmative acts that cause infringement, literally and/or by the doctrine of equivalents, of one or more claims of the '582 Patent with knowledge of the '582 Patent and knowledge that the induced acts constitute infringement of one or more claims of the '582 Patent. Southwest has actively induced others, including, but not limited to, partners, vendors, customers, and/or third parties who use the Example Southwest Count VI Products and Services to infringe the '582 Patent, literally and/or by the doctrine of equivalents, throughout the United States,

including within this District, by, among other things, advertising, promoting, and instructing the infringing use of the Example Southwest Count VI Products and Services.

127.     **Contributory Infringement.**     Southwest actively, knowingly, and intentionally has committed, and continues to commit contributory infringement, literally and/or by the doctrine of equivalents, by, *inter alia*, knowingly providing software and technologies that when used, cause the direct infringement of one or more claims of the '582 Patent by its partners, vendors, customers, and/or third parties, and which have no substantial non-infringing uses, or include a separate and distinct technology that is especially made or especially adapted for use in infringement of the '582 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

128.     Southwest therefore actively, knowingly, and intentionally has been and continues to materially contribute to their partners', vendors', and/or third-parties' infringement of the '582 Patent, literally and/or by the doctrine of equivalents, by making, utilizing, servicing, testing, distributing, offering, and/or offering for sale the Example Southwest Count VI Products and Services for use in a manner that infringes one or more claims of the '582 Patent.  Example Southwest Count VI Products and Services are especially made or adapted for infringing the '582 Patent and have no substantial non-infringing use.

129.     Exhibits 13 and 14 (claim charts) includes the Example Southwest Count VI Products and Services and Example '582 Patent Claims.  As set forth in these charts, the Example Southwest Count VI Products and Services practice the technology claimed by the '582 Patent. Accordingly, the Example Southwest Count VI Products and Services incorporated in these charts satisfy all elements of the Example '582 Patent Claims.

130.     Intellectual Ventures therefore incorporates by reference in its allegations herein the claim charts of Exhibits 13 and 14.

131.     Intellectual Ventures is entitled to recover damages adequate to compensate for Defendant's infringement of the '582 Patent and will continue to be damaged by such infringement.  Intellectual Ventures is entitled to recover damages from Defendant to compensate them for Defendant's infringement, as alleged above, in an amount measured by no less than a reasonable royalty under 35 U.S.C. § 284, as well as enhanced damages pursuant to 35 U.S.C. § 284.

132.     Further, Southwest's infringement of Intellectual Ventures' rights under the '582 Patent will continue to damage Intellectual Ventures' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court.

133.     As a result of Defendant's acts of infringement, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## DEMAND FOR JURY TRIAL

134.     Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.     A judgment that the Patents-in-Suit are valid and enforceable;

B.     A judgment that Defendant directly infringes, contributorily infringes, and/or actively induces infringement of one or more claims of *each of* the Patents-in-Suit;

C.     A judgment that awards Plaintiffs all damages adequate to compensate them for Defendant's direct infringement, willful infringement, contributory infringement,

and/or induced infringement of the Patents-in-Suit, including all pre- judgment and post- judgment interest at the maximum rate permitted by law;

D.      A judgment that awards Plaintiffs all appropriate damages under 35 U.S.C. § 284 for Defendant's past infringement with respect to the Patents-in-Suit;

E.      A judgment that awards Plaintiffs all appropriate damages under 35 U.S.C. § 284 for Defendant's infringement of the '844 Patent, '722 Patent, '785 Patent, '326 Patent, '469 Patent, and '582 Patent, which continue to damage Plaintiffs' business, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by the Court;

F.      A judgment that awards Plaintiffs all appropriate damages under 35 U.S.C. § 284 for Defendant's continuing or future infringement, up until the date such judgment is entered with respect to the Patents-in-Suit, including ongoing royalties, pre- and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

G.      A judgment that this case is exceptional under 35 U.S.C. § 285;

H.      An accounting of all damages not presented at trial; and

I.      A judgment that awards Plaintiffs their costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by the Court.

Dated: November 2, 2024            Respectfully submitted,

By: */s/ Mark D. Siegmund*
       Mark D. Siegmund (TX Bar No. 24117055)
       msiegmund@cjsjlaw.com
       **CHERRY JOHNSON SIEGMUND JAMES PLLC**
       7901 Fish Pond Rd., 2nd Floor
       Waco, Texas 76710
       Telephone: (254) 732-2242

Jonathan K. Waldrop (CA Bar No. 297903)
(Admitted in this District)
jwaldrop@kasowitz.com
Darcy L. Jones (CA Bar No. 309474)
(Admitted in this District)
djones@kasowitz.com
Marcus A. Barber (CA Bar No. 307361)
(Admitted in this District)
mbarber@kasowitz.com
John W. Downing (CA Bar No. 252850)
(Admitted in this District)
jdowning@kasowitz.com
Heather S. Kim (CA Bar No. 277686)
(Admitted in this District)
hkim@kasowitz.com
ThucMinh Nguyen (CA Bar No. 304382)
(Admitted in this District)
tnguyen@kasowitz.com
Jonathan Hicks (CA Bar No. 274634)
(Admitted in this District)
jhicks@kasowitz.com
**KASOWITZ BENSON TORRES LLP**
333 Twin Dolphin Drive, Suite 200
Redwood Shores, California 94065
Telephone: (650) 453-5170
Facsimile: (650) 453-5171

**Attorneys for Plaintiffs**
**INTELLECTUAL VENTURES I LLC and**
**INTELLECTUAL VENTURES II LLC**

# Exhibit 5

**Exhibit 11 to Complaint**
**Intellectual Ventures I LLC and Intellectual Ventures II LLC**

**Example Southwest Count 4 Systems and Services**
**U.S. Patent No. 8,027,326 ("'326 Patent")**

The Accused Systems and Services include without limitation Southwest systems and services that provide Wi-Fi Access Points that support at least IEEE 802.11n and/or 802.11ac; all past, current, and future systems and services that operate in the same or substantially similar manner as the specifically identified systems and services; and all past, current, and future Southwest systems and services that have the same or substantially similar features as the specifically identified systems and services ("Example Southwest Count 4 Systems and Services" or "Southwest Systems and Services").

On information and belief, the Southwest Systems and Services provide Wi-Fi Access Points that enable Internet connectivity on its airplanes.



Source: https://www.southwest.com/inflight-entertainment-portal/.[1]

---

[1] All sources cited in this document were publicly accessible as of the filing date of the Complaint.

We're excited to announce that as of yesterday, March 9, 2023, our first aircraft equipped with hardware from our new WiFi vendor, Viasat, has entered service. Viasat is an industry leader, and we're excited about the increased connectivity and reliability that Viasat will provide. As we prepare for additional Viasat-equipped aircraft deliveries, we're also making significant progress updating our existing fleet with new Anuvu hardware (our original WiFi vendor). We have now upgraded more than 400 aircraft and are well on our way to upgrading the entire fleet by the third quarter of this year.

Between our upgraded Anuvu hardware and integration of Viasat, we're bringing a faster, more reliable WiFi experience. In addition to improved WiFi quality, Viasat offers Customers the ability to trade paid internet connectivity between personal devices (known as "device swapping"). For example, if a Customer has paid Internet using their laptop, they can use the "swap device" function in the Inflight Entertainment Portal to switch connectivity to their phone.

| | Anuvu Legacy | Anuvu Upgraded | Viasat |
|---|---|---|---|
| Improved Speeds and Reliability | ✖ | ✔ | ✔ |
| Streaming (when authenticated for Internet) | ✖ | ✔ | ✔ |
| Device Swap | ✖ | ✖ | ✔ |
| Free Entertainment, Texting, and Flight Tracker | ✔ | ✔ | ✔ |

Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I.

On information and belief, Southwest uses routers that support WiFi 802.11 ac/abgn, such as the Viasat Select Router.

3

# Viasat Select Router

## Redefining the in-flight connectivity experience

The Viasat Select Router, coupled with Viasat's latest generation satellite terminal, delivers a fully managed internet connectivity network inside the cabin that promises to deliver maximum speed and capabilities from Viasat's high-capacity satellite network.

Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf.

### Multi-link connections

The Viasat Select Router ("VSR") is a fully featured cabin connectivity management device that integrates the Viasat connectivity service with other available cabin connectivity on the aircraft. User traffic is routed automatically over the best available network and in the event of a service disruption, an alternate service is automatically selected to ensure continuous internet access.

Every VSR is equipped with an integral cellular modem that enables near global 4G LTE data service while the aircraft is on the ground. The data service can be used by passengers or crew, and is available to Viasat's technical support team for remote access to assist with equipment configuration, software updates, and other troubleshooting support, while the aircraft remains in the hangar.

The router incorporates an 802.11ac Wi-Fi access point for easy in-cabin wireless connectivity for passengers, crew and ground operations. Additional antennas can be added to ensure optimal signal strength inside the cabin as necessary.

4

Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf.

**SPECIFICATIONS**

| | | | |
|---|---|---|---|
| **Size** | 1.75 in. H × 7.8 in. W × 5.5 in. D | **Storage** | 1 TB (OS and applications) |
| **Weight** | 3.9 lbs | **Ethernet Ports** | › 5 x 10/100/1000 bps Ethernet Ports (Switched) |
| **Voltage** | 28VDC with 200ms Hold-up | | › 1 x 10/100/1000 bps Ethernet Ports (Direct) |
| **Power** | 20W(typical); 30W (max) | | › 1 x 10/100/1000 bps Ethernet Ports (Front Panel) |
| **Environment** | Qualified to DO-160G | **ARINC 429** | 2x Rx Channels / 1x Tx Channel |
| **Processor** | Intel E3845 4 Core processor, 1.5GHz | **Cellular Modem** | Integrated Global coverage 4G/LTE Advanced modem; 2x mini SIMs; 2x RF QMA connections |
| | | **Wi-Fi** | 802.11 ac/abgn; 3x RF QMA connections |

Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf.

**IEEE 802.11n™, or Wi-Fi 4**, was introduced in 2009 to support the 2.4 GHz and 5GHz frequency bands, with up to 600 Mbit/s data rates, multiple channels within each frequency band, and other features. IEEE 802.11n data throughputs enabled the use of WLAN networks in place of wired networks, a significant feature enabling new use cases and reduced operational costs for end users and IT organizations.

**IEEE 802.11ac™, or Wi-Fi 5**, was introduced in 2013 to support data rates at up to 3.5 Gbit/s, with still-greater bandwidth, additional channels, better modulation, and other features. It was the first Wi-Fi standard to enable the use of multiple input/multiple output (MIMO) technology so that multiple antennas could be used on both sending and receiving devices to reduce errors and boost speed.

Source: https://standards.ieee.org/beyond-standards/the-evolution-of-wi-fi-technology-and-standards/.

On information and belief, other Southwest In-Flight Connectivity (IFC) providers, such as Anuvu, support IEEE 802.11n and 802.11ac.

## Satellite-based Connectivity and Entertainment experience

- High-speed internet and content streaming
- Consistent connected service with optimized network coverage
- Tiered payment configuration
- Ancillary revenue models

- Entertainment delivered as fully licensed and industry compliant
- Line-fit and retro-fit installation options
- No-touch software and content updates
- Flying onboard over 1,000+ aircraft

**Direct to passenger's own device connectivity and entertainment inflight experience**

6



Source:
https://d1io3yog0oux5.cloudfront.net/anuvu/files/pages/anuvu/db/620/description/AirconnectGlobalKU_Final_ProductSheet+.pdf.

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| [1.pre] A method for increasing data rates and data throughput in a network, the method comprising: | To the extent this preamble is limiting, on information and belief, the Southwest Count 4 Systems and Services practice a method for increasing data rates and data throughput in a network. <br><br> On information and belief, Southwest provides in flight Wi-Fi connectivity through provider equipment provided by Viasat and Anuvu. This equipment is compliant with Wi-Fi 802.11n and 802.11ac protocols. For example, the Viasat equipment and Anuvu equipment is compliant with the Wi-Fi 802.11n and 802.11ac protocols. <br><br> We're excited to announce that as of yesterday, March 9, 2023, our first aircraft equipped with hardware from our new WiFi vendor, Viasat, has entered service. Viasat is an industry leader, and we're excited about the increased connectivity and reliability that Viasat will provide. As we prepare for additional Viasat-equipped aircraft deliveries, we're also making significant progress updating our existing fleet with new Anuvu hardware (our original WiFi vendor). We have now upgraded more than 400 aircraft and are well on our way to upgrading the entire fleet by the third quarter of this year. <br><br> Between our upgraded Anuvu hardware and integration of Viasat, we're bringing a faster, more reliable WiFi experience. In addition to improved WiFi quality, Viasat offers Customers the ability to trade paid internet connectivity between personal devices (known as "device swapping"). For example, if a Customer has paid for Internet using their laptop, they can use the "swap device" function in the Inflight Entertainment Portal to switch connectivity to their phone. <br><br>  <br><br> Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | # Viasat Select Router<br><br>Redefining the in-flight connectivity experience<br><br>The Viasat Select Router, coupled with Viasat's latest generation satellite terminal, delivers a ==fully managed internet connectivity network inside the cabin that promises to deliver maximum speed and capabilities from Viasat's high-capacity satellite network.==<br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf.<br><br>**SPECIFICATIONS**<br><br>| | | | |<br>|---|---|---|---|<br>| Size | 1.75 in. H × 7.8 in. W × 5.5 in. D | Storage | 1 TB (OS and applications) |<br>| Weight | 3.9 lbs | Ethernet Ports | › 5 x 10/100/1000 bps Ethernet Ports (Switched) |<br>| Voltage | 28VDC with 200ms Hold-up | | › 1 x 10/100/1000 bps Ethernet Ports (Direct) |<br>| Power | 20W(typical); 30W (max) | | › 1 x 10/100/1000 bps Ethernet Ports (Front Panel) |<br>| Environment | Qualified to DO-160G | ARINC 429 | 2x Rx Channels / 1x Tx Channel |<br>| Processor | Intel E3845 4 Core processor, 1.5GHz | Cellular Modem | Integrated Global coverage 4G/LTE Advanced modem; 2x mini SIMs; 2x RF QMA connections |<br>| | | ==Wi-Fi== | ==802.11 ac/abgn;== 3x RF QMA connections |<br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Satellite-based Connectivity and Entertainment experience <br><br> • High-speed internet and content streaming <br> • Consistent connected service with optimized network coverage <br> • Tiered payment configuration <br> • Ancillary revenue models <br><br> • Entertainment delivered as fully licensed and industry compliant <br> • Line-fit and retro-fit installation options <br> • No-touch software and content updates <br> • Flying onboard over 1,000+ aircraft <br><br> **Direct to passenger's own device connectivity and entertainment inflight experience** |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | <br><br>Source:<br>https://d1io3yog0oux5.cloudfront.net/anuvu/files/pages/anuvu/db/620/description/AirconnectGlobalKU_Final_ProductSheet+.pdf.<br><br>On information and belief, by bonding two 20 MHz channels together, the IEEE 802.11-2016 standard enables 40 MHz capable high throughput (HT) operation, which can support high data rates up to 600 Mb/s. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **3A. Definitions specific to IEEE 802.11**<br><br>The following terms and definitions are specific to this standard and are not appropriate for inclusion in the *IEEE Standards Dictionary: Glossary of Terms & Definitions.*[1]<br><br>**3A.1 20 MHz basic service set (BSS):** A BSS in which the Secondary Channel Offset field is set to SCN.<br><br>**3A.2 20 MHz high-throughput (HT):** A Clause 20 transmission using FORMAT=HT_MF or HT_GF and CH_BANDWIDTH=HT_CBW20.<br><br>**3A.3 20 MHz mask physical layer convergence procedure (PLCP) protocol data unit (PPDU):** A Clause 17 PPDU, a Clause 19 orthogonal frequency division multiplexing (OFDM) PPDU, or a Clause 20 20 MHz high-throughput (HT) PPDU with the TXVECTOR parameter CH_BANDWIDTH set to HT_CBW20 and the CH_OFFSET parameter set to CH_OFF_20. The PPDU is transmitted using a 20 MHz transmit spectral mask defined in Clause 17, Clause 19, or Clause 20, respectively.<br><br>**3A.4 20 MHz physical layer convergence procedure (PLCP) protocol data unit (PPDU):** A Clause 15 PPDU, Clause 17 PPDU, Clause 18 PPDU, Clause 19 orthogonal frequency division multiplexing (OFDM) PPDU, or Clause 20 20 MHz high-throughput (HT) PPDU with the TXVECTOR parameter CH_BANDWIDTH set to HT_CBW20. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **3A.5 20/40 MHz basic service set (BSS):** A BSS in which the supported channel width of the access point (AP) or independent BSS (IBSS) dynamic frequency selection (DFS) owner (IDO) station (STA) is 20 MHz and 40 MHz (Channel Width field is set to 1) and the Secondary Channel Offset field is set to a value of SCA or SCB.<br><br>**3A.6 40-MHz-capable (FC) high-throughput (HT) access point (AP):** An HT AP that included a value of 1 in the Supported Channel Width Set subfield (indicating its capability to operate on a 40 MHz channel) of its most recent transmission of a frame containing an HT Capabilities element.<br><br>**3A.7 40-MHz-capable (FC) high-throughput (HT) access point (AP) 2G4:** An HT AP 2G4 that is also an FC HT AP.<br><br>**3A.8 40-MHz-capable (FC) high-throughput (HT) access point (AP) 5G:** An HT AP 5G that is also an FC HT AP.<br><br>**3A.9 40-MHz-capable (FC) high-throughput (HT) station (STA):** An HT STA that included a value of 1 in the Supported Channel Width Set subfield (indicating its capability to operate on a 40 MHz channel) of its most recent transmission of a frame containing an HT Capabilities element.<br><br>**3A.10 40-MHz-capable (FC) high-throughput (HT) station (STA) 2G4:** An HT STA 2G4 that is also an FC HT STA.<br><br>**3A.11 40-MHz-capable (FC) high-throughput (HT) station (STA) 5G:** An HT STA 5G that is also an FC HT STA.<br><br>**3A.12 40 MHz high throughput (HT):** A Clause 20 transmission using FORMAT=HT_MF or HT_GF and CH_BANDWIDTH=HT_CBW40.<br><br>Source: IEEE Standard 802.11n-2009 at 3-4. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | ## 3.2 Definitions specific to IEEE Std 802.11<br><br>**20/40 MHz basic service set (BSS):** A BSS in which the supported channel width of the access point (AP) or dynamic frequency selection (DFS) owner (DO) station (STA) is 20 MHz and 40 MHz (Channel Width field is equal to 1) and the Secondary Channel Offset field is equal to a value of secondary channel above (SCA) or secondary channel below (SCB).<br><br>**40-MHz-capable (40MC) high-throughput (HT) access point (AP):** An HT AP that included a value of 1 in the Supported Channel Width Set subfield (indicating its capability to operate on a 40 MHz channel) of its most recent transmission of a frame containing an HT Capabilities element.<br><br>Source: IEEE Standard 802.11-2016 at 143. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **20. High Throughput (HT) PHY specification** <br><br> **20.1 Introduction** <br><br> **20.1.1 Introduction to the HT PHY** <br><br> Clause 20 specifies the PHY entity for a high throughput (HT) orthogonal frequency division multiplexing (OFDM) system. <br><br> In addition to the requirements found in Clause 20, an HT STA shall be capable of transmitting and receiving frames that are compliant with the mandatory PHY specifications defined as follows: <br><br> — In Clause 17 when the HT STA is operating in a 20 MHz channel width in the 5 GHz band <br><br> — In Clause 18 and Clause 19 when the HT STA is operating in a 20 MHz channel width in the 2.4 GHz band <br><br> The HT PHY is based on the OFDM PHY defined in Clause 17, with extensibility up to four spatial streams, operating in 20 MHz bandwidth. Additionally, transmission using one to four spatial streams is defined for operation in 40 MHz bandwidth. These features are capable of supporting data rates up to 600 Mb/s (four spatial streams, 40 MHz bandwidth). <br><br> Source: IEEE Standard 802.11n-2009 at 247. <br><br> **19. High-throughput (HT) PHY specification** <br><br> **19.1 Introduction** <br><br> **19.1.1 Introduction to the HT PHY** |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | The HT PHY is based on the OFDM PHY defined in Clause 17, with extensibility up to four spatial streams, operating in 20 MHz bandwidth. Additionally, transmission using one to four spatial streams is defined for operation in 40 MHz bandwidth. These features are capable of supporting data rates up to 600 Mb/s (four spatial streams, 40 MHz bandwidth).<br><br>Source: IEEE Standard 802.11-2016 at 2334.<br><br>**40MHZ OFDM 802.11N**<br><br>• 802.11n also introduced a 40 MHz channel, which combined two 20 MHz channels<br>• The 40 MHz channel consists of 128 subcarriers:<br>  • 128 subcarriers:<br>    • 108 transmit data subcarriers<br>    • 6 as pilot carriers<br>    • 14 unused |

| U.S. Patent No. 8,027,326 (Claim 1) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | • When two 20 MHz HT channels are bonded together, some of the formerly unused subcarriers at the bottom of the higher channel and at the top end of the lower channel are able to be used to transmit data.<br>• That is why the number of subcarriers is slightly more than two times the 56 subcarriers in a 20 MHz channel.<br>• Each bonded channel consists of a primary and secondary 20 MHz channel.<br>• The channels must be adjacent. A positive or negative offset indicates whether the secondary channel is the channel above or the channel below the primary channel. This is pictured in Figure 19.4.<br><br>Source: https://dot11ap.wordpress.com/ht-channel-width-operation/.<br><br>On information and belief, IEEE 802.11ac infringes for the same reasons as 802.11n. *See supra*. *See also*: |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **4.3.14 Very high throughput (VHT) STA** <br><br> The IEEE 802.11 VHT STA operates in frequency bands below 6 GHz excluding the 2.4 GHz band. <br><br> A VHT STA is an HT STA that, in addition to features supported as an HT STA, supports VHT features identified in Clause 9, Clause 10, Clause 11, Clause 14, Clause 17, and Clause 21. <br><br> The main PHY features in a VHT STA that are not present in an HT STA are the following: <br> — Mandatory support for 40 MHz and 80 MHz channel widths <br> — Mandatory support for VHT single-user (SU) PPDUs <br> — Optional support for 160 MHz and 80+80 MHz channel widths <br> — Optional support for VHT sounding protocol to support beamforming <br> — Optional support for VHT multi-user (MU) PPDUs <br> — Optional support for VHT-MCSs 8 and 9 <br><br> Source: IEEE Standard 802.11-2016 at 197. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Table 21-38—VHT-MCSs for mandatory 40 MHz, $N_{SS} = 1$ |

| VHT-MCS Index | Modulation | $R$ | $N_{BPSCS}$ | $N_{SD}$ | $N_{SP}$ | $N_{CBPS}$ | $N_{DBPS}$ | $N_{ES}$ | Data rate (Mb/s) 800 ns GI | Data rate (Mb/s) 400 ns GI (See NOTE) |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | BPSK | 1/2 | 1 | 108 | 6 | 108 | 54 | 1 | 13.5 | 15.0 |
| 1 | QPSK | 1/2 | 2 | 108 | 6 | 216 | 108 | 1 | 27.0 | 30.0 |
| 2 | QPSK | 3/4 | 2 | 108 | 6 | 216 | 162 | 1 | 40.5 | 45.0 |
| 3 | 16-QAM | 1/2 | 4 | 108 | 6 | 432 | 216 | 1 | 54.0 | 60.0 |
| 4 | 16-QAM | 3/4 | 4 | 108 | 6 | 432 | 324 | 1 | 81.0 | 90.0 |
| 5 | 64-QAM | 2/3 | 6 | 108 | 6 | 648 | 432 | 1 | 108.0 | 120.0 |
| 6 | 64-QAM | 3/4 | 6 | 108 | 6 | 648 | 486 | 1 | 121.5 | 135.0 |
| 7 | 64-QAM | 5/6 | 6 | 108 | 6 | 648 | 540 | 1 | 135.0 | 150.0 |
| 8 | 256-QAM | 3/4 | 8 | 108 | 6 | 864 | 648 | 1 | 162.0 | 180.0 |
| 9 | 256-QAM | 5/6 | 8 | 108 | 6 | 864 | 720 | 1 | 180.0 | 200.0 |

NOTE—Support of 400 ns GI is optional on transmit and receive.

*See also* IEEE Standard 802.11-2016 at 2612, where a 40 MHz Modulation and Coding Scheme (MCS) is mandatory.

19

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |

Table 21-46—VHT-MCSs for mandatory 80 MHz, $N_{SS} = 1$

| VHT-MCS Index | Modulation | $R$ | $N_{BPSCS}$ | $N_{SD}$ | $N_{SP}$ | $N_{CBPS}$ | $N_{DBPS}$ | $N_{ES}$ | Data rate (Mb/s) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | **800 ns GI** | **400 ns GI (See NOTE)** |
| 0 | BPSK | 1/2 | 1 | 234 | 8 | 234 | 117 | 1 | 29.3 | 32.5 |
| 1 | QPSK | 1/2 | 2 | 234 | 8 | 468 | 234 | 1 | 58.5 | 65.0 |
| 2 | QPSK | 3/4 | 2 | 234 | 8 | 468 | 351 | 1 | 87.8 | 97.5 |
| 3 | 16-QAM | 1/2 | 4 | 234 | 8 | 936 | 468 | 1 | 117.0 | 130.0 |
| 4 | 16-QAM | 3/4 | 4 | 234 | 8 | 936 | 702 | 1 | 175.5 | 195.0 |
| 5 | 64-QAM | 2/3 | 6 | 234 | 8 | 1404 | 936 | 1 | 234.0 | 260.0 |
| 6 | 64-QAM | 3/4 | 6 | 234 | 8 | 1404 | 1053 | 1 | 263.3 | 292.5 |
| 7 | 64-QAM | 5/6 | 6 | 234 | 8 | 1404 | 1170 | 1 | 292.5 | 325.0 |
| 8 | 256-QAM | 3/4 | 8 | 234 | 8 | 1872 | 1404 | 1 | 351.0 | 390.0 |
| 9 | 256-QAM | 5/6 | 8 | 234 | 8 | 1872 | 1560 | 1 | 390.0 | 433.3 |
| NOTE—Support of 400 ns GI is optional on transmit and receive. | | | | | | | | | | |

See also IEEE Standard 802.11-2016 at 2616, where an 80 MHz Modulation and Coding Scheme (MCS) is mandatory.

| [1.a] selecting at least a first channel and a second channel, wherein the first channel and the second channel are adjacent without | On information and belief, the Southwest Count 4 Systems and Services practice selecting at least a first channel and a second channel, wherein the first channel and the second channel are adjacent without any other channels therebetween, wherein the first channel and the second channel each have a plurality of data subcarriers, wherein the data subcarriers of the first channel and the data subcarriers |

| U.S. Patent No. 8,027,326 (Claim 1) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| any other channels therebetween, wherein the first channel and the second channel each have a plurality of data subcarriers, wherein the data subcarriers of the first channel and the data subcarriers of the second channel are separated by a frequency gap corresponding to one or more guard bands between the first and second channels; | of the second channel are separated by a frequency gap corresponding to one or more guard bands between the first and second channels.<br><br>On information and belief, an IEEE 802.11-2016 HT STA selects a Primary Channel and a Secondary Channel as indicated via the HT Operation element.<br><br>**3. Definitions**<br><br>**3.242 primary channel:** The common channel of operation for all stations (STAs) that are members of the basic service set (BSS).<br><br>**3A.61 secondary channel:** A 20 MHz channel associated with a primary channel used by high-throughput (HT) stations (STAs) for the purpose of creating a 40 MHz channel.<br><br>Source: IEEE Standard 802.11n-2009 at 2, 7.<br><br>**3.2 Definitions specific to IEEE Std 802.11**<br><br>**primary 20 MHz channel:** In a 40 MHz, 80 MHz, 160 MHz, or 80+80 MHz very high throughput (VHT) basic service set (BSS), the 20 MHz channel that is used to transmit 20 MHz physical layer (PHY) protocol data units (PPDUs). In a VHT BSS, the primary 20 MHz channel is also the primary channel. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **secondary 20 MHz channel:** In a 40 MHz very high throughput (VHT) basic service set (BSS), the 20 MHz channel adjacent to the primary 20 MHz channel that together form the 40 MHz channel of the 40 MHz VHT BSS. In an 80 MHz VHT BSS, the 20 MHz channel adjacent to the primary 20 MHz channel that together form the primary 40 MHz channel of the 80 MHz VHT BSS. In a 160 MHz or 80+80 MHz VHT BSS, the 20 MHz channel adjacent to the primary 20 MHz channel that together form the primary 40 MHz channel of the 160 MHz or 80+80 MHz VHT BSS. In a VHT BSS, the secondary 20 MHz channel is also the secondary channel. <br><br> **secondary channel:** A 20 MHz channel associated with a primary channel used by high-throughput (HT) stations (STAs) for the purpose of creating a 40 MHz channel or used by very high throughput (VHT) STAs for the purpose of creating the primary 40 MHz channel. <br><br> Source: IEEE Standard 802.11-2016 at 161-63. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **7.3.2.57 HT Operation element**<br><br>The operation of HT STAs in the BSS is controlled by the HT Operation element. The structure of this element is defined in Figure 7-95o24.<br><br><br><br>**Figure 7-95o24—HT Operation element format**<br><br>Source: IEEE Standard 802.11n-2009 at 76. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **9.4.2.57 HT Operation element**<br><br>==The operation of HT STAs in the BSS is controlled by the HT Operation element.== The structure of this element is defined in Figure 9-338.<br><br><br><br>**Figure 9-338—HT Operation element format**<br><br>Source: IEEE Standard 802.11-2016 at 950.<br><br>The structure of the HT Operation Information field is shown in Figure 9-339.<br><br><br><br>Source: IEEE Standard 802.11-2016 at 951. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | The fields of the HT Operation element are defined in Table 7-43p. The "Reserved in IBSS?" column indicates whether each field is reserved (Y) or not reserved (N) when this element is present in a frame transmitted within an IBSS. |

Table 7-43p—HT Operation element

| Field | Definition | Encoding | Reserved in IBSS ? |
|---|---|---|---|
| Primary Channel | Indicates the channel number of the primary channel. See 11.14.2. | Channel number of the primary channel | N |
| Secondary Channel Offset | Indicates the offset of the secondary channel relative to the primary channel. | Set to 1 (SCA) if the secondary channel is above the primary channel. Set to 3 (SCB) if the secondary channel is below the primary channel. Set to 0 (SCN) if no secondary channel is present. The value 2 is reserved | N |

Source: IEEE Standard 802.11n-2009 at 77.

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **Figure 9-339—HT Operation Information field**

The Primary Channel field, subfields of the HT Operation Information field, and the Basic HT-MCS Set field are defined in Table 9-168. The "Reserved in IBSS?" column indicates whether each field is reserved (Y) or not reserved (N) when this element is present in a frame transmitted within an IBSS. The "Reserved in MBSS?" column indicates whether each field is reserved (Y) or not reserved (N) when this element is present in a frame transmitted within an MBSS.

**Table 9-168—HT Operation element fields and subfields**

| Field | Definition | Encoding | Reserved in IBSS? | Reserved in MBSS? |
|---|---|---|---|---|
| Primary Channel | Indicates the channel number of the primary channel. See 11.16.2. | Channel number of the primary channel | N | N |
| Secondary Channel Offset | Indicates the offset of the secondary channel relative to the primary channel. | Set to 1 (SCA) if the secondary channel is above the primary channel<br>Set to 3 (SCB) if the secondary channel is below the primary channel<br>Set to 0 (SCN) if no secondary channel is present<br><br>The value 2 is reserved | N | N |

Source: IEEE Standard 802.11-2016 at 951. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |

**Table 20-5—Timing-related constants**

| Parameter | TXVECTOR CH_BANDWIDTH | | | |
|---|---|---|---|---|
| | NON_HT_CBW20 | HT_CBW_20 | HT_CBW40 or NON_HT_CBW40 | |
| | | | HT format | MCS 32 and non-HT duplicate |
| $N_{SD}$: Number of complex data numbers | 48 | 52 | 108 | 48 |
| $N_{SP}$: Number of pilot values | 4 | 4 | 6 | 4 |
| $N_{ST}$: Total number of subcarriers See NOTE 1 | 52 | 56 | 114 | 104 |

Source: IEEE Standard 802.11n-2009 at Table 20-5.

**Table 19-6—Timing-related constants**

| Parameter | TXVECTOR CH_BANDWIDTH | | | |
|---|---|---|---|---|
| | NON_HT_CBW20 | HT_CBW_20 | HT_CBW40 or NON_HT_CBW40 | |
| | | | HT format | MCS 32 and non-HT duplicate |
| $N_{SD}$: Number of complex data numbers | 48 | 52 | 108 | 48 |
| $N_{SP}$: Number of pilot values | 4 | 4 | 6 | 4 |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Source: IEEE Standard 802.11-2016 at Table 19-6. |

**40 MHZ OFDM 802.11N**

- 802.11n also introduced a 40 MHz channel, which combined two 20 MHz channels
- The 40 MHz channel consists of 128 subcarriers:
  - 128 subcarriers:
    - 108 transmit data subcarriers
    - 6 as pilot carriers
    - 14 unused

- When two 20 MHz HT channels are bonded together, some of the formerly unused subcarriers at the bottom of the higher channel and at the top end of the lower channel are able to be used to transmit data.
- That is why the number of subcarriers is slightly more than two times the 56 subcarriers in a 20 MHz channel.
- Each bonded channel consists of a primary and secondary 20 MHz channel.
- The channels must be adjacent. A positive or negative offset indicates whether the secondary channel is the channel above or the channel below the primary channel. This is pictured in Figure 19.4.

Source: https://dot11ap.wordpress.com/ht-channel-width-operation/.

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| |  *Figure 2.6. OFDM Subcarriers in the Frequency Domain.* Source: http://download.ni.com/evaluation/rf/Introduction_to_WLAN_Testing.pdf. **Radio Enhancements** 802.11n uses both 20-MHz and 40-MHz channels. Like the proprietary products, the 40-MHz channels in 802.11n are two adjacent 20-MHz channels, bonded together. When using the 40-MHz bonded channel, 802.11n takes advantage of the fact that each 20-MHz channel has a small amount of the channel that is reserved at the top and bottom, to reduce interference in those adjacent channels. When using 40-MHz channels, the top of the lower channel and the bottom of the upper channel don't have to be reserved to avoid interference. These small parts of the channel can now be used to carry information. By using the two 20-MHz channels more efficiently in this way, 802.11n achieves slightly more than doubling the data rate when moving from 20-MHz to 40-MHz channels. Source: https://vocal.com/networking/ieee-802-11n/. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **Channel Bonding**<br><br>Channel bonding is used in 802.11n to bind two 20 MHz channels, to make one 40 MHz channel. Doubling the frequency space doubles the bandwidth, and doubling the bandwidth doubles the throughput. We can make an analogy with a highway. Moving from a two lines highway to a four lines highway doubles the traffic capacity. Same result applies in network. While 802.11a and g used 20 MHz channels, 802.11n uses 40MHz channels, thanks to Channel Bonding (see the following figure).<br><br><br><br>Figure 8: Channel Bonding<br><br>Source: https://www.gta.ufrj.br/ensino/eel879/trabalhos_vf_2014_2/remi/Physical%20Layer%20Improvements.html. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | In fact, channel bounding more than doubles the throughput. One 20 MHz channel is composed of two 1 MHz channels, one at the beginning of the channel and one at the end, called Guard Bands. The 18 MHz left are used for data transfers. When using Channel Bonding, the two Guard Bands between two 20 MHz channels can now be used carry information.  Figure 9: Gained frequencies from previous Gard Bands when using Channel Bonding Source: https://www.gta.ufrj.br/ensino/eel879/trabalhos_vf_2014_2/remi/Physical%20Layer%20Improvements.html. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | ### 20.3.11.10.3 Transmission in 40 MHz HT format<br><br>For 40 MHz HT transmissions, the signal from transmit chain $i_{TX}$ shall be as shown in Equation (20-59).<br><br>$$r_{HT-DATA}^{i_{TX}}(t) = \frac{1}{\sqrt{N_{STS} \cdot N_{HT-DATA}^{Tone}}} \sum_{n=0}^{N_{SYM}-1} w_{T_{SYM}}(t - nT_{SYM})$$<br><br>$$\cdot \sum_{k=-N_{SR}}^{N_{SR}} \sum_{i_{STS}=1}^{N_{STS}} ([Q_k]_{i_{TX}, i_{STS}} (\tilde{D}_{k, i_{STS}, n} + p_{n+z} P_{(i_{STS}, n)}^k)) \Upsilon_k \qquad (20\text{-}59)$$<br><br>$$\cdot \exp(j2\pi k\Delta_F(t - nT_{SYM} - T_{GI} - T_{CS}^{i_{STS}})))$$<br><br>Copyright © 2009 IEEE. All rights reserved.     301 |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | where<br><br>$z$ is 3 in an HT-mixed format packet and 2 in an HT-greenfield format packet<br><br>$P_n$ is defined in 17.3.5.9<br><br>$$\tilde{D}_{k,\,i_{STS},\,n} = \begin{cases} 0, k = 0, \pm1, \pm11, \pm25, \pm53 \\ \tilde{d}_{M'(k),\,i_{STS},\,n}, \text{ otherwise} \end{cases}$$<br><br>$$M'(k) = \begin{cases} k + 58, -58 \le k \le -54 \\ k + 57, -52 \le k \le -26 \\ k + 56, -24 \le k \le -12 \\ k + 55, -10 \le k \le -2 \\ k + 52, 2 \le k \le 10 \\ k + 51, 12 \le k \le 24 \\ k + 50, 26 \le k \le 52 \\ k + 49, 54 \le k \le 58 \end{cases}$$<br><br>$P^k_{(i_{STS},\,n)}$ is defined in Equation (20-55)<br><br>NOTE—The 90° rotation that is applied to the upper part of the 40 MHz channel is applied in the same way to the HT-STF, HT-LTF, and HT-SIG. The rotation applies to both pilots and the data in the upper part of the 40 MHz channel.<br><br>Source: IEEE Standard 802.11n-2009 at 301-302. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Grouping is a method that reduces the size of the CSI Report field by reporting a single value for each group of $Ng$ adjacent subcarriers. With grouping, the size of the CSI Report field is $Nr \times 8 + Ns \times (3 + 2 \times Nb \times Nc \times Nr)$ bits, where the number of subcarriers sent, $Ns$, is a function of $Ng$ and whether matrices for 40 MHz or 20 MHz are sent. The value of $Ns$ and the specific carriers for which matrices are sent are shown in Table 7-25f. If the size of the CSI Report field is not an integral multiple of 8 bits, up to 7 zeros are appended to the end of the report to make its size an integral multiple of 8 bits. |

**Table 7-25f—Number of matrices and carrier grouping**

| BW | Grouping $Ng$ | $Ns$ | Carriers for which matrices are sent |
| --- | --- | --- | --- |
| 20 MHz | 1 | 56 | All data and pilot carriers: –28, –27,…–2, –1, 1, 2,…27, 28 |
| | 2 | 30 | –28,–26,–24,–22,–20,–18,–16,–14,–12,–10,–8,–6,–4,–2,–1, 1,3,5,7,9,11,13,15,17,19,21,23,25,27,28 |
| | 4 | 16 | –28,–24,–20,–16,–12,–8,–4,–1,1,5,9,13,17,21,25,28 |
| 40 MHz | 1 | 114 | All data and pilot carriers: –58, –57, …, –3, –2, 2, 3,…, 57, 58 |
| | 2 | 58 | –58,–56,–54,–52,–50,–48,–46,–44,–42,–40,–38,–36,–34,–32,–30, –28,–26,–24,–22,–20,–18,–16,–14,–12,–10,–8,–6,–4,–2, 2,4,6,8,10,12,14,16,18,20,22,24,26,28, 30,32,34,36,38,40,42,44,46,48,50,52,54,56,58 |
| | 4 | 30 | –58,–54,–50,–46,–42,–38,–34,–30,–26,–22,–18,–14,–10,–6, –2, 2,6,10,14,18,22,26,30,34,38,42,46,50,54,58 |

Source: IEEE Standard 802.11n-2009 at 50.

On information and belief, IEEE 802.11ac infringes for the same reasons as 802.11n. *See supra*. *See also*:

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | ### 19.3.11.11.4 Transmission in 40 MHz HT format<br><br>For 40 MHz HT transmissions, the signal from transmit chain $i_{TX}$ shall be as shown in Equation (19-59).<br><br>$$r_{HT-DATA}^{i_{TX}}(t) = \frac{1}{\sqrt{N_{STS} \cdot N_{HT-DATA}^{Tone}}} \sum_{n=0}^{N_{STM}-1} w_{T_{SYM}}(t-nT_{SYM})$$<br><br>$$\cdot \sum_{k=-N_{SR}}^{N_{SR}} \sum_{i_{STS}=1}^{N_{STS}} ([Q_k]_{i_{TX},i_{STS}}(\tilde{D}_{k,i_{STS},n} + p_{n+z} P_{(i_{STS},n)}^k)) \Upsilon_k \qquad (19\text{-}59)$$<br><br>$$\cdot \exp(j2\pi k\Delta_F(t-nT_{SYM}-T_{GI}-T_{CS}^{i_{STS}})))$$<br><br>where<br><br>$z$      is 3 in an HT-mixed format packet and 2 in an HT-greenfield format packet<br>$p_n$      is defined in 17.3.5.10 |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | $$\tilde{D}_{k,\,i_{STS},\,n} = \begin{cases} 0, k = 0, \pm 1, \pm 11, \pm 25, \pm 53 \\ \tilde{d}_{M'(k),\,i_{STS},\,n}, \text{otherwise} \end{cases}$$ $$M'(k) = \begin{cases} k + 58, -58 \le k \le -54 \\ k + 57, -52 \le k \le -26 \\ k + 56, -24 \le k \le -12 \\ k + 55, -10 \le k \le -2 \\ k + 52, 2 \le k \le 10 \\ k + 51, 12 \le k \le 24 \\ k + 50, 26 \le k \le 52 \\ k + 49, 54 \le k \le 58 \end{cases}$$ $P^k_{(i_{STS},\,n)}$ is defined in Equation (19-55) NOTE—The 90° rotation that is applied to the upper part of the 40 MHz channel is applied in the same way to the HT-STF, HT-LTF, and HT-SIG. The rotation applies to both pilots and the data in the upper part of the 40 MHz channel. Source: IEEE Standard 802.11-2016 at 2390-2391. |

**Table 9-70—Subcarriers for which a Compressed Beamforming Feedback Matrix subfield is sent back**

| Channel Width | $N_g$ | $N_s$ | Subcarriers for which Compressed Feedback Beamforming Matrix subfield is sent: $scidx(0)$, $scidx(1)$, …, $scidx(N_s-1)$ |
|---|---|---|---|
| 20 MHz | 1 | 52 | −28, −27, −26, −25, −24, −23, −22, −20, −19, −18, −17, −16, −15, −14, −13, −12, −11, −10, −9, −8, −6, −5, −4, −3, −2, −1, 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28<br><br>NOTE—Pilot subcarriers (±21, ±7) and DC subcarrier (0) are skipped |
| | 2 | 30 | −28, −26, −24, −22, −20, −18, −16, −14, −12, −10, −8, −6, −4, −2, −1, 1, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28 |
| | 4 | 16 | −28, −24, −20, −16, −12, −8, −4, −1, 1, 4, 8, 12, 16, 20, 24, 28 |
| 40 MHz | 1 | 108 | −58, −57, −56, −55, −54, −52, −51, −50, −49, −48, −47, −46, −45, −44, −43, −42, −41, −40, −39, −38, −37, −36, −35, −34, −33, −32, −31, −30, −29, −28, −27, −26, −24, −23, −22, −21, −20, −19, −18, −17, −16, −15, −14, −13, −12, −10, −9, −8, −7, −6, −5, −4, −3, −2, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58<br><br>NOTE—Pilot subcarriers (±53, ±25, ±11) and DC subcarriers (0, ±1) are skipped. |
| | 2 | 58 | −58, −56, −54, −52, −50, −48, −46, −44, −42, −40, −38, −36, −34, −32, −30, −28, −26, −24, −22, −20, −18, −16, −14, −12, −10, −8, −6, −4, −2, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 56, 58 |
| | 4 | 30 | −58, −54, −50, −46, −42, −38, −34, −30, −26, −22, −18, −14, −10, −6, −2, 2, 6, 10, 14, 18, 22, 26, 30, 34, 38, 42, 46, 50, 54, 58 |
| 80 MHz | 1 | 234 | −122, −121, −120, −119, −118, −117, −116, −115, −114, −113, −112, −111, −110, −109, −108, −107, −106, −105, −104, −102, −101, −100, −99, −98, −97, −96, −95, −94, −93, −92, −91, −90, −89, −88, −87, −86, −85, −84, −83, −82, −81, −80, −79, −78, −77, −76, −74, −73, −72, −71, −70, −69, −68, −67, −66, −65, −64, −63, −62, −61, −60, −59, −58, −57, −56, −55, −54, −53, −52, −51, −50, −49, −48, −47, −46, −45, −44, −43, −42, −41, −40, −38, −37, −36, −35, −34, −33, −32, −31, −30, −29, −28, −27, −26, −25, −24, −23, −22, −21, −20, −19, −18, −17, −16, −15, −14, −13, −12, −10, −9, −8, −7, −6, −5, −4, −3, −2, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122<br><br>NOTE—Pilot subcarriers (±103, ±75, ±39, ±11) and DC subcarriers (0, ±1) are skipped. |

Source: IEEE Standard 802.11-2016 at 768.

| U.S. Patent No. 8,027,326 (Claim 1) | | | | | |
|---|---|---|---|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** | | | | |
| | EXPANSION_MAT_TYPE | FORMAT is VHT and EXPANSION_MAT is present. | Set to COMPRESSED_SV | Y | N |
| | | Otherwise | See corresponding entry in Table 19-1 | | |
| | EXPANSION_MAT | FORMAT is VHT | Contains a vector in the number of selected subcarriers containing feedback matrices as defined in 21.3.11.2 based on the channel measured during the training symbols of a previous VHT NDP PPDU. | M U | N |
| | | Otherwise | See corresponding entry in Table 19-1 | | |
| | Source: IEEE Standard 802.11-2016 at 2501. | | | | |

38

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **4.3.14 Very high throughput (VHT) STA**<br><br>The IEEE 802.11 VHT STA operates in frequency bands below 6 GHz excluding the 2.4 GHz band.<br><br>A VHT STA is an HT STA that, in addition to features supported as an HT STA, supports VHT features identified in Clause 9, Clause 10, Clause 11, Clause 14, Clause 17, and Clause 21.<br><br>The main PHY features in a VHT STA that are not present in an HT STA are the following:<br>— Mandatory support for 40 MHz and 80 MHz channel widths<br>— Mandatory support for VHT single-user (SU) PPDUs<br>— Optional support for 160 MHz and 80+80 MHz channel widths<br>— Optional support for VHT sounding protocol to support beamforming<br>— Optional support for VHT multi-user (MU) PPDUs<br>— Optional support for VHT-MCSs 8 and 9<br><br>Source: IEEE Standard 802.11-2016 at 197. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Table 21-38—VHT-MCSs for mandatory 40 MHz, $N_{SS} = 1$

| VHT-MCS Index | Modulation | $R$ | $N_{BPSCS}$ | $N_{SD}$ | $N_{SP}$ | $N_{CBPS}$ | $N_{DBPS}$ | $N_{ES}$ | Data rate (Mb/s) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 800 ns GI | 400 ns GI (See NOTE) |
| 0 | BPSK | 1/2 | 1 | 108 | 6 | 108 | 54 | 1 | 13.5 | 15.0 |
| 1 | QPSK | 1/2 | 2 | 108 | 6 | 216 | 108 | 1 | 27.0 | 30.0 |
| 2 | QPSK | 3/4 | 2 | 108 | 6 | 216 | 162 | 1 | 40.5 | 45.0 |
| 3 | 16-QAM | 1/2 | 4 | 108 | 6 | 432 | 216 | 1 | 54.0 | 60.0 |
| 4 | 16-QAM | 3/4 | 4 | 108 | 6 | 432 | 324 | 1 | 81.0 | 90.0 |
| 5 | 64-QAM | 2/3 | 6 | 108 | 6 | 648 | 432 | 1 | 108.0 | 120.0 |
| 6 | 64-QAM | 3/4 | 6 | 108 | 6 | 648 | 486 | 1 | 121.5 | 135.0 |
| 7 | 64-QAM | 5/6 | 6 | 108 | 6 | 648 | 540 | 1 | 135.0 | 150.0 |
| 8 | 256-QAM | 3/4 | 8 | 108 | 6 | 864 | 648 | 1 | 162.0 | 180.0 |
| 9 | 256-QAM | 5/6 | 8 | 108 | 6 | 864 | 720 | 1 | 180.0 | 200.0 |

NOTE—Support of 400 ns GI is optional on transmit and receive.

*See also* IEEE Standard 802.11-2016 at 2612, where a 40 MHz Modulation and Coding Scheme (MCS) is mandatory. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Table 21-46—VHT-MCSs for mandatory 80 MHz, $N_{SS}$ = 1 |

| VHT-MCS Index | Modulation | $R$ | $N_{BPSCS}$ | $N_{SD}$ | $N_{SP}$ | $N_{CBPS}$ | $N_{DBPS}$ | $N_{ES}$ | Data rate (Mb/s) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | **800 ns GI** | **400 ns GI (See NOTE)** |
| 0 | BPSK | 1/2 | 1 | 234 | 8 | 234 | 117 | 1 | 29.3 | 32.5 |
| 1 | QPSK | 1/2 | 2 | 234 | 8 | 468 | 234 | 1 | 58.5 | 65.0 |
| 2 | QPSK | 3/4 | 2 | 234 | 8 | 468 | 351 | 1 | 87.8 | 97.5 |
| 3 | 16-QAM | 1/2 | 4 | 234 | 8 | 936 | 468 | 1 | 117.0 | 130.0 |
| 4 | 16-QAM | 3/4 | 4 | 234 | 8 | 936 | 702 | 1 | 175.5 | 195.0 |
| 5 | 64-QAM | 2/3 | 6 | 234 | 8 | 1404 | 936 | 1 | 234.0 | 260.0 |
| 6 | 64-QAM | 3/4 | 6 | 234 | 8 | 1404 | 1053 | 1 | 263.3 | 292.5 |
| 7 | 64-QAM | 5/6 | 6 | 234 | 8 | 1404 | 1170 | 1 | 292.5 | 325.0 |
| 8 | 256-QAM | 3/4 | 8 | 234 | 8 | 1872 | 1404 | 1 | 351.0 | 390.0 |
| 9 | 256-QAM | 5/6 | 8 | 234 | 8 | 1872 | 1560 | 1 | 390.0 | 433.3 |

NOTE—Support of 400 ns GI is optional on transmit and receive.

| | |
|---|---|
| | See also IEEE Standard 802.11-2016 at 2616, where an 80 MHz Modulation and Coding Scheme (MCS) is mandatory. |
| [1.b] partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the | On information and belief, the Southwest Count 4 Systems and Services practice partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| frequency gap such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform; | with at least some of the one or more data subcarriers using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform. On information and belief, a 2 MHz frequency gap is present between the outer subcarriers of adjacent 20 MHz channels. In a 40 MHz bonded channel, this gap is partially filled with additional subcarriers.  Source: https://www.arubanetworks.com/assets/wp/WP_80211acInDepth.pdf. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **Table 7-25f—Number of matrices and carrier grouping** |

| BW | Grouping $N_g$ | $N_s$ | Carriers for which matrices are sent |
|---|---|---|---|
| 20 MHz | 1 | 56 | All data and <mark>pilot</mark> carriers: −28, −27,...−2, −1, 1, 2,...27, 28 |
| | 2 | 30 | −28,−26,−24,−22,−20,−18,−16,−14,−12,−10,−8,−6,−4,−2,−1, 1,3,5,7,9,11,13,15,17,19,21,23,25,27,28 |
| | 4 | 16 | −28,−24,−20,−16,−12,−8,−4,−1,1,5,9,13,17,21,25,28 |
| 40 MHz | 1 | 114 | All data and <mark>pilot</mark> carriers: −58, −57, …, −3, −2, 2, 3,…, 57, 58 |
| | 2 | 58 | −58,−56,−54,−52,−50,−48,−46,−44,−42,−40,−38,−36,−34,−32,−30, −28,−26,−24,−22,−20,−18,−16,−14,−12,−10,−8,−6,−4,−2, 2,4,6,8,10,12,14,16,18,20,22,24,26,28, 30,32,34,36,38,40,42,44,46,48,50,52,54,56,58 |
| | 4 | 30 | −58,−54,−50,−46,−42,−38,−34,−30,−26,−22,−18,−14,−10,−6, −2, 2,6,10,14,18,22,26,30,34,38,42,46,50,54,58 |

Source: IEEE Standard 802.11n-2009 at 2356.

On information and belief, a 2 MHz frequency gap is present between the outer subcarriers of adjacent 20 MHz channels. In a 40 MHz bonded channel, this gap (6 sub carriers is partially filled with four additional subcarriers, corresponding to indexes −3,-2, +2 and +3. When two 20 MHz HT channels are bonded together, some of the formerly unused subcarriers at the bottom of the higher channel and at the top end of the lower channel can be used to transmit data. That is why the number of data subcarriers is slightly more than two times the 52 (=104) subcarriers in a 40 MHz channel, which is 108 as in table 19-6.

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
|  | **Table 20-5—Timing-related constants**

| Parameter | TXVECTOR CH_BANDWIDTH | | | |
|---|---|---|---|---|
|  | NON_HT_CBW20 | HT_CBW_20 | HT_CBW40 or NON_HT_CBW40 | |
|  |  |  | HT format | MCS 32 and non-HT duplicate |
| $N_{SD}$: Number of complex data numbers | 48 | 52 | 108 | 48 |
| $N_{SP}$: Number of pilot values | 4 | 4 | 6 | 4 |
| $N_{ST}$: Total number of subcarriers See NOTE 1 | 52 | 56 | 114 | 104 |

Source: IEEE Standard 802.11n-2009 at Table 20-5.



114 subcarriers (108 usable) for a 40 MHz HT mode (802.11n) channel

Source: https://www.arubanetworks.com/assets/wp/WP_80211acInDepth.pdf. |

44

**Table 9-70—Subcarriers for which a Compressed Beamforming Feedback Matrix subfield is sent back**

| Channel Width | $Ng$ | $Ns$ | Subcarriers for which Compressed Feedback Beamforming Matrix subfield is sent: $scidx(0)$, $scidx(1)$, …, $scidx(Ns-1)$ |
|---|---|---|---|
| 20 MHz | 1 | 52 | −28, −27, −26, −25, −24, −23, −22, −20, −19, −18, −17, −16, −15, −14, −13, −12, −11, −10, −9, −8, −6, −5, −4, −3, −2, −1, 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28 <br><br> NOTE—Pilot subcarriers (±21, ±7) and DC subcarrier (0) are skipped |
| | 2 | 30 | −28, −26, −24, −22, −20, −18, −16, −14, −12, −10, −8, −6, −4, −2, −1, 1, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28 |
| | 4 | 16 | −28, −24, −20, −16, −12, −8, −4, −1, 1, 4, 8, 12, 16, 20, 24, 28 |
| 40 MHz | 1 | 108 | −58, −57, −56, −55, −54, −52, −51, −50, −49, −48, −47, −46, −45, −44, −43, −42, −41, −40, −39, −38, −37, −36, −35, −34, −33, −32, −31, −30, −29, −28, −27, −26, −24, −23, −22, −21, −20, −19, −18, −17, −16, −15, −14, −13, −12, −10, −9, −8, −7, −6, −5, −4, −3, −2, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58 <br><br> NOTE—Pilot subcarriers (±53, ±25, ±11) and DC subcarriers (0, ±1) are skipped. |
| | 2 | 58 | −58, −56, −54, −52, −50, −48, −46, −44, −42, −40, −38, −36, −34, −32, −30, −28, −26, −24, −22, −20, −18, −16, −14, −12, −10, −8, −6, −4, −2, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 56, 58 |
| | 4 | 30 | −58, −54, −50, −46, −42, −38, −34, −30, −26, −22, −18, −14, −10, −6, −2, 2, 6, 10, 14, 18, 22, 26, 30, 34, 38, 42, 46, 50, 54, 58 |
| 80 MHz | 1 | 234 | −122, −121, −120, −119, −118, −117, −116, −115, −114, −113, −112, −111, −110, −109, −108, −107, −106, −105, −104, −102, −101, −100, −99, −98, −97, −96, −95, −94, −93, −92, −91, −90, −89, −88, −87, −86, −85, −84, −83, −82, −81, −80, −79, −78, −77, −76, −74, −73, −72, −71, −70, −69, −68, −67, −66, −65, −64, −63, −62, −61, −60, −59, −58, −57, −56, −55, −54, −53, −52, −51, −50, −49, −48, −47, −46, −45, −44, −43, −42, −41, −40, −38, −37, −36, −35, −34, −33, −32, −31, −30, −29, −28, −27, −26, −25, −24, −23, −22, −21, −20, −19, −18, −17, −16, −15, −14, −13, −12, −10, −9, −8, −7, −6, −5, −4, −3, −2, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122 <br><br> NOTE—Pilot subcarriers (±103, ±75, ±39, ±11) and DC subcarriers (0, ±1) are skipped. |

Source: IEEE Standard 802.11-2016 at 768.

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |

| | | | | | |
|---|---|---|---|---|---|
| CH_BANDWIDTH | FORMAT is HT_MF or HT_GF | Indicates whether the packet is transmitted using 40 MHz or 20 MHz channel width. Enumerated type: HT_CBW20 for 20 MHz and 40 MHz upper and 40 MHz lower modes HT_CBW40 for 40 MHz | Y | Y |
| | FORMAT is NON_HT | Enumerated type: NON_HT_CBW40 for non-HT duplicate format NON_HT_CBW20 for all other non-HT formats | Y | Y |

Source: IEEE Standard 802.11n-2009 at 251.

## 4. Abbreviations and acronyms

IDFT     inverse discrete Fourier transform

Source: IEEE Standard 802.11n-2009 at 9.

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **20.3.7 Mathematical description of signals**<br><br>For the description of the convention on mathematical description of signals, see 17.3.2.4.<br><br>In the case of either a 20 MHz non-HT format (TXVECTOR parameter FORMAT set to NON_HT, MODULATION parameter set to one of {DSSS-OFDM, ERP-OFDM, OFDM}) transmission or a 20 MHz HT format (TXVECTOR parameter FORMAT set to HT_MF or HT_GF, CH_BANDWIDTH set to HT_CBW_20) transmission, the channel is divided into 64 subcarriers. In the 20 MHz non-HT format, the signal is transmitted on subcarriers –26 to –1 and 1 to 26, with 0 being the center (dc) carrier. In the 20 MHz HT format, the signal is transmitted on subcarriers –28 to –1 and 1 to 28.<br><br>In the case of the 40 MHz HT format, a 40 MHz channel is used. The channel is divided into 128 subcarriers. The signal is transmitted on subcarriers –58 to –2 and 2 to 58.<br><br>Source: IEEE Standard 802.11n-2009 at 267.<br><br>**19.3.7 Mathematical description of signals**<br><br>For the description of the convention on mathematical description of signals, see 17.3.2.5.<br><br>In the case of either a 20 MHz non-HT format (TXVECTOR parameter FORMAT equal to NON_HT, MODULATION parameter equal to one of {ERP-OFDM, OFDM}) transmission or a 20 MHz HT format (TXVECTOR parameter FORMAT equal to HT_MF or HT_GF, CH_BANDWIDTH equal to HT_CBW_20) transmission, the channel is divided into 64 subcarriers. In the 20 MHz non-HT format, the signal is transmitted on subcarriers –26 to –1 and 1 to 26, with 0 being the center (dc) carrier. In the 20 MHz HT format, the signal is transmitted on subcarriers –28 to –1 and 1 to 28.<br><br>In the case of the 40 MHz HT format, a 40 MHz channel is used. The channel is divided into 128 subcarriers. The signal is transmitted on subcarriers –58 to –2 and 2 to 58.<br><br>Source: IEEE Standard 802.11-2016 at 2356. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | On information and belief, the HT PHY uses a 128-point IDFT, usually implemented as an IFFT, to create the transmitted signal across the full 40 MHz signal spectrum. This process involves a fast fourier transform (FFT).<br><br>**20.3.3 Transmitter block diagram**<br><br>Figure 20-2 and Figure 20-3 show example transmitter block diagrams. In particular, Figure 20-2 shows the transmitter blocks used to generate the HT-SIG of the HT-mixed format PPDU. These transmitter blocks are also used to generate the non-HT portion of the HT-mixed format PPDU, except that the BCC encoder and interleaver are not used when generating the L-STF and L-LTFs. Figure 20-3 shows the transmitter blocks used to generate the Data field of the HT-mixed format and HT-greenfield format PPDUs. A subset of these transmitter blocks consisting of the constellation mapper and CSD blocks, as well as the blocks to the right of, and including, the spatial mapping block, are also used to generate the HT-STF, HT-GF-STF, and HT-LTFs. The HT-greenfield format SIGNAL field is generated using the transmitter blocks shown in Figure 20-2, augmented by additional CSD and spatial mapping blocks. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| |  |

Source: IEEE Standard 802.11n-2009 at 261.

On information and belief, IEEE 802.11ac infringes for the same reasons as 802.11n. *See supra*. *See also*:

### 19.3.3 Transmitter block diagram

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Figure 19-2 and Figure 19-3 show example transmitter block diagrams. In particular, Figure 19-2 shows the transmitter blocks used to generate the HT-SIG of the HT-mixed format PPDU. These transmitter blocks are also used to generate the non-HT portion of the HT-mixed format PPDU, except that the BCC encoder and interleaver are not used when generating the L-STF and L-LTFs. Figure 19-3 shows the transmitter blocks used to generate the Data field of the HT-mixed format and HT-greenfield format PPDUs. A subset of these transmitter blocks consisting of the constellation mapper and CSD blocks, as well as the blocks to the right of, and including, the spatial mapping block, are also used to generate the HT-STF, HT-GF-STF, and HT-LTFs. The HT-greenfield format SIGNAL field is generated using the transmitter blocks shown in Figure 19-2, augmented by additional CSD and spatial mapping blocks.<br><br><br><br>**Figure 19-2—Transmitter block diagram 1**<br><br>Source: IEEE Standard 802.11-2016 at 2348-350. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **21.3.10.10 Pilot subcarriers**<br><br>In a 20 MHz transmission, four pilot tones shall be inserted in subcarriers $k \in \{-21, -7, 7, 21\}$. The pilot mapping $P_n^k$ for subcarrier $k$ for symbol $n$ shall be as specified in Equation (21-91).<br><br>$$P_n^{\{-21, -7, 7, 21\}} = \{ \Psi_{1, n \bmod 4}^{\{1\}}, \Psi_{1, (n+1) \bmod 4}^{\{1\}}, \Psi_{1, (n+2) \bmod 4}^{\{1\}}, \Psi_{1, (n+3) \bmod 4}^{\{1\}} \}$$ <br> $$P_n^{k \notin \{-21, -7, 7, 21\}} = 0$$ <div align="right">(21-91)</div><br>where<br><br>$\Psi_{1, m}^{\{1\}}$ is given by the $N_{STS} = 1$ row of Table 19-19<br><br>In a 40 MHz transmission, six pilot tones shall be inserted in subcarriers –53, –25, –11, 11, 25, and 53. The pilot mapping $P_n^k$ for subcarrier $k$ for symbol $n$ shall be as specified in Equation (21-92).<br><br>Source: IEEE Standard 802.11-2016 at 2574. |

**Table 9-70—Subcarriers for which a Compressed Beamforming Feedback Matrix subfield is sent back**

| Channel Width | Ng | Ns | Subcarriers for which Compressed Feedback Beamforming Matrix subfield is sent: scidx(0), scidx(1), …, scidx(Ns-1) |
|---|---|---|---|
| 20 MHz | 1 | 52 | –28, –27, –26, –25, –24, –23, –22, –20, –19, –18, –17, –16, –15, –14, –13, –12, –11, –10, –9, –8, –6, –5, –4, –3, –2, –1, 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28 <br> NOTE—Pilot subcarriers (±21, ±7) and DC subcarrier (0) are skipped. |
| | 2 | 30 | –28, –26, –24, –22, –20, –18, –16, –14, –12, –10, –8, –6, –4, –2, –1, 1, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28 |
| | 4 | 16 | –28, –24, –20, –16, –12, –8, –4, –1, 1, 4, 8, 12, 16, 20, 24, 28 |
| 40 MHz | 1 | 108 | –58, –57, –56, –55, –54, –52, –51, –50, –49, –48, –47, –46, –45, –44, –43, –42, –41, –40, –39, –38, –37, –36, –35, –34, –33, –32, –31, –30, –29, –28, –27, –26, –24, –23, –22, –21, –20, –19, –18, –17, –16, –15, –14, –13, –12, –10, –9, –8, –7, –6, –5, –4, –3, –2, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58 <br> NOTE—Pilot subcarriers (±53, ±25, ±11) and DC subcarriers (0, ±1) are skipped. |
| | 2 | 58 | –58, –56, –54, –52, –50, –48, –46, –44, –42, –40, –38, –36, –34, –32, –30, –28, –26, –24, –22, –20, –18, –16, –14, –12, –10, –8, –6, –4, –2, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 56, 58 |
| | 4 | 30 | –58, –54, –50, –46, –42, –38, –34, –30, –26, –22, –18, –14, –10, –6, –2, 2, 6, 10, 14, 18, 22, 26, 30, 34, 38, 42, 46, 50, 54, 58 |
| 80 MHz | 1 | 234 | –122, –121, –120, –119, –118, –117, –116, –115, –114, –113, –112, –111, –110, –109, –108, –107, –106, –105, –104, –102, –101, –100, –99, –98, –97, –96, –95, –94, –93, –92, –91, –90, –89, –88, –87, –86, –85, –84, –83, –82, –81, –80, –79, –78, –77, –76, –74, –73, –72, –71, –70, –69, –68, –67, –66, –65, –64, –63, –62, –61, –60, –59, –58, –57, –56, –55, –54, –53, –52, –51, –50, –49, –48, –47, –46, –45, –44, –43, –42, –41, –40, –38, –37, –36, –35, –34, –33, –32, –31, –30, –29, –28, –27, –26, –25, –24, –23, –22, –21, –20, –19, –18, –17, –16, –15, –14, –13, –12, –10, –9, –8, –7, –6, –5, –4, –3, –2, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122 <br> NOTE—Pilot subcarriers (±103, ±75, ±39, ±11) and DC subcarriers (0, ±1) are skipped. |

Source: IEEE Standard 802.11-2016 at 768.

| U.S. Patent No. 8,027,326 (Claim 1) | | | | | |
|---|---|---|---|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** | | | | |
| | EXPANSION_MAT_TYPE | FORMAT is VHT and EXPANSION_MAT is present. | Set to COMPRESSED_SV | Y | N |
| | | Otherwise | See corresponding entry in Table 19-1 | | |
| | EXPANSION_MAT | FORMAT is VHT | Contains a vector in the number of selected subcarriers containing feedback matrices as defined in 21.3.11.2 based on the channel measured during the training symbols of a previous VHT NDP PPDU. | M U | N |
| | | Otherwise | See corresponding entry in Table 19-1 | | |
| | Source: IEEE Standard 802.11-2016 at 2501. | | | | |
| [1.c] combining the first channel and the second channel using channel bonding with orthogonal frequency division multiplexing (OFDM); and | On information and belief, the Southwest Count 4 Systems and Services practice combining the first channel and the second channel using channel bonding with orthogonal frequency division multiplexing (OFDM).<br><br>On information and belief, in 40 MHz capable HT STA, both primary ("first") and secondary ("second") 20 MHz channels are combined by using channel bonding to give a wideband channel. | | | | |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | **40MHZ OFDM 802.11N**<br><br>• 802.11n also introduced a 40 MHz channel, which combined two 20 MHz channels<br>• The 40 MHz channel consists of 128 subcarriers:<br> • 128 subcarriers:<br>  • 108 transmit data subcarriers<br>  • 6 as pilot carriers<br>  • 14 unused<br><br>• When two 20 MHz HT channels are bonded together, some of the formerly unused subcarriers at the bottom of the higher channel and at the top end of the lower channel are able to be used to transmit data.<br>• That is why the number of subcarriers is slightly more than two times the 56 subcarriers in a 20 MHz channel.<br>• Each bonded channel consists of a primary and secondary 20 MHz channel.<br>• The channels must be adjacent. A positive or negative offset indicates whether the secondary channel is the channel above or the channel below the primary channel. This is pictured in Figure 19.4.<br><br>Source: https://dot11ap.wordpress.com/ht-channel-width-operation/. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | ## 20. High Throughput (HT) PHY specification<br><br>## 20.3.11.10 OFDM modulation<br><br>### 20.3.11.10.3 Transmission in 40 MHz HT format<br><br>For 40 MHz HT transmissions, the signal from transmit chain $i_{TX}$ shall be as shown in Equation (20-59).<br><br>$$r_{HT-DATA}^{i_{TX}}(t) = \frac{1}{\sqrt{N_{STS} \cdot N_{HT-DATA}^{Tone}}} \sum_{n=0}^{N_{SYM}-1} w_{T_{SYM}}(t-nT_{SYM})$$<br><br>$$\cdot \sum_{k=-N_{SR}}^{N_{SR}} \sum_{i_{STS}=1}^{N_{STS}} ([Q_k]_{i_{TX},i_{STS}}(\tilde{D}_{k,i_{STS},n} + p_{n+z}P_{(i_{STS},n)}^k))\Upsilon_k \qquad (20\text{-}59)$$<br><br>$$\cdot \exp(j2\pi k\Delta_F(t-nT_{SYM}-T_{GI}-T_{CS}^{i_{STS}})))$$<br><br>Copyright © 2009 IEEE. All rights reserved. 301 |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | where $z$ is 3 in an HT-mixed format packet and 2 in an HT-greenfield format packet $p_n$ is defined in 17.3.5.9 $$\tilde{D}_{k,\,i_{STS},\,n} = \begin{cases} 0, k = 0, \pm1, \pm11, \pm25, \pm53 \\ \tilde{d}_{M'(k),\,i_{STS},\,n}, \text{otherwise} \end{cases}$$ $$M'(k) = \begin{cases} k+58, -58 \leq k \leq -54 \\ k+57, -52 \leq k \leq -26 \\ k+56, -24 \leq k \leq -12 \\ k+55, -10 \leq k \leq -2 \\ k+52, 2 \leq k \leq 10 \\ k+51, 12 \leq k \leq 24 \\ k+50, 26 \leq k \leq 52 \\ k+49, 54 \leq k \leq 58 \end{cases}$$ $P^k_{(i_{STS},\,n)}$ is defined in Equation (20-55) NOTE—The 90° rotation that is applied to the upper part of the 40 MHz channel is applied in the same way to the HT-STF, HT-LTF, and HT-SIG. The rotation applies to both pilots and the data in the upper part of the 40 MHz channel. Source: IEEE Standard 802.11n-2009 at 247, 298, 301-302. Improved OFDM and Channel Bonding |

| U.S. Patent No. 8,027,326 (Claim 1) | |
| --- | --- |
| Claim(s) | Example Southwest Count 4 Systems and Services |
| | 802.11n uses a more efficient OFDM modulation and can use 40 MHz channels. This more than doubles the data rate for 802.11n when compared to 20 MHz channels. When operating within a traditional 20 MHz channel, OFDM further slices the channel into 52 subcarriers (48 of which are used for carrying data). However, when 802.11n applies OFDM on a 40 MHz channel, the number of data-carrying subcarriers do not simply double to 96 sub-carriers. Instead, they actually more than double to 114 subcarriers, including pilots (which do not carry data). This allows 802.11n to deliver a 65 Mbps data rate (instead of 54 Mbps) per 20 MHz channel for a total of 135 Mbps on a 40 MHz channel when transmitting a single spatial data stream. When transmitting using 2 spatial streams on a 40 MHz channel, this data rate again doubles to 135 Mbps x 2 — 270 Mbps. <br><br> Source: https://www.winncom.com/images/stories/Motorola_802.11nDEM_WP_v4_0209.pdf. <br><br> **HT-OFDM** <br><br> 802.11a and g used Orthogonal Frequency Division Multiplexing (OFDM) to transmit information. 802.11n continues to use OFDM but in a slightly different way. This new version is called HT-OFDM for High Throughput OFDM. <br><br> How does OFDM works? The OFDM divides a channel into several subcarriers to carry information. For example, 802.11a and g use an OFDM that divides the 20MHz channels into 52 subcarriers. 48 of those are used for data transmission and 4 others are used for forward error correction. This configuration offers a data rates of 54 Mbps at best. <br><br> When 802.11n uses 20MHz channels, HT-OFDM now offers 56 subcarriers. There are still 4 that are used for forward error correction and now 52 that are used for data transmission. This marginally increases the data rates to a maximum of 65 Mbps. This is when we use a single-transmitter radio. For two transmitters, the maximum data rates is 130 Mbps. Three transmitters provide a maximum data rates of 195 Mbps. The maximum four transmitters can deliver 260 Mbps. <br><br> When a 40MHz channel is used, we get 108 subcarriers to transmit data information and 6 subcarriers for forward error correction. This way the channel is divided into 114 subcarriers. This provides a maximum data rates of 135 Mbps, 270 Mbps, 405 Mbps, and 540 Mbps for one through four transmitters, respectively. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | Source: https://www.gta.ufrj.br/ensino/eel879/trabalhos_vf_2014_2/remi/Physical%20Layer%20Improvements.html. |



Figure 10: Number of subcarriers offered by OFDM

Source: https://www.gta.ufrj.br/ensino/eel879/trabalhos_vf_2014_2/remi/Physical%20Layer%20Improvements.html.

On information and belief, IEEE 802.11ac infringes for the same reasons as 802.11n. *See supra. See also*:

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | ### 19. High-throughput (HT) PHY specification<br><br>### 19.3.11.11 OFDM modulation<br><br>### 19.3.11.11.4 Transmission in 40 MHz HT format<br><br>For 40 MHz HT transmissions, the signal from transmit chain $i_{TX}$ shall be as shown in Equation (19-59).<br><br>$$r_{HT-DATA}^{i_{TX}}(t) = \frac{1}{\sqrt{N_{STS} \cdot N_{HT-DATA}^{Tone}}} \sum_{n=0}^{N_{SYM}-1} w_{T_{SYM}}(t - nT_{SYM})$$<br><br>$$\cdot \sum_{k=-N_{SR}}^{N_{SR}} \sum_{i_{STS}=1}^{N_{STS}} ([Q_k]_{i_{TX}, i_{STS}}(\tilde{D}_{k, i_{STS}, n} + p_{n+z} P_{(i_{STS}, n)}^k) \Upsilon_k \quad (19\text{-}59)$$<br><br>$$\cdot \exp(j2\pi k\Delta_F(t - nT_{SYM} - T_{GI} - T_{CS}^{i_{STS}})))$$<br><br>where<br><br>$z$    is 3 in an HT-mixed format packet and 2 in an HT-greenfield format packet<br>$p_n$    is defined in 17.3.5.10 |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | $\tilde{D}_{k, i_{STS}, n} = \begin{cases} 0, k = 0, \pm 1, \pm 11, \pm 25, \pm 53 \\ \tilde{d}_{M'(k), i_{STS}, n}, \text{otherwise} \end{cases}$ |
| | $M'(k) = \begin{cases} k + 58, -58 \leq k \leq -54 \\ k + 57, -52 \leq k \leq -26 \\ k + 56, -24 \leq k \leq -12 \\ k + 55, -10 \leq k \leq -2 \\ k + 52, 2 \leq k \leq 10 \\ k + 51, 12 \leq k \leq 24 \\ k + 50, 26 \leq k \leq 52 \\ k + 49, 54 \leq k \leq 58 \end{cases}$ |
| | $P^k_{(i_{STS}, n)}$ is defined in Equation (19-55) |
| | NOTE—The 90° rotation that is applied to the upper part of the 40 MHz channel is applied in the same way to the HT-STF, HT-LTF, and HT-SIG. The rotation applies to both pilots and the data in the upper part of the 40 MHz channel. |
| | Source: IEEE Standard 802.11-2016 at 2334, 2387, 2390-2391. |
| [1.d] transmitting data subcarriers occupying the first channel, the second channel, and the frequency gap in parallel to a receiver. | On information and belief, the Southwest Count 4 Systems and Services practice transmitting data subcarriers occupying the first channel, the second channel, and the frequency gap in parallel to a receiver. |
| | On information and belief, subcarriers occupying both channels and the partially-filled frequency gap are transmitted in parallel. |
| | ## 20.3.4 Overview of the PPDU encoding process |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | o) Determine whether 20 MHz or 40 MHz operation is to be used from the CH_BANDWIDTH parameter of the TXVECTOR. Specifically, when CH_BANDWIDTH is HT_CBW20 or NON_HT_CBW20, 20 MHz operation is to be used. When CH_BANDWIDTH is HT_CBW40 or NON_HT_CBW40, 40 MHz operation is to be used. For 20 MHz operation (with the exception of non-HT formats), insert four subcarriers as pilots into positions $-21$, $-7$, 7, and 21. The total number of the subcarriers, $N_{ST}$, is 56. For 40 MHz operation (with the exception of MCS 32 and non-HT duplicate format), insert six subcarriers as pilots into positions $-53$, $-25$, $-11$, 11, 25, and 53, resulting in a total of $N_{ST} = 114$ subcarriers. See 20.3.11.10.4 for pilot locations when using MCS 32 and 20.3.11.11 for pilot locations when using non-HT duplicate format. The pilots are modulated using a pseudo-random cover sequence. Refer to 20.3.11.9 for details. For 40 MHz operation, apply a +90 degree phase shift to the complex value in each OFDM subcarrier with an index greater than 0, as described in 20.3.11.10.3, 20.3.11.10.4, and 20.3.11.11. |
| | p) Map each of the complex numbers in each of the $N_{ST}$ subcarriers in each of the OFDM symbols in each of the $N_{STS}$ space-time streams to the $N_{TX}$ transmit chain inputs. For direct-mapped operation, $N_{TX} = N_{STS}$, and there is a one-to-one correspondence between space-time streams and transmit chains. In this case, the OFDM symbols associated with each space-time stream are also associated with the corresponding transmit chain. Otherwise, a spatial mapping matrix associated with each OFDM subcarrier, as indicated by the EXPANSION_MAT parameter of the TXVECTOR, is used to perform a linear transformation on the vector of $N_{STS}$ complex numbers associated with each subcarrier in each OFDM symbol. This spatial mapping matrix maps the vector of $N_{STS}$ complex numbers in each subcarrier into a vector of $N_{TX}$ complex numbers in each subcarrier. The sequence of $N_{ST}$ complex numbers associated with each transmit chain (where each of the $N_{ST}$ complex numbers is taken from the same position in the $N_{TX}$ vector of complex numbers across the $N_{ST}$ subcarriers associated with an OFDM symbol) constitutes an OFDM symbol associated with the corresponding transmit chain. For details, see 20.3.11.10. Spatial mapping matrices may include cyclic shifts, as described in 20.3.11.10.1. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | t) Up-convert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 20.3.7 for details. The transmit chains are connected to antenna elements according to ANTENNA_SET of the TXVECTOR if ASEL is applied.<br><br>Source: IEEE Standard 802.11n-2009 at 262-264.<br><br>On information and belief, IEEE 802.11ac infringes for the same reasons as 802.11n. *See supra*. *See also*:<br><br>**19.3.4 Overview of the PPDU encoding process** |

| U.S. Patent No. 8,027,326 (Claim 1) |
|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |

|  |  |
|---|---|
|  | o) Determine whether 20 MHz or 40 MHz operation is to be used from the CH_BANDWIDTH parameter of the TXVECTOR. Specifically, when CH_BANDWIDTH is HT_CBW20 or NON_HT_CBW20, 20 MHz operation is to be used. When CH_BANDWIDTH is HT_CBW40 or NON_HT_CBW40, 40 MHz operation is to be used. For 20 MHz operation (with the exception of non-HT formats), insert four subcarriers as pilots into positions $-21, -7, 7$, and $21$. The total number of the subcarriers, $N_{ST}$, is 56. For 40 MHz operation (with the exception of MCS 32 and non-HT duplicate format), insert six subcarriers as pilots into positions $-53, -25, -11, 11, 25$, and $53$, resulting in a total of $N_{ST} = 114$ subcarriers. See 19.3.11.11.5 for pilot locations when using MCS 32 and 19.3.11.12 for pilot locations when using non-HT duplicate format. The pilots are modulated using a pseudorandom cover sequence. Refer to 19.3.11.10 for details. For 40 MHz operation, apply a $+90°$ phase shift to the complex value in each OFDM subcarrier with an index greater than 0, as described in 19.3.11.11.4, 19.3.11.11.5, and 19.3.11.12. |
|  | p) Map each of the complex numbers in each of the $N_{ST}$ subcarriers in each of the OFDM symbols in each of the $N_{STS}$ space-time streams to the $N_{TX}$ transmit chain inputs. For direct-mapped operation, $N_{TX} = N_{STS}$, and there is a one-to-one correspondence between space-time streams and transmit chains. In this case, the OFDM symbols associated with each space-time stream are also associated with the corresponding transmit chain. Otherwise, a spatial mapping matrix associated with each OFDM subcarrier, as indicated by the EXPANSION_MAT parameter of the TXVECTOR, is used to perform a linear transformation on the vector of $N_{STS}$ complex numbers associated with each subcarrier in each OFDM symbol. This spatial mapping matrix maps the vector of $N_{STS}$ complex numbers in each subcarrier into a vector of $N_{TX}$ complex numbers in each subcarrier. The sequence of $N_{ST}$ complex numbers associated with each transmit chain (where each of the $N_{ST}$ complex numbers is taken from the same position in the $N_{TX}$ vector of complex numbers across the $N_{ST}$ subcarriers associated with an OFDM symbol) constitutes an OFDM symbol associated with the corresponding transmit chain. For details, see 19.3.11.11. Spatial mapping matrices may include cyclic shifts, as described in 19.3.11.11.2. |

| U.S. Patent No. 8,027,326 (Claim 1) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 4 Systems and Services** |
| | t) Upconvert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 19.3.7 for details. The transmit chains are connected to antenna elements according to ANTENNA_SET of the TXVECTOR if ASEL is applied. Source: IEEE Standard 802.11-2016 at 2349-2353. |

# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC, | Civil Action No. |
| Plaintiff, | |
| v. | |
| EXTREME NETWORKS, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Intellectual Ventures I LLC ("Intellectual Ventures I" or "IV"), by and through its undersigned counsel, files this Complaint for Patent Infringement against Defendant Extreme Networks, Inc. ("Extreme") as follows:

## THE PARTIES

1.     Intellectual Ventures I is a Delaware limited liability company having its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

2.     Upon information and belief, Extreme is a Delaware corporation having its principal place of business at 2121 RDU Center Drive, Suite 300, Morrisville, North Carolina 27560.

3.     Upon information and belief, Extreme can be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

4.     IV brings this action for patent infringement pursuant to 35 U.S.C. § 271, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Extreme because: Defendant has minimum contacts within the state of Delaware and in this District; Defendant has purposefully availed itself of the privileges of conducting business in the state of Delaware and in this District; Defendant has sought protection and benefit from the laws of the State of Delaware and is incorporated there; Defendant regularly conducts business within the State of Delaware and within this District, and Plaintiff's causes of action arise directly from Defendant's business contacts and other activities in the State of Delaware and in this District.

6.     More specifically, Extreme, directly and/or through intermediaries, ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises its products and services in the United States, the State of Delaware, and in this District.

7.     Upon information and belief, Extreme solicits customers in the State of Delaware and in this District and has many paying customers who are residents of the State of Delaware and this District and who use its products in the State of Delaware and in this District.  Extreme is also incorporated in the State of Delaware and in this District.

8.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Extreme is incorporated in this District and has committed acts of patent infringement within this District.

**FACTUAL BACKGROUND**

9.     Intellectual Ventures Management, LLC ("Intellectual Ventures") was founded in 2000.  Intellectual Ventures fosters inventions and facilitates the filing of patent applications for those inventions; collaborates with others to develop and patent inventions; and manages the acquisition and licensing of patents from individual inventors, universities, corporations, and other

institutions.  A significant aspect of Intellectual Ventures' business is managing the plaintiff in this case, Intellectual Ventures I.

10.     One founder of Intellectual Ventures is Nathan Myhrvold, who worked at Microsoft from 1986 until 2000 in a variety of executive positions, culminating in his appointment as the company's first Chief Technology Officer ("CTO") in 1996.   While at Microsoft, Dr. Myhrvold founded Microsoft Research in 1991 and was one of the world's foremost software experts. Between 1986 and 2000, Microsoft became the world's largest technology company.

11.     Under Dr. Myhrvold's leadership, Intellectual Ventures managed the acquisition of thousands of patents covering many important inventions of the Internet era, including many pertaining to the networked computers that comprise the Internet.  Many of these inventions coincided with Dr. Myhrvold's successful tenure at Microsoft.

### Wireless Network Communications

12.     An area of particular importance in today's computing environments is the efficiency of wireless communications systems.  More specifically, wireless local area networks (WLANs) typically use IR or RF communication channels to communicate between portable or mobile computer terminals and stationary access points.  The access points are in turn connected to a network infrastructure which links groups of access points together to form the LAN.  But while efficiency improvements in wired LAN implementations have been rapidly developed, in part due to the availability and use of technology such as dedicated full-duplex connections, lack of signal attenuation in cables, and the need for less robust processing for error correction and retransmission of lost packets, wireless networks have lagged behind due to inherent restrictions in the wireless medium.  Just some of these restrictions include limited bandwidth, a shared medium, interference, signal attenuation, latency and overhead, which are mitigated or eliminated

in wired networks. One standard that has been developed, in part to address the aforementioned inefficiencies, is the IEEE's 802.11 standard.

13. As the 802.11 standard has evolved, there was a focus on improving the overall efficiency, performance, and user experience in wireless networks, but not necessarily increasing throughput and lowering overhead. For example, channel selection improvements, prioritization mechanisms for high priority traffic, power management and load balancing techniques were developed. All of these things improved network efficiency but did not directly relate to increasing throughput or reducing the significant overhead required to send and receive data wirelessly among access points and stations, particularly in dense environments. In other words, these prior art solutions did not solve the need for reduced overhead and thus improved throughput. In fact, some of the prior art methods of improving network efficiency, such as channel sounding, contributed to the large overhead required to send and receive data wirelessly.

14. Therefore, it was realized that a system and method for improving throughput in 802.11 networks was essential. In particular, improved throughput would allow for increased bandwidth demand to be met as more and more devices connect to the network, increased support for multiple user environments, more efficient use of the spectrum, and increased scalability and future-proofing.

15. To address these and other problems in the art, Menzo Wentink, at the time an engineer for Conexant Systems, developed improved systems and methods of using transmit announcement indications in wireless networks, which include, but are not limited to, an improved scheme for reducing the overhead required to send and receive large amounts of information between stations and access points. In one embodiment, for example, an access point sends a first communication to a station which indicates a second communication will be coming, such as a

null data packet or other channel sounding mechanism. The announcement enables the access point to then send the second transmission without the address information typically required to identify the intended recipient. This is enabled in part using a short inter frame space (SIFS) following the announcement, ensuring that control of the channel is not lost in the time between the two communications. Therefore, rather than increasing the network overhead when adapting to channel conditions (which is necessary to implement important efficiency gaining mechanisms like beamforming, (e.g., channel sounding)), overall overhead is reduced thereby improving throughput. Furthermore, the claimed transmit announcement scheme can be used to achieve power savings, improve channel access, improve spatial reuse capabilities, and enable more efficient use of MU-MIMO by coordinating the transmissions of multiple devices.

16.     Defendant makes, uses, and sells devices that include embedded wireless 802.11ac compliant chipsets configured to use transmit announcement indications in the VHT sounding protocol required for SU Beamforming, among other features, compliant with the 802.11ac standard, such as the ExtremeWireless WiNG 8533 Wave 2 Access Points.

## THE PATENT-IN-SUIT

17.     On November 26, 2013, the United States Patent and Trademark Office issued United States Patent No. 8,594,122 ("the '122 patent"), titled TRANSMIT ANNOUNCEMENT INDICATION. The '122 patent is valid and enforceable. A copy of the '122 patent is attached as Exhibit A.

18.     Intellectual Ventures I LLC is the owner and assignee of all rights, title, and interest in the '122 patent, including the rights to grant licenses, to exclude others, and to recover past damages for infringement of that patent.

19. The '122 patent is directed to a system and method for using transmit announcement indications to reduce the overhead in and enhance the network performance and efficiency of 802.11 networks. The systems and methods utilize transmit announcement indications to improve the wireless communication systems performance by notifying receiving devices about upcoming transmissions, allowing the transmitting device to remove addressing information of the recipient from the subsequent messages, which can improve overall throughput while enabling the access points to make more informed decisions about channel access, power saving, beamforming, quality of service and multi-user multiple-input operations.

20. The inventions claimed in the '122 patent were conceived by Menzo Wentink, an engineer at Conexant Systems, a well-known software developer and fabless semiconductor company specializing in, among other things, wireless communications. Conexant's wireless communications division was spun off to form Skyworks Solutions, Inc. in the early 2000's and developed some of the foundational technology of that era with respect to wireless communications. Mr. Wentink has held Chair and Vice Chair positions at the IEEE and is currently a principal engineer at Qualcomm.

## COUNT I
(Defendant's Infringement of U.S. Patent No. 8,594,122)

21. The preceding paragraphs are reincorporated by reference as if fully set forth herein.

22. The '122 patent claims and teaches, *inter alia*, systems and methods for utilizing transmit announcement indications to improve wireless communication system performance by notifying receiving devices about upcoming transmissions. This allows the transmitting device to remove addressing information of the recipient from the subsequent messages, which can improve overall throughput while enabling the access points to make more informed decisions about

channel access, power saving, beamforming, quality of service and multi-user multiple-input operations.

23. The inventions improved upon then-existing wireless medium performance enhancing mechanisms by enabling access points to notify receiving stations that a transmission was to be expected but would lack addressing information, thus enabling the access point to refrain from transmitting that addressing information in a subsequent transmission, which in turn reduced the transmission of network overhead data (the addressing information). It further provided that the second communication (i.e., the second transmission) would follow a SIFS, ensuring that control of the channel would be maintained by the notifying access point until the second communication was received.

24. Unlike in prior art solutions the transmit announcement notification system and methods claimed in the asserted claims allowed for more efficient channel sounding and information exchange without increasing the overhead of the wireless medium, thus enabling technologies like beamforming to be performed efficiently and in turn increasing throughput, among other benefits.

25. More specifically, one exemplary embodiment comprises an improved transmit announcement indication scheme in which a first communication frame from a first station to a second station is sent, which comprises an address of the second station as well as a transmit announcement indication indicating that a second communication frame intended for the second station will follow the first communication frame. Furthermore, this exemplary embodiment specifies that the second frame which was to be expected would not include the address of the second station which is normally required. Additionally, the second communication is configured

to be transmitted following a short interframe space (SIFS), ensuring that control over the channel is maintained while simultaneously reducing overhead and increasing throughput.

26. The systems and methods covered by the asserted claims, therefore, differ markedly from prior art systems in use at the time of this invention, which lacked the claimed combination of transmitting a first communication frame from a first station to a second station, wherein the first communication frame comprises an address of the second station and a transmit announcement indication indicating that a second communication frame intended for the second station will follow the first communication frame and that the second communication frame will not include the address of the second station, and where the second communication frame follows after a short inter frame space (SIFS) after the first communication frame with the transmit announcement indication.

27. Defendant has directly infringed and continues to directly infringe at least claim 11 of the '122 patent by making, using, selling, offering for sale, or importing products and/or services covered by the '122 patent. Defendant's products and/or services that infringe the '122 patent include all wireless communication products that support IEEE 802.11ac SU Beamforming, including the transmission of transmit announcement indications, a.k.a. Very High Throughput (VHT) Sounding Protocol, or any other method or system of using a transmit announcement indication in 802.11ac networks, such that a transmission is sent to an intended recipient which notifies it of a forthcoming address-less transmission, thus reducing overhead and increasing throughput, and that are made, used, sold, or offered for sale by or on behalf of Defendant and/or its subsidiaries or parent companies (cumulatively, "the '122 Accused Products"), including but not limited to, the Extreme Wireless WiNG 8533 Wave 2 Access Point.

28. Claim 11 of the '122 patent is reproduced below:

*11.  A non-transitory computer-readable medium having instructions stored thereon that, if executed by a computing device, cause the computing device to perform operations comprising:*

> *transmitting a first communication frame from a first station to a second station;*

> *wherein the first communication frame comprises an address of the second station and a transmit announcement indication indicating that a second communication frame intended for the second station will follow the first communication frame and that the second communication frame will not include the address of the second station, and*

> *wherein the second communication frame follows after a short inter frame space (SIFS) after the first communication frame with the transmit announcement indication.*

29.    The '122 Accused Products include a non-transitory computer-readable medium having instructions stored thereon that when executed by a computing device cause the device to perform the operation of transmitting a first communication frame from a first station to a second station. Specifically, the Accused Products implement 802.11ac transmit beamforming, which relies on the VHT sounding protocol, which in turn calls for a first communication frame to be transmitted from a first station to a second station:





# ExtremeWireless™ WiNG 8533 Wave 2 Access Point

| Product Features | |
| --- | --- |
| **802.11ac Capabilities** | |
| • Quad radios (3 Wi-Fi radios + one Bluetooth® radio) | • Advanced forward error correction coding: STBC, LDPC |
| • Band-unlocked Network Sensor for WIPS and Location Service | • 802.11ac transmit beamforming |
| • 4x4 MU-MIMO with 4 Spatial Streams | • Maximal Ratio Combining (MRC) |
| • Auto-Selecting MU-MIMO supports 1 and 2 stream wireless clients | • NitroQAM provides up to 800 Mbps on 2.4GHz radio and up to 2166 Mbps on 5GHz radio |
| • 20, 40, and 80 MHz Channels | • Support for up to 500 associated client devices per access point and up to 16 BSSIDs per radio |
| • Packet Aggregation (AMSDU, AMPDU) and  RIFS | |
| • MIMO Power Save (Static and Dynamic) | |

Source: https://kapost-files-prod.s3.amazonaws.com/kapost/55ba7c9e07003d9aab000394/studio/content/581cb23d5926b0fd2b0004cf/published/ap-8533-data-sheet.pdf?kui=ZkaoY07Rbi_iHRyNkAE4cA

| Product Info | | Wi-Fi CERTIFIED™ ac (continued) |
| --- | --- | --- |
| Date of Certification | March 14, 2017 | LDPC Tx |
| Company | Extreme Networks | MCS 8-9 Rx |
| Product Name | AP-8533 Tri Radio 802.11ac Access Point, Dedicated Sensor, BLE | Short Guard Interval |
| Product Model Variant | 2017-03-14 (WFA67121 - 5197988) | STBC |
| Model Number | AP-8533 | SU beamformer |
| Category | Routers | |
| Sub-category | Enterprise/Service Provider Access Point, Switch/Controller or Router | |

Source: https://api.cert.wi-fi.org/api/certificate/download/public?variantId=22470

### 10.34.5 VHT sounding protocol

#### 10.34.5.1 General

Transmit beamforming and DL-MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmitted signal to optimize reception at one or more receivers. The STA transmitting using the steering matrix is called the *VHT beamformer*, and a STA for which reception is optimized is called a *VHT beamformee*. An explicit feedback mechanism is used where the VHT beamformee directly measures the channel from the training symbols transmitted by the VHT beamformer and sends back a transformed estimate of the channel state to the VHT beamformer. The VHT beamformer then uses this estimate, perhaps combining estimates from multiple VHT beamformees, to derive the steering matrix.

#### 10.34.5.2 Rules for VHT sounding protocol sequences

A VHT beamformer shall initiate a sounding feedback sequence by transmitting a VHT NDP Announcement frame followed by a VHT NDP after a SIFS. The VHT beamformer shall include in the VHT NDP Announcement frame one STA Info field for each VHT beamformee that is expected to prepare VHT Compressed Beamforming feedback and shall identify the VHT beamformee by including the VHT beamformee's AID in the AID subfield of the STA Info field. The VHT NDP Announcement frame shall include at least one STA Info field.



Source: IEEE 802.11-2016 at pp. 1488, 1490.

30.     In the transmission operation performed by the '122 Accused Products, the first communication frame comprises an address of the second station.  For example, the VHT NDP Announcement includes a "STA Info" field that includes the AID12 of the recipient, as seen below:

A VHT beamformer shall initiate a sounding feedback sequence by transmitting a VHT NDP Announcement frame followed by a VHT NDP after a SIFS. The VHT beamformer shall include in the VHT NDP Announcement frame one STA Info field for each VHT beamformee that is expected to prepare VHT Compressed Beamforming feedback and shall identify the VHT beamformee by including the VHT beamformee's AID in the AID subfield of the STA Info field. The VHT NDP Announcement frame shall include at least one STA Info field.



Source: IEEE Std 802.11-2016 pp. 1488, 1490.



**Figure 9-49—VHT NDP Announcement frame format**



**Figure 9-51—STA Info field**

**Table 9-25—STA Info subfields**

| Field | Description |
|---|---|
| AID12 | Contains the 12 least significant bits of the AID of a STA expected to process the following VHT NDP and prepare the sounding feedback. Equal to 0 if the STA is an AP, mesh STA, or STA that is a member of an IBSS. |

<u>Source</u>: IEEE Std 802.11-2016 pp. 685-86.

**9.4.1.8 AID field**

In infrastructure BSS operation, the AID field contains a value assigned by an AP or PCP during association. The field represents the 16-bit ID of a STA. In mesh BSS operation, the AID field is a value that represents the 16-bit ID of a neighbor peer mesh STA. An AID value is assigned by a mesh STA that receives and accepts a Mesh Peering Open frame to the transmitter of the Mesh Peering Open frame during the mesh peering establishment process (see 14.3.1). The length of the AID field is 2 octets. The AID field is illustrated in Figure 9-73.



**Figure 9-73—AID field**

<u>Source</u>: IEEE Std. 802.11-2016, p. 731.

31.     In the transmission operation performed by the '122 Accused Products, the first communication frame comprises a transmit announcement indication indicating that a second communication frame intended for the second station will follow the first communication frame. For example, the 802.11-2016 standard requires that every VHT NDP Announcement frame is followed by a VHT NDP transmission after a SIFS. Each VHT Announcement frame includes the recipient's address information as described above, thus indicating that the second communication is intended for the second station, as seen below:

12

### 10.34.5.2 Rules for VHT sounding protocol sequences

A VHT beamformer shall initiate a sounding feedback sequence by transmitting a VHT NDP Announcement frame followed by a VHT NDP after a SIFS. The VHT beamformer shall include in the VHT NDP Announcement frame one STA Info field for each VHT beamformee that is expected to prepare VHT Compressed Beamforming feedback and shall identify the VHT beamformee by including the VHT beamformee's AID in the AID subfield of the STA Info field. The VHT NDP Announcement frame shall include at least one STA Info field.

A VHT NDP shall be transmitted only following a SIFS after a VHT NDP Announcement frame. A VHT NDP Announcement frame shall be followed by a VHT NDP after SIFS.

Source: IEEE Std. 802.11-2016, p. 1488.

### 9.2.4.1 Frame Control field

### 9.2.4.1.1 General

The first three subfields of the Frame Control field are Protocol Version, Type, and Subtype. The remaining subfields of the Frame Control field depend on the setting of the Type and Subtype subfields.

### 9.2.4.1.3 Type and Subtype subfields

The Type subfield is 2 bits in length, and the Subtype subfield is 4 bits in length. The Type and Subtype subfields together identify the function of the frame. There are three frame types: control, data, and

**Table 9-1—Valid type and subtype combinations**

| Type value B3 B2 | Type description | Subtype value B7 B6 B5 B4 | Subtype description |
|---|---|---|---|
| 01 | Control | 0101 | VHT NDP Announcement |

Source: IEEE Std. 802.11-2016, pp. 638-39.

### 10.20 Group ID and partial AID in VHT PPDUs

The partial AID is a nonunique STA identifier defined in Table 10-9. The partial AID is carried in the TXVECTOR parameter PARTIAL_AID of a VHT SU PPDU and is limited to 9 bits.

A STA transmitting a VHT SU PPDU carrying one or more group addressed MPDUs or transmitting a VHT NDP intended for multiple recipients shall set the TXVECTOR parameters GROUP_ID to 63 and PARTIAL_AID to 0. The intended recipient of a VHT NDP is defined in 10.34.6.

Source: IEEE Std. 802.11-2016, p. 1373.

### 10.34.6 Transmission of a VHT NDP

The destination of a VHT NDP is equal to the RA of the immediately preceding VHT NDP Announcement frame.

Source: IEEE Std. 802.11-2016, p. 1493.

## 10.34.5.2 Rules for VHT sounding protocol sequences

If the VHT NDP Announcement frame includes more than one STA Info field, the RA of the VHT NDP Announcement frame shall be set to the broadcast address. If the VHT NDP Announcement frame includes a single STA Info field, the RA of the VHT NDP Announcement frame shall be set to the MAC address of the VHT beamformee.

Source: IEEE Std. 802.11-2016, pp. 1488-89.



Source: IEEE Std. 802.11-2016, p. 1490.

32.   In the transmission operation performed by the '122 Accused Products, the second communication frame will not include the address of the second station.  For instance, the VHT NDP frame that follows the VHT NDP Announcement frame does not include the address of the second station:



**Figure 21-28—VHT NDP format**

Source: IEEE Std. 802.11-2016, p. 2580.

14

### 21.3.8.3.3 VHT-SIG-A definition

The VHT-SIG-A field carries information required to interpret VHT PPDUs. The structure of the VHT-SIG-A field for the first part (VHT-SIG-A1) is shown in Figure 21-18 and for the second part (VHT-SIG-A2) is shown in Figure 21-19.



**Figure 21-18—VHT-SIG-A1 structure**

<u>Source</u>: IEEE Std. 802.11-2016, p. 2543.

### 10.20 Group ID and partial AID in VHT PPDUs

The partial AID is a nonunique STA identifier defined in Table 10-9. The partial AID is carried in the TXVECTOR parameter PARTIAL_AID of a VHT SU PPDU and is limited to 9 bits.

A STA transmitting a VHT SU PPDU carrying one or more group addressed MPDUs or transmitting a VHT NDP intended for multiple recipients shall set the TXVECTOR parameters GROUP_ID to 63 and PARTIAL_AID to 0. The intended recipient of a VHT NDP is defined in 10.34.6.

<u>Source</u>: IEEE Std. 802.11-2016, p. 1373.

33.     In the operation performed by the '122 Accused Products, the second communication frame follows a short inter frame space (SIFS) after the first communication frame with the transmit announcement indication.  For example, the VHT NDP frame is transmitted to the second station after a SIFS interval following the transmission of the VHT NDP Announcement frame, as seen below:

### 10.34.5.2 Rules for VHT sounding protocol sequences

A VHT NDP shall be transmitted only following a SIFS after a VHT NDP Announcement frame. A VHT NDP Announcement frame shall be followed by a VHT NDP after SIFS.



Source: IEEE Std. 802.11-2016, pp. 1488, 1490.

34.     Additionally, Defendant has been and currently is an active inducer of infringement of the '122 patent under 35 U.S.C. § 271(b) and a contributory infringer of the '122 patent under 35 U.S.C. § 271(c).

35.     Defendant has actively induced, and continues to actively induce, infringement of the '122 patent by causing others to use, offer for sale, or sell in the United States, products or services covered by the '122 patent, including but not limited to the '122 Accused Products and any other products or services that include the use of transmit announcement indications with a second communication without address information of the recipient following said announcement after a SIFS, such as, the VHT NDP sounding procedure for beamforming described herein. Defendant provides these products and services to others, such as customers, resellers, partners, and end-users, who, in turn, use, provide for use, offer for sale, or sell those products and services, which directly infringe the '122 patent as described above.  Defendant's inducement includes requiring WiFi chipsets within the '122 Accused Products to be compliant with the IEEE 802.11ac standard, in which the VHT NDP sounding procedure described above is mandatory, and advertising and promoting such compliance—and functionality it enables, such as beamforming—to its customers, partners, re-sellers and the like, including the promotion, directions and instructions found at one or more of the following links, the provision of which is on-going as of the filing of this Complaint and much of the content of which is specifically illustrated above:

- https://www.extremenetworks.com/product/wing-ap-8533/
- https://documentation.extremenetworks.com/wireless/QRG/AP-8533_QuickRef.pdf?_ga=2.256806211.996432638.1680194988-148695506.1678225403
- https://documentation.extremenetworks.com/WiNG/Access_Points/ExtremeWireless_WiNG_AP-8533_Install_Guide.pdf?_ga=2.184142446.996432638.1680194988-148695506.1678225403
- https://documentation.extremenetworks.com/wing/5.9.6/crg/GUID-1E9D5776-14A1-4779-8C9E-82FCA5ADA1B7.shtml

- https://www.extremenetworks.com/product/wing-ap-7612-wall-plate/
- https://documentation.extremenetworks.com/WiNG/Access_Points/ExtremeWireless_WiNG_AP-7612_Install_Guide/Wireless_Hardware/AP7612_Install_Guide/c_overview-ap-7612.shtml
- https://documentation.extremenetworks.com/wireless/QRG/AP7612_QuickRef.pdf?_ga=2.154644208.996432638.1680194988-148695506.1678225403
- https://api.cert.wi-fi.org/api/certificate/download/public?variantId=30910
- https://api.cert.wi-fi.org/api/certificate/download/public?variantId=22470
- https://www.extremenetworks.com/product/wing-ap-7532/
- https://www.extremenetworks.com/product/wing-ap-7522/
- https://community.extremenetworks.com/t5/extremewireless-general/how-802-11-ac-wave-2-mu-mimo-works/m-p/31379

36. Defendant has contributed to, and continues to contribute to, the infringement of the '122 patent by others by knowingly providing one or more components, for example the 802.11ac WiFi chipset with transmit announcement functionality which enables the VHT sounding protocol used in beamforming, included in the '122 Accused Products, a portion thereof, and/or the software/hardware modules responsible for the accused functionality described herein, that, when installed, configured, and used result in systems that, as intended by Defendant described above, directly infringe one or more claims of the '122 patent.

37. Defendant knew of the '122 patent, or should have known of the '122 patent, but was willfully blind to its existence. Upon information and belief, Defendant had actual knowledge of the '122 patent since at least as early as April 25, 2023, the date on which IV sent it a notice letter describing the above infringement. Additionally, Defendant has known of the '122 patent since at least when it received a copy of this Complaint, or alternatively, at least as early as service upon Defendant of the Complaint in this action.

38. By the time of trial, Defendant will or should have known and intended (since receiving such notice) that its continued actions would infringe and would actively induce and contribute to the infringement of the '122 patent.

39. Defendant has committed, and continues to commit, contributory infringement by selling products and services that directly infringe the '122 patent when used by a third party, such as the Accused '122 Products, and that are a material part of the invention, knowing them to be especially made or adapted for use in infringement of the '122 patent and not staple articles or commodities of commerce suitable for substantial non-infringing use.

40. As a result of Defendant's acts of infringement, IV has suffered and will continue to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

IV requests that the Court enter judgment as follows:

(A)     that Defendant has infringed the '122 patent;

(B)     awarding damages sufficient to compensate IV for Defendant's infringement under 35 U.S.C. § 284;

(C)     finding this case exceptional under 35 U.S.C. § 285 and awarding IV its reasonable attorneys' fees;

(D)     awarding IV its costs and expenses incurred in this action;

(E)     awarding IV prejudgment and post-judgment interest; and

(F)     granting IV such further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

IV demands trial by jury of all claims so triable under Federal Rule of Civil Procedure 38.

Dated: May 4, 2023                          Respectfully submitted,

Of Counsel:                                 FARNAN LLP

Paul J. Hayes                               /s/ Michael J. Farnan
Matthew D. Vella                            Brian E. Farnan (Bar No. 4089)
Robert R. Gilman                            Michael J. Farnan (Bar No. 5165)
Jonathan DeBlois                            919 N. Market Str., 12th Floor
Brian Seeve                                 Wilmington, DE 19801
PRINCE LOBEL TYE LLP                        Tel: (302) 777-0300
One International Place, Suite 3700         Fax: (302) 777-0301
Boston, MA 02110                            bfarnan@farnanlaw.com
Tel: (617) 456-8000                         mfarnan@farnanlaw.com
phayes@princelobel.com
mvella@princelobel.com                      *Attorneys for Intellectual Ventures I LLC*
rgilman@princelobel.com
jdeblois@princelobel.com
bseeve@princelobel.com

# Exhibit 7

**Exhibit 12 to Complaint**
**Intellectual Ventures I LLC and Intellectual Ventures II LLC**

**Example Southwest Count 5 Systems and Services**
**U.S. Patent No. 7,324,469 ("'469 Patent")**

The Accused Systems and Services include without limitation Southwest systems and services that provide onboard WiFi in its airplanes; all past, current, and future systems and services that operate in the same or substantially similar manner as the specifically identified systems and services; and all past, current, and future Southwest systems and services that have the same or substantially similar features as the specifically identified systems and services ("Example Southwest Count 5 Systems and Services" or "Southwest Systems and Services").

On information and belief, the Southwest Systems and Services provide onboard WiFi in its airplanes.



Source: https://www.southwest.com/inflight-entertainment-portal/.[1]

---

[1] All sources cited in this document were publicly accessible as of the filing date of the Complaint.

We're excited to announce that as of yesterday, March 9, 2023, our first aircraft equipped with hardware from our new WiFi vendor, Viasat, has entered service. Viasat is an industry leader, and we're excited about the increased connectivity and reliability that Viasat will provide. As we prepare for additional Viasat-equipped aircraft deliveries, we're also making significant progress updating our existing fleet with new Anuvu hardware (our original WiFi vendor). We have now upgraded more than 400 aircraft and are well on our way to upgrading the entire fleet by the third quarter of this year.

Between our upgraded Anuvu hardware and integration of Viasat, we're bringing a faster, more reliable WiFi experience. In addition to improved WiFi quality, Viasat offers Customers the ability to trade paid internet connectivity between personal devices (known as "device swapping"). For example, if a Customer has paid for Internet using their laptop, they can use the "swap device" function in the Inflight Entertainment Portal to switch connectivity to their phone.

|  | Anuvu Legacy | Anuvu Upgraded | Viasat |
|---|:---:|:---:|:---:|
| Improved Speeds and Reliability | ✘ | ✔ | ✔ |
| Streaming (when authenticated for Internet) | ✘ | ✔ | ✔ |
| Device Swap | ✘ | ✘ | ✔ |
| Free Entertainment, Texting, and Flight Tracker | ✔ | ✔ | ✔ |

Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I.

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| [24.pre] An Internet Hotspot comprising: | To the extent this preamble is limiting, on information and belief, the Southwest Count 5 Systems and Services include an Internet Hotspot.<br><br>On information and belief, Southwest has partnered with Viasat and Anuvu[2] to provide its passengers with in-flight Wi-Fi connectivity. Southwest aircraft are equipped with Viasat and Anuvu's In-Flight Connectivity system.<br><br>We're excited to announce that as of yesterday, March 9, 2023, our first aircraft equipped with hardware from our new WiFi vendor, Viasat, has entered service. Viasat is an industry leader, and we're excited about the increased connectivity and reliability that Viasat will provide. As we prepare for additional Viasat-equipped aircraft deliveries, we're also making significant progress updating our existing fleet with new Anuvu hardware (our original WiFi vendor). We have now upgraded more than 400 aircraft and are well on our way to upgrading the entire fleet by the third quarter of this year.<br><br>Between our upgraded Anuvu hardware and integration of Viasat, we're bringing a faster, more reliable WiFi experience. In addition to improved WiFi quality, Viasat offers Customers the ability to trade paid internet connectivity between personal devices (known as "device swapping"). For example, if a Customer has paid for Internet using their laptop, they can use the "swap device" function in the Inflight Entertainment Portal to switch connectivity to their phone.<br><br>|                                   | Anuvu Legacy | Anuvu Upgraded | Viasat |<br>|---|---|---|---|<br>| Improved Speeds and Reliability | ✖ | ✔ | ✔ |<br>| Streaming (when authenticated for Internet) | ✖ | ✔ | ✔ |<br>| Device Swap | ✖ | ✖ | ✔ |<br>| Free Entertainment, Texting, and Flight Tracker | ✔ | ✔ | ✔ |<br><br>Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I. |

---

[2] Based on publicly-available information, Plaintiffs have identified Viasat and Anuvu as Wi-Fi and/or In-Flight Connectivity (IFC) providers for Southwest. To the extent Southwest has used other IFC providers to provide satellite-based Internet connectivity to its customers, Plaintiffs reserve right to investigate such use.

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| Claim(s) | Example Southwest Count 5 Systems and Services |
| | **DOES SOUTHWEST USE VIASAT?**<br><br>Yes. Southwest airlines announced in March 2023 that new aircraft with the airline will come with factory-installed Wi-Fi connectivity powered by Viasat. The Ka-band connectivity will offer faster, reliable Wi-Fi network connections for Southwest passengers. Viasat currently offers In-Flight Connectivity services to Delta Air Lines, JetBlue, American and United. The first Viasat-equipped aircraft entered service in March 2023 for various North American routes. Viasat is proud to have been selected as the provider in this partnership.<br><br>The connectivity will use three large Ka-band satellites, Viasat-1, Viasat-2 and the recently launched Viasat-3 once it completes in-orbit testing, which is expected to be late summer or the fall of 2023. Viasat is a global communications company that provides high-speed satellite internet and other communication services. It operates a satellite network that delivers broadband internet access to residential, commercial, and government customers, particularly in areas where traditional wired internet infrastructure is limited or unavailable.<br><br>Source: https://www.rsinc.com/does-southwest-use-viasat.php.<br><br>Southwest, serving more than 100 million passengers each year, continues to offer the most comprehensive inflight entertainment and connectivity experience at all phases of flight, which now includes:<br><br>• Inflight WiFi available from gate-to-gate for $8 per device per day<br>• iMessage, available from gate-to-gate for $2 per day, for iPhone users with iOS5 or later<br>• Live Television streamed directly to passengers' own personal electronic devices, free of charge, courtesy of DISH<br>• Video-on-Demand television content and movies<br><br>Powered by Global Eagle's satellite-based connectivity platform, the new service—in sync with gate-to-gate Wi-Fi—is also optimized to work in all phases of flight, including on the ground.<br><br>Source: https://www.anuvu.com/our-company/press-releases/detail/30/southwest-airlines-and-global-eagle-entertainment-announce-launch-of-gate-to-gate-messaging-on-all. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| [24.a] a satellite dish communicating with the Internet via one or more data links with a satellite; | On information and belief, the Southwest Count 5 Systems and Services include a satellite dish communicating with the Internet via one or more data links with a satellite.<br><br>On information and belief, Southwest's aircraft are equipped with Viasat In-Flight Connectivity (IFC). This functionality uses satellite technology that communicates with the Internet through data links.<br><br>We're excited to announce that as of yesterday, March 9, 2023, our first aircraft equipped with hardware from our new WiFi vendor, Viasat, has entered service. Viasat is an industry leader, and we're excited about the increased connectivity and reliability that Viasat will provide. As we prepare for additional Viasat-equipped aircraft deliveries, we're also making significant progress updating our existing fleet with new Anuvu hardware (our original WiFi vendor). We have now upgraded more than 400 aircraft and are well on our way to upgrading the entire fleet by the third quarter of this year.<br><br>Between our upgraded Anuvu hardware and integration of Viasat, we're bringing a faster, more reliable WiFi experience. In addition to improved WiFi quality, Viasat offers Customers the ability to trade paid internet connectivity between personal devices (known as "device swapping"). For example, if a Customer has paid for Internet using their laptop, they can use the "swap device" function in the Inflight Entertainment Portal to switch connectivity to their phone.<br><br>

| | **Anuvu Legacy** | **Anuvu Upgraded** | **Viasat** |
|---|---|---|---|
| **Improved Speeds and Reliability** | ✖ | ✔ | ✔ |
| **Streaming** (when authenticated for Internet) | ✖ | ✔ | ✔ |
| **Device Swap** | ✖ | ✖ | ✔ |
| **Free Entertainment, Texting, and Flight Tracker** | ✔ | ✔ | ✔ |

Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I.

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
|  | **DOES SOUTHWEST USE VIASAT?**<br><br>Yes. Southwest airlines announced in March 2023 that new aircraft with the airline will come with factory-installed Wi-Fi connectivity powered by Viasat. The Ka-band connectivity will offer faster, reliable Wi-Fi network connections for Southwest passengers. Viasat currently offers In-Flight Connectivity services to Delta Air Lines, JetBlue, American and United. The first Viasat-equipped aircraft entered service in March 2023 for various North American routes. Viasat is proud to have been selected as the provider in this partnership.<br><br>The connectivity will use three large Ka-band satellites, Viasat-1, Viasat-2 and the recently launched Viasat-3 once it completes in-orbit testing, which is expected to be late summer or the fall of 2023. Viasat is a global communications company that provides high-speed satellite internet and other communication services. It operates a satellite network that delivers broadband internet access to residential, commercial, and government customers, particularly in areas where traditional wired internet infrastructure is limited or unavailable.<br><br>Source: https://www.rsinc.com/does-southwest-use-viasat.php.<br><br>ViaSat-3 is a constellation of three ultra-high-capacity Ka-band geostationary satellites currently in production. The first and second payloads have already been sent to Boeing Satellite Systems for integration with the 702MP+ bus (spacecraft). This is a modified version of Boeing's 702 bus with a good deal more power (greater than 25kW per satellite), and they are expected to make the ViaSat-3 satellites some of the most high-powered ones ever built. To produce that power, the four solar panels of the traditional 702MP have been bumped to eight. These solar cells are similar to the ones used in the original Apollo moon missions and have powered more than 1,000 satellites around the globe.<br><br>Source: https://news.viasat.com/blog/scn/what-is-viasat3. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/932043_Global_Ku-band_Advanced_Brochure_016_web.pdf. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | On information and belief, Anuvu functions similarly to Viasat.<br><br><br><br>Source: https://www.anuvu.com/our-portfolio/connectivity. |
| [24.b] at least one router operatively coupled to the satellite dish; | On information and belief, the Southwest Count 5 Systems and Services include at least one router operatively coupled to the satellite dish.<br><br>On information and belief, Southwest's aircraft are equipped with Wi-Fi and/or IFC that includes a router that is connected to a satellite antenna mounted about the plane that communicates using a satellite and ground stations.<br><br> |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/932043_Global_Ku-band_Advanced_Brochure_016_web.pdf. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf.<br><br>On information and belief, Southwest offers WiFi solutions (through its IFC providers) that support satellite-based WiFi.<br><br>We're excited to announce that as of yesterday, March 9, 2023, our first aircraft equipped with hardware from our new WiFi vendor, Viasat, has entered service. Viasat is an industry leader, and we're excited about the increased connectivity and reliability that Viasat will provide. As we prepare for additional Viasat-equipped aircraft deliveries, we're also making significant progress updating our existing fleet with new Anuvu hardware (our original WiFi vendor). We have now upgraded more than 400 aircraft and are well on our way to upgrading the entire fleet by the third quarter of this year.<br><br>Between our upgraded Anuvu hardware and integration of Viasat, we're bringing a faster, more reliable WiFi experience. In addition to improved WiFi quality, Viasat offers Customers the ability to trade paid internet connectivity between personal devices (known as "device swapping"). For example, if a Customer has paid for Internet using their laptop, they can use the "swap device" function in the Inflight Entertainment Portal to switch connectivity to their phone. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
|  |  |

Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I.

## DOES SOUTHWEST USE VIASAT?

Yes. Southwest airlines announced in March 2023 that new aircraft with the airline will come with factory-installed Wi-Fi connectivity powered by Viasat. The Ka-band connectivity will offer faster, reliable Wi-Fi network connections for Southwest passengers. Viasat currently offers In-Flight Connectivity services to Delta Air Lines, JetBlue, American and United. The first Viasat-equipped aircraft entered service in March 2023 for various North American routes. Viasat is proud to have been selected as the provider in this partnership.

The connectivity will use three large Ka-band satellites, Viasat-1, Viasat-2 and the recently launched Viasat-3 once it completes in-orbit testing, which is expected to be late summer or the fall of 2023. Viasat is a global communications company that provides high-speed satellite internet and other communication services. It operates a satellite network that delivers broadband internet access to residential, commercial, and government customers, particularly in areas where traditional wired internet infrastructure is limited or unavailable.

Source: https://www.rsinc.com/does-southwest-use-viasat.php.

13

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | Our hybrid satellite network combines our own satellites with capacity on over 50 third-party satellites, providing scalable capacity, reliability and redundancy, and cost-effective solutions for our customers. As the industry pioneer in regional Inflight Connectivity and gigabit-class cruise ship connectivity, Anuvu has continuously invested in new technologies to keep pace with end-user expectations. We recognize the importance of reliable, fast, global connectivity for our customers around the world. Our hybrid network, consisting of high-throughput geostationary satellites and 4G/5G mobile connectivity, builds on the industry's first and most capable SD-WAN platform optimized for aviation and maritime applications. **96%** Anuvu's world satellite coverage **1000+** Aircraft connected – the largest domestic single-aisle fleet in the world Source: https://www.anuvu.com/our-portfolio/connectivity. |
| [24.c] a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and | On information and belief, the Southwest Count 5 Systems and Services include a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet. On information and belief, the IFC includes a satellite antenna, multiple WAPs, and an onboard server that hosts information passenger-focused services. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
|  | <br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/932043_Global_Ku-band_Advanced_Brochure_016_web.pdf.<br><br>On information and belief, Southwest passengers authenticate themselves on the SouthwestWiFi.com web portal to access in-flight Wi-Fi using on-board server(s). The authentication completes when the user enters their login credentials on the portal. Limited free Wi-Fi is available to passengers, and upgraded high-speed |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | WiFi is available to certain Southwest members or can be purchased.<br><br><br><br>Source: https://www.southwest.com/inflight-entertainment-portal/. <br><br>Source: https://www.southwest.com/inflight-entertainment-portal/. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| [24.d] a web-ready device operatively coupled to the at least one router, the web-ready device having a browser application operating thereon for accessing the Internet; | On information and belief, the Southwest Count 5 Systems and Services include a web-ready device operatively coupled to the at least one router, the web-read device having a browser application operating thereon for accessing the Internet.<br><br>On information and belief, Southwest enables access to onboard WiFi through seatback and/or user devices that include a browser application for Internet accessibility.<br><br><br><br>Source: https://www.southwest.com/inflight-entertainment-portal/.<br><br><br><br>Source: https://www.southwest.com/inflight-entertainment-portal/. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | **Stay Connected[1]**<br><br>Keeping you connected to what matters to you–even when you're in the air. Access the portal to enjoy free texting[2] and $8 Internet.[4]<br><br>**Free Texting**<br><br>Keep those texts flying with **iMessage** and **WhatsApp** on your personal device. Visit the Texting page in Portal to activate service.<br><br>**$8 Internet**<br><br>Go online to check email, browse social media, or snag a dinner reservation for just $8 (**free** for our A-List Preferred Members and Business Select Customers) per device from takeoff to landing.<br><br>**Note:** In order to provide a better experience, we may prohibit access to certain high-bandwidth applications, websites, and video conferencing services. In consideration of the public environment onboard we may also restrict potentially offensive online content.<br><br>Source: https://www.southwest.com/inflight-entertainment-portal/. |
| [24.e] wherein the satellite dish, at least one router and the subscriber access unit are located in a remote location a experiencing a relatively high volume of transient traffic; | On information and belief, the Southwest Count 5 Systems and Services include a satellite dish, at least one router, and a subscriber access unit, where the satellite dish, at least one router and the subscriber access unit are located in a remote location a experiencing a relatively high volume of transient traffic. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/932043_Global_Ku-band_Advanced_Brochure_016_web.pdf. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br><br>Source: https://www.viasat.com/content/dam/us-site/aviation/documents/Viasat_Select_Router-datasheet.pdf. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br>Source: https://onezero.medium.com/what-makes-it-possible-to-browse-the-internet-at-35-000-feet-1afaea83eb5. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| |  Source: https://www.businessinsider.com/how-airplane-wifi-works-2018-9. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | **Southwest Airlines fleet** |

| Aircraft | In service | Orders | Passengers | Notes |
|---|---|---|---|---|
| Boeing 737-700 | 374 | — | 143 | Launch customer and largest operator.[15] Older aircraft to be replaced by Boeing 737 MAX 7. |
| Boeing 737-800 | 205 | — | 175 | To be replaced by Boeing 737 MAX 8. |
| Boeing 737 MAX 7 | — | 307 | 150[33] | Deliveries begin in 2025.[34] To replace older Boeing 737-700s.[35] |
| Boeing 737 MAX 8 | 239 | 166 | 175 | Largest Boeing 737 MAX operator. To replace Boeing 737-700s.[35] |
| **Total** | **818** | **473** | | |

Source: https://en.wikipedia.org/wiki/Southwest_Airlines_fleet.

| | |
|---|---|
| [24.f] wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router. | On information and belief, the Southwest Count 5 Systems and Services include WiFi where the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router. |
| | On information and belief, Southwest passengers authenticate themselves on the SouthwestWiFi.com web portal to access in-flight Wi-Fi. The authentication completes when the user enters their login credentials on the portal through seatback and/or user devices. Limited free Wi-Fi is available to passengers, and upgraded high-speed WiFi is available to certain Southwest members or can be purchased. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
| --- | --- |
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br><br>Source: https://www.southwest.com/inflight-entertainment-portal/.<br><br>Source: https://www.southwest.com/inflight-entertainment-portal/.<br><br>On information and belief, upon authentication the user may access the Internet through onboard WiFi, where a connection is established with onboard software and/or hardware including a router. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | <br><br>Source: https://www.southwest.com/inflight-entertainment-portal/.<br><br>Source: https://www.southwest.com/inflight-entertainment-portal/. |

26

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | **Stay Connected[1]**<br><br>Keeping you connected to what matters to you--even when you're in the air. Access the portal to enjoy free texting[2] and $8 Internet.[4]<br><br>**Free Texting**<br><br>Keep those texts flying with **iMessage** and **WhatsApp** on your personal device. Visit the Texting page in Portal to activate service.<br><br>**$8 Internet**<br><br>Go online to check email, browse social media, or snag a dinner reservation for just $8 (**free** for our A-List Preferred Members and Business Select Customers) per device from takeoff to landing.<br><br>ℹ️ **Note:** In order to provide a better experience, we may prohibit access to certain high-bandwidth applications, websites, and video conferencing services. In consideration of the public environment onboard we may also restrict potentially offensive online content.<br><br>Source: https://www.southwest.com/inflight-entertainment-portal/. |

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| |  Source: https://onezero.medium.com/what-makes-it-possible-to-browse-the-internet-at-35-000-feet-1afaea83eb5. <br><br> On information and belief, Southwest offers WiFi solutions on its airplanes that support satellite-based WiFi. |

| U.S. Patent No. 7,324,469 (Claim 24) ||
| :---: | :---: |
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
|  |  Source: https://www.swamedia.com/southwest-stories/wifi-modernization-first-viasat-aircraft-enters-service-MC5XTXWTTLWNESJDQR4LZQBIDI2I.  Source: https://www.rsinc.com/does-southwest-use-viasat.php. |

29

| U.S. Patent No. 7,324,469 (Claim 24) | |
|---|---|
| **Claim(s)** | **Example Southwest Count 5 Systems and Services** |
| | Our hybrid satellite network combines our own satellites with capacity on over 50 third-party satellites, providing scalable capacity, reliability and redundancy, and cost-effective solutions for our customers.<br><br>As the industry pioneer in regional Inflight Connectivity and gigabit-class cruise ship connectivity, Anuvu has continuously invested in new technologies to keep pace with end-user expectations. We recognize the importance of reliable, fast, global connectivity for our customers around the world. Our hybrid network, consisting of high-throughput geostationary satellites and 4G/5G mobile connectivity, builds on the industry's first and most capable SD-WAN platform optimized for aviation and maritime applications.<br><br>**96%**<br>Anuvu's world satellite coverage<br><br>**1000+**<br>Aircraft connected - the largest domestic single-aisle fleet in the world<br><br>Source: https://www.anuvu.com/our-portfolio/connectivity. |